

**FILED**

OCT 1 9 2015

**Clerk, U.S. District and Bankruptcy Courts**

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DARREN R. VASATURO

502 SUN LOTUS IKEJI,

217 OWARICHO, NAKAGYOKU

KYOTO, JAPAN 604-0934

(81 75) 744-0833

Case: 1:15-cv-01736
Assigned To : Boasberg, James E.
Assign. Date : 10/19/2015
Description: Pro Se Gen. Civil  (F Deck)

VS.                                    CIVIL ACTION NO. (                    )

**Suspected CIA Officers:**

Sasha Peterka (appears to have changed name to "Mira Peterka")

     379A 12th Ave.

     San Francisco, CA 94118



RECEIVED
Mail Room

OCT 1 3 2015

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

Jamie Roughan

#501 Kaneko Building

Shiba 2-26-8, Minato-ku

Tokyo 105-0014, Japan

Glenn Paquette

3836 NE 93rd St.

Seattle, WA 98115

Anthony Blackman

Ei Ei Go

103 Neverland Momoyama

136-1 Nayamachi, Fushimiku

Kyoto 612-8363, Japan

David J. Dalsky

Kyoto University (i-ARRC)

Institute for Liberal Arts and Sciences

Yoshida Nihonmatsu-cho, Sakyo-ku,

Kyoto 606-8501, Japan

A.J. Dickinson

Rengezo Apt. 9, 4F

Shogoin, Sakyoku

Kyoto 606-8357, Japan

Dan Douglass (sued in official and individual capacities)

Litigation Division

Office of General Counsel

Central Intelligence Agency

Washington, D.C. 20505

Eric Bray

46-2 Tokiwagicho

Ebisugawa-agaru Teramachi,

Nakagyoku, Kyoto, 604-0915

Dawn E. O'Day

Department of First Foreign Languages

Kyoto Prefectural University of Medicine

Kajii-cho, Kawaramachi-Hirokoji, Kamigyo-ku,

Kyoto 602-8566, Japan

Michael Wessel

1725 Butler Ave

Los Angeles, CA 90025-4162

Peter Laverne

201 W 94th St

New York, NY 10025-6938.

Yahiya Abdelsamad

8401 Main St Apt 119

Jamaica, NY 11435-1707

Seth Yarden

31 Concord Ave Apt 13,

Cambridge, MA 02138

Preston Houser

Preston Houser

Department of English Literature

Koyama-Kamifusacho

Kyoto 603-8143, Japan

Bruce W. Taylor

1036 Cassia Way

Sunnyvale, CA 94086-8207

Sean Lotman

322 Niomontsukinukecho

Nakagyoku,

Kyoto 604-0841, Japan

Colin Zimbleman

109 Arcade Dr.

Ventura, CA 93003

**Suspected CIA officers with official cover as Foreign Service Officers:**

Gary Schaefer (CIA/DOS: sued in official and individual capacities)

Litigation Division

Office of General Counsel

Central Intelligence Agency

Washington, D.C. 20505

Marc Snider (CIA/DOS: sued in official and individual capacities)

Litigation Division

Office of General Counsel

Central Intelligence Agency

Washington, D.C. 20505

Sylbeth Kennedy (CIA/DOS: sued in official and individual capacities)

1550 Clarendon Blvd Apt 713

Arlington, VA 22209

**Appointed Officials:**

John Brennan (Director of CIA: sued in official and individual capacities)

Litigation Division

Office of General Counsel

Central Intelligence Agency

Washington, D.C. 20505

David Petraeus (Former Director of CIA: sued in official and individual capacities)

Litigation Division

Office of General Counsel

Central Intelligence Agency

Washington, D.C. 20505

Eric Holder (DOJ: Former Attorney General: sued in official and individual capacities)

Attorney General of the United States

U.S. Department of Justice

950 Pennsylvania Avenue

Washington, D.C. 20530

Mark Kappelhoff (Deputy Assistant Attorney General for the Civil Rights Division,

DOJ: sued in official and individual capacities)

U.S. Department of Justice

950 Pennsylvania Avenue

Washington, D.C. 20530

Michael Rogers (Director of NSA: sued in official and individual capacities

National Security Agency

Fort Meade

MD 20755-6711

**DOJ Employee:**

Kevin Callahan (paralegal in the Civil Rights Division: sued in official and individual

capacities)

U.S. Department of Justice

950 Pennsylvania Avenue

Washington, D.C. 20530

**Departments and Agencies of the Executive Branch:**

Central Intelligence Agency

Central Intelligence Agency

Washington, D.C. 20505

United States Department of Justice

950 Pennsylvania Avenue, NW

Washington, DC 20530-0001

United States Department of State

2201 C Street NW

Washington, DC 20520

National Security Agency

Fort Meade

MD 20755-6711

**Other:**

Congresswoman Barbara Lee

1301 Clay Street Suite 1000-N

Oakland, CA 94612

Believed to reside in the Oakland, CA, and Washington, DC areas

Elaine P. McKellar (former case worker on the staff of Congresswoman Lee)

1664 Eisenhower St

San Mateo, CA 94403-1046

# TABLE OF CONTENTS

| Title | Page |
|-------|------|
| Complaint | 11 |
| I. Parties | 11 |
| II. Jurisdiction and Venue | 17 |
| III. Operable Facts | 21 |
| IV. First Cause of Action (Bivens 1) | 44 |
| V. Second Cause of Action (Conspiracy) | 48 |
| VI. Third Cause of Action (Honest Services Fraud) | 115 |
| VII. Fourth Cause of Action (Bivens 2) | 132 |
| VIII. Fifth Cause of Action (Bivens 3: Monell 1) | 134 |
| IX. Sixth Cause of Action (Bivens 4: Monell 2) | 173 |
| X. Seventh Cause of Action (Obstruction Of Justice) | 177 |
| XI. Eighth Cause of Action (Bivens 5) | 194 |
| XII. Relief Requested | 224 |

COMPLAINT

(For Damages for Violations of Civil Rights, Violations of Honest Services Fraud,

Obstruction of Justice, and Request for Jury Trial)

I

PARTIES

1. Plaintiff Darren R. Vasaturo, is and was at all times mentioned herein, a

private American citizen residing in Kyoto, Japan. Plaintiff has resided in Japan since

1997, holds permanent residency status in Japan, and is married to a Japanese national

with whom he has two children, ages 2- and 4-years-old.

2. Defendant Sasha Peterka (hereinafter "Peterka") is a suspected officer in the

Central Intelligence Agency (hereinafter "CIA") who is believed to reside in the

Berkeley, CA, and Lawrence, KS areas.

3. Defendant Jamie Roughan (hereinafter "Roughan") is a suspected officer in

the CIA who is believed to reside in the Tokyo, Japan, and Chiba, Japan areas.

4. Defendant Glenn Paquette (hereinafter "Paquette") is a suspected CIA officer who is believed to reside in the Seattle, WA area.

5. Defendant Anthony Blackman (hereinafter "Blackman") is a suspected CIA officer who is believed to reside in the Fushimi area of Kyoto, Japan.

6. Defendant A.J. Dickinson (hereinafter "Dickinson") is a suspected CIA officer who is believed to reside in Kyoto.

7. Defendant David J. Dalsky (hereinafter "Dalsky") is a suspected CIA officer who is believed to reside in Kyoto, Japan.

8. Defendant Dan Douglass (hereinafter "Douglass") is a suspected CIA officer who is believed to reside in Kyoto, Japan, and perhaps Jacksonville, FL.

9. Defendant Eric Bray (hereinafter "Bray") is a suspected CIA officer who is believed to reside primarily in Mie, Japan, while maintaining a house in Kyoto.

12

10. Defendant Dawn E. O'Day (hereinafter "O'Day") is a suspected CIA officer who is believed to reside in Kyoto.

11. Defendant Michael Wessel (hereinafter "Wessel") is a suspected CIA officer who is believed to reside in Los Angeles, CA.

12. Defendant Peter Laverne (hereinafter "Laverne") is a suspected CIA officer who is believed to reside in New York, NY.

13. Defendant Yahiya Abdelsamad (hereinafter "Abdelsamad") is a suspected CIA officer who is believed to reside in Jamaica, NY.

14. Seth Yarden (hereinafter "Yarden") is a suspected CIA officer who is believed to reside in Cambridge, MA.

15. Defendant Preston Houser (hereinafter "Houser") is a suspected CIA officer who is believe to reside in the Kyoto, Japan area.

13

16. Defendant Bruce W. Taylor (hereinafter "Taylor") is a suspected CIA officer who resides in Sunnyvale, CA.

17. Sean Lotman (hereinafter "Lotman") is a suspected CIA officer who is believed to reside Los Angeles, CA, in the United States, and in Kyoto, Japan.

18. Colin Zimbleman (hereinafter "Zimbleman") is a suspected CIA officer who is believed to reside in Carpinteria, CA in the United States, and in Kyoto, Japan.

19. Defendant Gary Schaefer (hereinafter "Schaefer") is a suspected CIA case officer who is last known to have resided in Tokyo while serving as the Political Officer at the U.S. Embassy.

20. Defendant Marc Snider (hereinafter "Snider") is a suspected CIA case officer whose residence and whereabouts are unknown to Plaintiff.

21. Defendant Sylbeth Kennedy (hereinafter "Kennedy") is a suspected CIA

14

case officer whose.

22. Defendant John Brennan is the Director of the CIA, and is believed to reside in the Washington, DC area.

23. Defendant David Petraeus (hereinafter "Petraeus") is a former Director of the CIA, and is believed to reside in the New York, NY area.

24. Defendant Eric Holder (hereinafter "Holder") is a former U.S. Attorney General, and is believed to reside in Flushing, NY, or the Washington, DC area.

25. Defendant Mark Kappelhoff (hereinafter "Kappelhoff") is a Deputy Assistant Attorney General in the Civil Rights Division of the DOJ, and is believed to reside in the Washington, DC area.

26. Defendant Michael Rogers (hereinafter "Rogers") is the Director of the NSA, and is believed to reside in the Washington, DC area.

27. Defendant Kevin Callahan (hereinafter "Callahan") is a paralegal in the Civil Rights Division of the U.S. Department of Justice (hereinafter DOJ), and is believed to reside in the Washington, DC area.

28. The United States Central Intelligence Agency

29. The United States Department of Justice

30. The United States Department of State

31. The United States National Security Agency

32. Congresswoman Barbara Lee is a member of the House of Representatives of the United States Congress, and is believed to reside in Oakland, CA.

33. Elaine McKellar (hereinafter, "McKellar) is a retired case worker from the staff of Congresswoman Barbara Lee, and is believed to reside in San Mateo, CA.

34. Plaintiff believes that other Federal agents, officers, and employees assisted and/or aided and abetted the named Defendants or further participated in the unlawful conduct complained of herein, and Plaintiff will seek leave to amend this complaint to add the names of those persons once the same become known to Plaintiff through discovery.

II

JURISDICTION AND VENUE

35. This suit is brought pursuant to the Fourth Amendment of the United States Constitution under the authority of *Bivens (Bivens v. Six Unknown Named Agents Of The Federal Bureau Of Narcotics* (1971), 403 U.S. 388) allowing a personal civil suit brought by Plaintiff's aggrieved by Fourth Amendment violations by Federal agents and officers acting under color of law.

36. This suit is also brought pursuant to pursuant to the Fifth Amendment of the United States Constitution and the Fourteenth Amendment of the United States

Constitution under the authority of *Bivens* allowing a personal civil suit brought by Plaintiffs aggrieved by Fifth Amendment violations and Fourteenth Amendment violations committed by state actors (i.e., Federal agents and officers) under color of law.

37. Further, this suit is also brought pursuant to the Fourth Amendment of the United States Constitution, the Fifth Amendment of the United States Constitution, and the Fourteenth Amendment of the United States Constitution under the authority of *Bivens* allowing a personal civil suit brought by Plaintiff's aggrieved by Fourth Amendment violations, Fifth Amendment violations, and Fourteenth Amendment violations facilitated or caused by official policy, custom or practice, as presented in the form of *Monell* claims (Monell v. Department of Soc. Svcs., 436 U.S. 658 (1978)).

38. Still further, this suit is also brought pursuant to the Fifth Amendment of the United States Constitution and the Fourteenth Amendment of the United States Constitution under the authority of *Bivens* allowing a personal civil suit brought by Plaintiff's aggrieved by violations of Plaintiff's rights to procedural due process and substantive due process secured by the Fifth Amendment of the U.S. Constitution and

Fourteenth Amendment of the U.S. Constitution facilitated or caused by official policy, custom or practice, as presented in the form of *Monell* claims.

39. Moreover, this suit is further brought pursuant to 18 USC 1341, 18 USC 1342, 18 USC 1343, 18 USC 1346, and 18 USC 1349 with respect to the corresponding unlawful conduct of federal officials in at least two, and more likely three to four, federal departments and agencies, including the DOJ, the CIA, the NSA, and the DOS that have, through fraudulent misrepresentations and the like, violated Plaintiff's right and entitlement to receive honest services from public officials as protected by said statutes.

40. Further, this suit is brought pursuant to 18 USC § 1512 and 18 USC § 1514 with respect to both tampering with Plaintiff as a victim of violations of rights protected by the U.S. Constitution by CIA officers as well as harassment of Plaintiff as a victim of violations of rights protected by the U.S. Constitution by CIA officers and their proxies conducting covert operation in Kyoto, Japan; in addition, this suit is also brought pursuant to pursuant to 18 USC 1505 and 18 USC 1519 in conjunction with other aspects related to Obstruction of Justice by federal officials that have violated Plaintiff's

rights protected by said statutes.

41. In addition, this suit is brought pursuant to the First Amendment of the

United States Constitution and the Ninth Amendment of the United States Constitution

under the authority of *Bivens* allowing a personal civil suit brought by Plaintiff's

aggrieved by First Amendment violations and Ninth Amendment violations committed

by Federal agents and officers acting under color of law.

42. Thus, this suit involves a Federal question (28 USC § 1331) and questions

arising under the United States Constitution and laws of the United States. Here, it

further bears noting that the right to judicial review of the unlawful actions of the

federal agencies and officials and employees thereof in question as described herein is

also provided for under title 5 of the United States Code section 702.

43. Venue is appropriate in the District of Columbia, where a number of the

Defendants are believed to reside, which is also the location of the DOJ and nearby the

headquarters of the CIA and NSA, where one or more of the acts alleged herein took

place.

44. If it is determined that venue lies in some other Federal Court in the United

States, then the matter should be transferred to that District Court pursuant to 28 USC §

1406(a).


III

OPERABLE FACTS


45. Plaintiff Vasaturo is an American citizen that served in the U.S. Army

Signal Intelligence Corps as a Voice Intercept Operator qualified in the Korean

language for four years (active duty), during which time Plaintiff held a TS/SCI security

clearance.


46. After receiving an honorable discharged from the army, Plaintiff re-entered

college at the University of California, Berkeley, in January 1987, where he became

acquainted with two of the named defendants and others, and completed the

requirements for a Bachelor's degree in Interdisciplinary Studies in Social Sciences in

21

1994 with a focus on East Asian history and politics; more specifically, 20th century

developments with a focus on Korea as a concrete historical example against which to

apply a theoretical framework encompassing "modernity and identity".

47. In light of the inevitable further disclosure of the identities of covert CIA

officers, "intelligence sources and methods" and the like, Plaintiff requests, in advance,

that the Honorable Court adopt CIPA-like procedures for conducting the proceedings of

this civil action, as per the precedent set by the decision of the appeal to the D.C. Circuit

Court (CASE NO. 09-5311) in relation to the Richard A. Horn v. Arthur Huddle case

heard before this Honorable Court (CASE NO. 1 : 94-CV-0 1756-RCL).

48. Plaintiff is not aiming to expose legitimate national security information

falling outside of the purview of the likes of the information he has posted on his blog

(started in 2010, "Kyoto inside out": http://kyoto-inside-out.blogspot.jp/) in relation to

events and persons that have had a direct impact on his life or are engaged in covert

operations that pose a direct or indirect threat to the plaintiff and his family as well as

civil society in Kyoto, Japan, at large.

49. The incidents detailed in this Complaint are not considered by Plaintiff to represent legitimate national security information, but federal crimes and/or tortious acts committed in violation of the U.S. Constitution and clearly established law by rogue CIA officers and other federal officers, agents, and employees. Furthermore, official policies, customs, and practices that have been implemented by respective federal departments and agencies of the Executive Branch of the U.S. government are implicated in facilitating the commission of such crimes and/or tortious acts among those described herein. Plaintiff understands that the identities of covert CIA officers are classified and that such state secrets are at issue, wherefore Plaintiff has proposed, in advance, the adoption of CIPA-like procedures; however, Plaintiff is also aware of the fact that the People need to be kept well informed of the activities of Their government.

50. Plaintiff has submitted Privacy Act requests to the CIA and NSA that have been denied on the basis of national security exceptions. Plaintiff also has a Privacy Act request pending with DOS (Case Control Number P-2014-09239), which is projected to be finalized in September 2015. Plaintiff also submitted a Privacy Act request to the DOJ and received a packet of documents in response thereto; however, said packet of documents consisted solely of documents that the plaintiff himself had faxed to the DOJ,

absent the emails Plaintiff had sent to the Special Litigation Department, some of which

were subsequently received via a further request. The DOJ disclosed no information

related to its internal procedures and actions taken in the processing of the complaint

Plaintiff submitted to the Civil Rights Division of the DOJ.


51. Peterka was an acquaintance of Plaintiff's from UC Berkeley. In 2001 or

thereabouts, Plaintiff moved into the Villa Tonodan apartment building, which he later

came to understand was densely populated with intelligence officers, who accounted for

approximately 50% of the total occupancy.


52. One day while Plaintiff was in Berkeley during a visit to the USA, in 2001

or thereabouts, Peterka showed up in the Whole Foods market, and we exchanged email

contacts. As Peterka was in graduate school at UC Berkeley at the time, Plaintiff did not

find it exceedingly unusual to bump into Peterka by coincidence at a shopping center

near the campus. Peterka next contacted Plaintiff a couple of years later out of the blue,

and said he was planning to visit Japan. Plaintiff had some space at his apartment, so

Plaintiff invited Peterka to stay at his place when he visited Kyoto.

53. Peterka told Plaintiff he was coming to Japan to visit some friends in Tokyo, including another individual from Berkeley named Robert, whose last name Plaintiff can't recall but who had been employed at Lehman Brothers in Tokyo before the crash and had majored in Japanese at UC Berkeley. Plaintiff became acquainted with Robert through Peterka and in relation to taking the Japanese Language proficiency test around the year 1999 or 2000, but had not known him at UC Berkeley. The other individuals Peterka was visiting in Tokyo were employed at Goldman Sachs, and Plaintiff does not know how he was connected to those people, though Plaintiff subsequently came to suspect that an individual named John to whom he introduced me was a CIA officer. Peterka told me that John had worked in the architectural field in Hong Kong before leaving to join Goldman Sachs in Tokyo, where he was engaged in evaluating commercial real estate investment opportunities for the firm.

54. Roughan was also an acquaintance of Plaintiff's from UC Berkeley. Roughan showed up at a bus stop in Kyoto, in another apparent coincidence, though one which Plaintiff did register as unusual. We exchanged contact information, and would socialize when Roughan visited Kyoto occasionally. He had also asked Plaintiff to do some short translation projects for his employer, Mizuho Finance. Plaintiff did translate

a couple of short documents for which he requested translation. It should be noted that

Roughan had also told Plaintiff that he'd worked at Lehman Brothers and Nomura. Like

Peterka, Roughan tried to convince Plaintiff on more than one occasion that his fortune

awaited him in Tokyo, but Plaintiff made it amply clear that he wasn't interested in

returning to Tokyo. In fact, in an email from May 2009, Plaintiff explicitly wrote:

> "...thanks for mentioning the possibility of work at nomura, but i have
>
> no intention of relocating."

55. Plaintiff visited Roughan in Tokyo in 2008 during a trip to see Plaintiff's

music teacher perform at the National Theater with other top-level performers,

including one designated as a Living Cultural Treasure. During that trip Plaintiff stayed

at Roughan's place for one night, but the hospitality was somewhat cold comfort.

Moreover, though he'd ample space, he said that he couldn't lodge me for more than

one night, which was fine, but Roughan seemed to suddenly be acting somewhat out of

character. Everything about the interaction during that trip, starting with the continued

sales pitch to Plaintiff on Tokyo coupled with the less-than-welcoming hospitality, had

seemed incongruous.

56. Plaintiff notes in passing that during that visit to Tokyo he also had dinner with a woman named Chie Yakura who had once been a romantic interest and is currently a partner at a large American law firm in Tokyo, and on the Bar in the state of New York. Plaintiff believes that she may be a CIA (or MI6) "asset", though she has refused to respond to Plaintiff's queries in relation thereto, choosing to remain silent.

57. Paquette and Falun Gong Mike were introduced to Plaintiff by Peterka at the Starbucks in Kyoto. Plaintiff has generally referred to Mike as "Falun Gong Mike" (in correspondence to the American Consulate in Osaka (hereinafter "Consulate", on Plaintiff's blog, etc.) because Plaintiff doesn't know (or recall) "Mike's" last name, and in light of the fact that Mike practices Tai Chi by the river and once defended Falun Gong as an organized religion or the like at the Starbucks on an occasion when a young American who was handing out flyers promoting Falun Gong handed on to Plaintiff which became a subsequent topic of café conversation. Mike has mentioned that he spends time in Vietnam.

58. Asaho Kudo (hereinafter "Kudo") is a former girlfriend of Plaintiff's who is

suspected of having been recruited by the CIA (most likely Peterka) and deployed

against Plaintiff years later in a scheme to undermine Plaintiff's life in Kyoto, said

scheme constituting one episode in a continuum comprising related schemes all having

the objective of displacing Plaintiff from Kyoto.

59. Prior to lodging a complaint with the American Consulate in Osaka,

Plaintiff submitted an online application to the CIA offering to serve as an independent

contractor, stipulating the condition that he would maintain continuity in the lifestyle

he'd been leading, and not interrupt or undermine the various scholarly and cultural

pursuits in which he was actively engaged.

60. The decision to submit the application was not made out of the blue, that is

to say, without prompting, but on the basis of prompting in the form of a surreptitious

intimation by Paquette that he was acquainted with a close friend of Plaintiff's whom

Plaintiff did, in fact, assume had entered the CIA. That friend (to be named in a

subsequent sealed filing) had visited Plaintiff in Japan in the year 1998 or 1999 while

Plaintiff was living in Tokyo. After the problems with CIA officers in Kyoto escalated to

the point of my having to report them to the DOJ, Plaintiff cc'd said friend's old

Hotmail account a number of emails sent to the Consulate and the DOJ. It appears that

he deactivated that Hotmail account within a year or so after the first such cc'd email.


61. In retrospect, it has become clear that Paquette may have had more than one

motivation for encouraging Plaintiff to submit an application to the CIA; in particular,

with respect to the electronics communications provisions related to applicants for

employment with the CIA found in Executive Order 12333 (hereinafter "EO12333"),

and triggering a clause therein that could be seen to authorize electronic eavesdropping

and the like against Plaintiff.


62. After Plaintiff submitted the aforementioned application, he received no

reply from the CIA, which wasn't surprising. However, it was not clear to Plaintiff what

the actual disposition of the CIA was in light of developments on the ground, which

oscillated between the projection of empathy from CIA officers and positive signs that

there might be an effort being made to integrate Plaintiff into the local intelligence

network, on the one hand, and continued harassment, on the other.


63. The first evidence of a concrete example demonstrating that such

oscillation had been adopted as a tactic by the rogue CIA officers against Plaintiff after

he'd submitted the application to the CIA is found in emails exchanged during

Plaintiff's interaction with Blackman. Blackman was an American teaching English

whom Paquette introduced to Plaintiff with a subterfuge related to translation work.

Blackman had claimed to be running a translation company called TSA Translations

(listed on old LinkedIn page), which Plaintiff eventually learned didn't exist. That

represented the first blatant falsehood to be exposed in the ruse, which was intended to

interfere with Plaintiff's pursuit of a lawful livelihood, and cause Plaintiff to uselessly

expend time and effort in pursuit of a fraudulently represented non-existent enterprise.

64. The collaborative effort between Paquette and Blackman to entangle

Plaintiff in a humiliating and demoralizing pursuit of a fraudulent offer of work

represents the first incident with respect to which Plaintiff presented material evidence

(i.e., the aforementioned emails) to U.S. government officials demonstrating that rogue

CIA officers were harassing him, with the ultimate aim of displacing him from Kyoto.

There is no possibility that the acts involved could be construed to be part of a

recruiting process by the CIA; they can only be construed as an unwarranted intrusion

and harassment.

65. Having already endured several years of harassment, and receiving no response from the CIA to the online application after five months, the collaborative harassment operation by Paquette and Blackman made it clear that Plaintiff would have to lodge an official complaint of some sort to forestall further trouble.

66. Plaintiff decided to telephone the American Consulate in Osaka to make an appointment to meet personally with consular officials to lodge the complaints, and met with Schaeffer, who represented himself as the Chief of the American Citizen Services Section, at the Consulate in or around the first week of September 2009, as is evident from follow-up emails Plaintiff sent to Schaeffer as well as Schaefer's eventual reply.

67. Before continuing, it bears noting that on two occasions Plaintiff was driven to the point of resorting to making allusion to violence to Paquette due to Paquette's incessant harassment of Plaintiff at the Starbucks. Plaintiff did report that, even exaggerated it, to the Consulate. As an example of the sort of behavior at issue in terms of harassment, Plaintiff quotes a passage from an email he sent to the Schaeffer et al. on January 7, 2011:

This particular action relates to a series consisting of a first occasion when he basically insinuated that I was a latent homosexual, and on another occasion during a brief conversation with him and Falun Gung Mike that occurred while I was waiting to receive a coffee at the Starbucks. During that conversation he mentioned the gays in San Francisco, asking me if I'd ever had any problems with them. I replied that I hadn't, for the most part, as people basically had a live and let live attitude there. He then asserted that Mike had been accosted by some gays in San Francisco, to which Mike gave him a sidelong glance, with no reply. This happened around a time when the yakuza had basically stopped sending hostess types to the cafe to try to lure me out, and were instead sending people to occupy seats next to me and harass me, males exhibiting what could only be described as behavior and body language intended to be homo-erotic.

What Mr. Paquette intended to insinuate, I gather, was that I was in danger of being assaulted by the males exhibiting homosexual tendencies he was sending to harass me in the cafe...

32

68. Schaeffer was not forthcoming with an email confirming the nature and content of our meeting. In fact, Plaintiff had to take the initiative and raise that point explicitly with Schaeffer, despairing of his non-responsiveness and imploring him to reply. Schaefer did eventually reply, stating:

> *"Rest assured that I have taken your concerns on board and will pass them on through the appropriate channels".*

69. During the meeting with Schaeffer Plaintiff mentioned incidents such as being set up to be physically attacked, in addition to those described above. We discussed other topics relevant to the instant case as well, such as the friend that Paquette had intimated he knew in order to encourage me to apply to the CIA.

70. In the numerous emails Plaintiff had occasion to send Schaeffer during his tenure as Chief of the American Citizen Services Unit at the American Consulate in Osaka, Plaintiff again mentioned having been physically assaulted, and Plaintiff indicated that he thought that the individuals he'd reported to Schaeffer needed to be

subjected to discipline by the (CIA) "IG". Plaintiff had been aware of the existence of

the existence of an administrative organ called the IG while serving in the Army.

Furthermore, Plaintiff sent Schaeffer a series of emails exchanged with Roughan

demonstrating that Roughan appeared to have access to information about Plaintiff that

he could have obtained through electronic eavesdropping or human intelligence

networks involved in physical surveillance of Plaintiff and his wife-to-be. That, in turn,

also indicated that previously.


71. Here, it should be noted that the above-described collaborative operation

between Paquette and Blackman as well as the repeated hostile actions of Roughan had

been allowed to continue despite Plaintiff's complaints to the Consulate, is are

representative of a recurrent pattern that has persisted into the present. There would be a

lull in harassment, leading me to believe that the complaint had been effective in

exposing wrongs that were corrected. There were also continual surreptitious signs that

maybe the CIA was about to make me an offer at any time, but


72. Over the years the CIA has continually introduced a succession of new

individuals into Plaintiff's immediate surroundings in a manner such as to establish a

quasi-cordial rapport with Plaintiff, implying that there was some process underway

toward reconciliation. Otherwise, given my complaints to the American Consulate, it

was more than obvious that Plaintiff wanted nothing to do with the CIA and considered

them hostile. Such individuals subsequently included Laverne (last emails 2013),

Dickinson (last emails 2010), Dalsky, Bray, and O'Day (last emails 2014)", all of whom

with Plaintiff exchanged emails on the basis of various pretenses presented by said

individuals socializing at Starbucks, which was meant to mislead Plaintiff while further

operations against him were being set in motion. Without exception, all of said

Defendants attempted to convince Plaintiff to leave Kyoto, in one way or another, often

with the implication that things were going to be tough for Plaintiff otherwise in a

hostile environment teeming with the CIA et al., aiming to recruit spies, etc., among the

Japanese citizenry at civil society venues frequented by Plaintiff.


73. Peterka introduced Plaintiff to Mike, who in turn introduced Plaintiff to

Paquette, Yoshiyuki, Motez, etc., at Starbucks (Sanjo-Ohashi location). Plaintiff was

subsequently set up to be attacked at a sports bar where he'd agreed to meet Yoshiyuki

for a drink. The attacker was subsequently purported to be a Moroccan by Douglass,

who seemed to be encouraging Plaintiff to aggressively pursue the incident as a conflict

needing to be resolved by vengeful violence. Plaintiff did visit the local 'police box',

accompanied by Yoshiyuki, after the manager at the bar had refused to call the police,

but Plaintiff relented with respect to filing a formal complaint when informed by the

police that he would have to go a hospital and get a medical report written up, etc.

74. The Starbucks is a social networking focus of the CIA et al., who for the

most part seemed conspicuously out of place in Kyoto, and had a lifestyle that permitted

them to frequent Starbucks every day and wither away the hours in glib conversation.

75. Plaintiff became acquainted with Dalksy at the nursery school in Plaintiff's

neighborhood where both our children were enrolled. Dalksy has a PhD in psychology

and teaches social psychology at Kyoto University. Plaintiff became acquainted with

Bray after Bray approached Plaintiff one day in the neighborhood in which both lived.

According to his resume, which is posted online, he has a BA in psychology, and a PhD

in education, and teaches English at a local college.

76. As an area specialist and Japanese-to-English translator, Plaintiff stood in

stark contrast to the sports-bar/college-fraternity group ethos being projected by the CIA

et al. at the Starbucks, none of whom were area knowledgeable of Japanese history, and

fewer than 10% of them were even fluent in spoken Japanese.

77. Accordingly, when Plaintiff had tried to socialize with the individuals at the

Starbucks that turned out to be CIA officers, it was clear that there was a disjuncture.

Plaintiff had already surmised that Peterka and the aforementioned individuals were

CIA officers, etc., but had not discerned what exactly their objectives were. Suffice it to

say that the dumb-it-down telos evident in the group ethos projected by the CIA et al. at

the Starbucks was palpably incongruent in the ancient cultural capital of Kyoto, which

has few cafes that stay open late and are well lit.

78. The fact that there was a religion angle being cultivated by the CIA et al.

came into stark relief when Plaintiff connected Preston Houser and John Dougill, whom

could then be found among the patrons of the Sanjo-Ohashi Starbucks, with articles they

had published in the Kansai Time Out (hereinafter "KTO"). They stopped frequenting

the Starbucks, however, after Plaintiff had questioned Dougill about an article he'd

published about a renowned rebel figure associated with the Meiji Restoration. Plaintiff

had read the seminal monograph (1961) on said figure (Sakamoto Ryoma) by deceased

Princeton professor Marius Jansen, a world-renowned historian of Japan, and

introduced that book to Dougill. After a brief discussion, during which Dougill

attempted to introduce notions associated with Shamanism—traces of which were also

evident in the article as well, in interpreting Japanese mythology—it soon became

apparent to Plaintiff that Dougill knew next to nothing about Japanese history. Any

student of Japanese history would have been familiar with the subject matter that the

CIA and MI6 were attempting to exploit in a preposterous manner for obvious and

extremely dubious political purposes. Such disinformation operations can hardly be said

to be "covert", except insofar as they are not acknowledged to be the product of the

government of the United States and its closest Western allies disseminated through

jointly produced and distributed local English media publications. In any case, Plaintiff

had made the purported authors of such disinformation aware of the fact that he knew

they were imposters disseminating propaganda.


79. In passing, Plaintiff notes that in an email (January 10, 2008) Roughan

mentioned a book about Sakamoto Ryoma by Romulus Hillsborough, who baldly

declares that it is, "*the only biographical novel in English about this charismatic leader

of the samurai revolution (i.e., Meiji Restoration)*". Plaintiff owns a copy and had

deduced that the author was CIA, and his book a form of disinformation aimed at

countering the biography of the internationally renowned scholar Jansen. The small

publisher, Ridgeback Press, has released a only a handful of works, including one by the

owner

(http://www.amazon.com/Stephen-R.-Redmond/e/B001K8WPMM/ref=ntt_dp_epwbk_

0). And several by Hillsborough on the theme of military adventurism and samurai.


80. Yarden is an individual that Plaintiff met in Plaintiff's old neighborhood,

which was not far from where Yarden resided.


81. More recently, Plaintiff was contacted by suspected CIA officer

psychologist Zimbleman—via his wife, Misaki Inaoka (hereinafter, "Inaoka")—and

invited to participate in a literature discussion group (the "Monkey Shoulder Gang",

named after a whisky bottle; hereinafter "MSG") including a number of suspected CIA

et al. officers, some of whom Plaintiff had already blogged about.


82. The first such individual is Zimbleman's brother-in-law, Lotman, about

whom Plaintiff posted a blog entry two years ago

(http://kyoto-inside-out.blogspot.jp/2013/05/who-is-sean-lotman-just-some-connected.h

tml), suspecting him of being a CIA officer in response to an unduly high-profile in the

media, including a piece in the Japan Times (i.e., a promotional article written by

another suspected CIA officer, Kris Kosaka (hereinafter, "Kosaka"), lauding Lotman's

essentially non-existent accomplishments as a writer), and the sudden appearance of a

contingency of similarly disposed people (style- and attitude-wise, a veritable affinity

group) on the streets of Plaintiff's neighborhood. Other members of the group on the

mailing list include additional suspected intelligence officer Canadian, Eric Luong,

(hereinafter, "Luong"), about whom Plaintiff has blogged, and suspected CIA asset

Ariya Sasaki (hereinafter, "A. Sasaki"), whom has been on Plaintiff's radar in

association with suspected CIA fronts in the area as well as her association with Luong

(http://www.pechakucha.org/presentations/debunking-kyotos-myths). Since Plaintiff

started blogging about Sasaki, her information has been removed from this page

(archived:

http://web.archive.org/web/20150510162638/http://www.pechakucha.org/cities/kyoto).

83. Another individual on the list, suspected CIA officer Mike Barr (hereinafter,

"Barr"), has appeared in the event called "The Flame" held at a suspected CIA-front

café named Papa John's operated by suspected CIA officer Charles Roche (hereinafter

"Roche") that serves as an venue for promotes Western intelligence officers stationed in

Kyoto, including 'Day, for example, and about which Plaintiff has blogged

(http://kyoto-inside-out.blogspot.jp/2015/01/the-flame-brought-to-you-by-charles.html).


84. In fact, many of the above-described individuals were first encountered at

one of two Starbucks that Plaintiff frequents. The above-mentioned individuals all

evidenced a degree of frustration with regard to Plaintiff's presence at Starbucks. On the

other hand, unlike other suspected CIA officers that would simply leave, the

above-named individuals not only persisted in coming to the café but of doing things

like advising me against suing the government of the United States, for example

(O'Day), in or around November 2014.


85. Another recent incident involved a somewhat hostile exchange about

Chinese medicine with Dickinson, who had (mis)represented himself as a former

university teacher that taught aspiring medical students at medical schools about

traditional Chinese medicine. An individual named Peter (last name unknown) that had

recently appeared on the scene and described himself as a "medical anthropologist" was

present at the exchange, which exposed the subterfuge engaged in by AJ Dickinson and

a couple of other CIA officers passing themselves of as esoteric wise men, shamans, etc.


86. Peter was an articulate individual, and his story believable, but his

credibility was undermined when he attempted to support Dickinson's cover story by

pretending to acknowledge Dickinson's stature in academia in the relevant field.

Plaintiff had long since looked into Dickinson's background on the Internet and

ascertained that the academia story was suspect, to say the least, as there was not a

single mention of an "AJ Dickinson", etc., in relation to said topics. Plaintiff

subsequently described Peter in a report to the Consulate, and all of the above-named

individuals, in addition to suspected CIA officer Kevin Turner, whose online

pseudo-shamanism CIA-front Plaintiff had long since discovered. Plaintiff eventually

posted a blog entry exposing the CIA's secret society metaphysical charlatanism in

Kyoto called "Why I have written about secret societies in conjunction with intelligence

agencies", briefly examining Dickinson's presentations to the esoteric San Francisco

Rosicrucian Society, Turner's shamanism, a KTO article about Freemasonry, etc.


87. Plaintiff would have thought that such individuals such as Dickinson and

Mike (whom Plaintiff has posted a photo of on his blog) should have been removed from Plaintiff's surroundings immediately after he'd complained to the Consulate, but that was not the case. Circumstances compelled Plaintiff to escalate the complaints, and eventually raise his concerns in a letter to President Obama, followed by a couple of emails to the White House.

88. Plaintiff has come to understand that the Starbucks at Sanjo-Ohashi in Kyoto has been the epicenter of Western intelligence agency efforts to recruit Japanese as spies in Kyoto to act against their own society and country, which Plaintiff now makes his home.

IV

FIRST CAUSE OF ACTION

(*Bivens* 1: Fourth Amendment of the United States Constitution)

89. Plaintiff incorporates herein as though fully set forth, all of the allegations

43

contained in paragraphs 1 through 89, above, as though fully set forth.

90. All of the actions and activities taken by the Defendants were taken under color of law and were without lawful authority and were accomplished in violation of clearly established law.

91. The unlawful interception of Plaintiff's electronic communications and/or the dissemination thereof, all of which were performed without Plaintiff's permission, in addition to the unlawful dissemination of information gathered through human intelligence networks, which were presumably involved in providing for the physical protection of Plaintiff and his family (including Plaintiff's wife-to-be, who was pregnant with their first child at the time of the illicit contact from Roughan), violated Plaintiff's rights protected under Fourth Amendment of the U.S. Constitution.

92. As a result of the unlawful misconduct by the Defendants, Plaintiff has suffered humility, embarrassment, loss of personal privacy, emotional distress, and is entitled to compensatory damages in an amount according to proof, but in excess of the minimal amount for this Court's jurisdiction. The Defendants acts were willful,

malicious and intentional entitling Plaintiff to punitive damages.

93. Plaintiff's computer has been hacked a number of times, causing the loss of

data, damage to hard disk drives, etc. Some of the email exchanges between Plaintiff

and Paquette, some of said exchanges discussing the CIA, were deleted from Plaintiff's

Hotmail email account, presumably in conjunction with said hacking. Such deletions are

tantamount to the premeditated destruction of evidence that would be important to a

subsequent investigation or the like related to the allegations against Paquette et al. set

forth in this Complaint, and therefore represent a violation of 18 USC 1519 against

tampering with evidence, in addition to violating Plaintiff's rights protected by the

Fourth Amendment of the U.S. Constitution.

94. Plaintiff has studied EO12333 and discerned therein two authorities that the

government could possibly cite as basis for legitimating the interception of Plaintiffs

electronic communications and the carrying out of physical surveillance of Plaintiff and

his family. However, even assuming that a limited scope of authorities under EO12333

were applicable, the text of EO12333 explicitly prohibits the diversion for unlawful use

of information obtained under the authority thereof, as set forth in section 2.4 *Collection*

*Techniques.* Thus, any unlawful diversion and use of such information would constitute

a violation of the Plaintiff's rights protected under Fourth Amendment of the U.S.

Constitution.


95. Roughan had contacted Plaintiff after approximately a year without contact

(yet another coincidence?) by email at a timing shortly after Plaintiff's then girlfriend

had become pregnant with our son and visited the neighborhood maternity clinic a

couple of times. In said email, Roughan informed Plaintiff that Roughan's wife was

pregnant and due to deliver in a couple of months. Plaintiff was suspicious of

Roughan's contact, having already reported Roughan to the Consulate, and did not

inform Roughan that Plaintiff's girlfriend was pregnant.


96. Next, Roughan sent a second email, but there was a substantial discrepancy

between the time frame described in his first email and the timing at which he reported

his wife as entering the hospital for delivery. Plaintiff considered that to confirm his

suspicion that Roughan had unlawfully gained access to information about Plaintiff's

private life, and that his purpose of contacting Plaintiff was to ply Plaintiff for further

information in a manner that can only be described as attempting to "spy" on Plaintiff.

What Roughan specifically thought he stood to gain thereby is unclear; however,

Roughan had given Plaintiff the strong impression that he yearned to live in Kyoto.


97. Here, it need to be pointed out that there would be no reason whatsoever for

Roughan to have access to information pertaining to Plaintiff obtained through

interception of electronic communications or physical surveillance of Plaintiff under

EO12333. Roughan was not involved in the physical surveilling of Plaintiff for

providing physical protection, nor would he have had any connection to Plaintiff's

application for employment with the CIA, which Plaintiff considered to have been

rejected at that point. Plaintiff assumes that Roughan acted on his own in his individual

capacity as a rogue CIA officer colluding with other rogue CIA officers in violating

Plaintiffs rights protected under the Fourth Amendment of the U.S. Constitution.


99. Plaintiff further assumes that there are reasonable limits to the respective

time frame of each applicable clause of EO12333, particularly with respect to the clause

related to applicants for employment with the CIA. Plaintiff has declared in emails to

Schaeffer et al. his intention to withdraw said application. The text of EO12333

explicitly states that the stipulations set forth therein are not intended to serve as

47

justification for violating the Constitution of the United States of America.

99. It bears emphasizing here that some of the events described above occurred: after Kudo, who'd been recruited by the CIA as an agent and deployed to act against Plaintiff, had become pregnant (with Plaintiff's child) and unilaterally decided to undergo an abortion; and after Plaintiff had already reported Roughan to the American Consulate in Osaka as a rogue CIA officer harassing Plaintiff. Plaintiff assumes that he should not have been contacted again by Roughan after lodging such a complaint against him through official government channels. The authority of *Bivens* enables a private action to be brought with respect to such violations.

100. Plaintiff Vasaturo is also entitled to court costs as well as reasonable attorneys' fees, should he henceforth be represented by legal counsel in the course of this civil action.

V

SECOND CAUSE OF ACTION

(Conspiracy)

101. Plaintiff incorporates herein, as though fully set forth, all of the allegations

contained in paragraphs 1 through 101, above, as though fully set forth.

102. It was not, in fact, a coincidence that Peterka appeared one day while

Plaintiff was visiting Berkeley and subsequently made several trips to Japan while still a

graduate student at UC Berkeley, ostensibly, to visit his friends at Goldman Sachs in

Tokyo and Plaintiff in Kyoto. Plaintiff has supplied an email (with header information)

to the CIA/OIG from 2003 in which Peterka gave Plaintiff directions to the residence in

Tokyo of his friends working at Goldman Sachs.

103. Similarly, it was not by coincidence that Roughan appeared at a Kyoto bus

in Plaintiff daily sphere of activity while visiting in or around 2004. After exchanging

contacts and socializing, Roughan eventually requested Plaintiff to do some translation

work for Mizuho Finance—Roughan's employer at the time—toward the end of 2005

or thereabouts. Plaintiff does not know when the conspiracy to displace him from Kyoto

was launched or by whom, but Peterka appeared probably within a year (or two) of

Plaintiff's moving into the centrally located apartment building called Villa Tonodan

(recently demolished), which included a large number of intelligence officers among the

residents. Plaintiff may seek leave to amend the complaint in relation to the conspiracy

on the basis of evidence revealed during discovery.

104. The severally named CIA "field officers" (i.e., covert CIA officials

without official cover and diplomatic immunity), including Peterka, Roughan, Paquette,

Blackman, etc., conspired among themselves and with others to undertake actions

intended to undermine Plaintiff's ability to lead a productive life in Kyoto, targeting

Plaintiff's social life as well as livelihood, and thereby violated Plaintiff's privacy and

liberty interests protected by the Fourth Amendment, the Fifth Amendment, and the

Fourteenth Amendment of the Constitution of the United States of America (*Griswold v.*

*Connecticut*, 381 U.S. 479).

105. Plaintiff suspects that Peterka recruited Kudo, to whom Plaintiff had

introduced along with her brother (vising from the UK) before she moved to Tokyo,

whereupon Peterka exchanged contact information with one or both of them. Kudo was

subsequently deployed (years later) in an operation aimed at breaking up a somewhat

long-term relationship Plaintiff was in at the time that was fairly stable, but not flawless.

Kudo decided to return to Kyoto from Tokyo, where she'd gone to pursue an

employment opportunity, in order to enter graduate school and, expressly, to be with

Plaintiff. Plaintiff had become comfortable with Kudo again, and allowed the

relationship with his then girlfriend to flounder. Kudo's mission was basically part of

the scheme to undermine Plaintiff's life in Kyoto, with the ultimate objective of

displacing him from Kyoto, which has been voted the world's best city by the magazine

Travel & Leisure for two consecutive years in 2014 and 2015.


106. Though Kudo did seductively succeed in convincing Plaintiff that he

should let the relationship he was in flounder and get back together with her, when she

subsequently became pregnant with Plaintiff's child and unilaterally decided to undergo

an abortion—something she had earlier insisted she would never do, going so far as to

claim it was against her religion—the false pretense was irrefutably exposed.


107. Plaintiff was devastated by the turn of events and loss. The fact that the

CIA (likely Plaintiff's so-called friend Peterka) recruited Kudo as an asset and then used

her to infiltrate Plaintiff's life years later with the implied intent of marriage, whereupon

she became pregnant and aborted our child, is conduct that should shock the conscience

of the court. Such acts violate Plaintiff's rights secured by the Fourth Amendment and

Fifth Amendment of the U.S. Constitution. Here, Plaintiff makes references to United

States Supreme Court case Meyer v. State of Nebraska, (1923), No. 325.


> *'No state ... shall deprive any person of life, liberty or property*
>
> *without due process of law.'*
>
> *While this court has not attempted to define with exactness the*
>
> *liberty thus guaranteed, the term has received much consideration and*
>
> *some of the included things have been definitely stated... the right of the*
>
> *individual to contract, to engage in any of the common occupations of*
>
> *life, to acquire useful knowledge, to marry, establish a home and bring*
>
> *up children...*


108. Kudo's behavior prior to the abortion had made Plaintiff suspicious that

she had been recruited by the CIA, with Kudo once even making an out of context

comment about having "needed the money", but despite those suspicions, Plaintiff

would not have believed it beforehand that she would go through with an abortion as

described above. Plaintiff had, in the back of his mind, held out hope that the CIA

would come to reason and change course, accommodating Plaintiff in the process.


109. Moreover, after the abortion, Kudo persisted, trying yet again to interfere

with a relationship Plaintiff was building with a woman whom Plaintiff had

subsequently met; in this case, Plaintiff's future wife. More specifically, Kudo had

appeared out of nowhere near Plaintiff's dwelling while Plaintiff was in the company of

his new girlfriend, whereupon Kudo asserted that she (Kudo) was still Plaintiff's

girlfriend, etc., in front of Plaintiff's new girlfriend, shamelessly trying to interfere.


110. Kudo's recruitment by the CIA occurred in the early 2000s (introduced to

Peterka in 2003-4), and her abortion in 2009, in a continuum of conspiratorial attempts

to undermine Plaintiff's life in Kyoto that continues to this day. The conspiratorial acts

described herein have violated Plaintiff's rights secured under the Fourth Amendment,

Fifth Amendment, Ninth Amendment, and Fourteenth Amendment of the U.S.

Constitution. *Biven's* provides the authority to bring a private action for such violations.


111. Upon information and belief, Plaintiff alleges that the Defendants, and

others, not yet known, conspired between and amongst themselves to unlawfully

intercept wire and oral communications of the Plaintiff and disclose said

communications to others within the United States Government and elsewhere for

personal reasons connected to the objective of displacing Plaintiff from Kyoto.


112. Plaintiff further alleges that his computer was hacked and emails

exchanged between Plaintiff and CIA officers, in particular, Paquette, were deleted. It is

highly probable that said emails would implicate Paquette, for example, in relation to

violations alleged herein against him by Plaintiff. Defendant Paquette subsequently

closed his long-held personal email account with CompuServe, presumably to prevent

the deleted emails and others from being subsequently obtained through the servers

hosting the closed account.


113. The eavesdropping, etc., continued even after Plaintiff had initiated

complaints related thereto through official U.S. government channels, starting with

Schaeffer at the American Consulate in Osaka. It is almost certain that the

eavesdropping continues to this day. Plaintiff does not know how many instances of the

unlawful eavesdropping, etc., in violation of Plaintiff's rights guaranteed under the

Fourth Amendment, etc., of the U.S. Constitution have occurred; accordingly, Plaintiff

will seek leave to amend this Complaint upon becoming apprised of evidence revealed

through discovery.


114. Plaintiff has suffered physical assault, undergone the trauma of having a

girlfriend whom he thought would become his wife unilaterally decide to abort their

child, been humiliated and embarrassed and suffered emotional distress, and is entitled

to compensatory and punitive damages in an amount according to proof, including

reasonable attorneys' fees (should Plaintiff obtain services thereof henceforth) and costs.


115. In light of the contents of the reply Plaintiff received from the DOS Office

of the Inspector General (hereinafter "DOS/OIG"), which seem to imply that Schaeffer

was in fact a CIA officer posted to the position of American Citizen Services Officer,

and corresponds to an apparently well-established practice of providing covert CIA

officers ("case officers") with "official cover" (affording said officers diplomatic

immunity), Plaintiff adduces that Schaeffer and the other named consular officials (i.e.,

Snider and Kennedy) with whom Plaintiff has personally exchanged emails (hereinafter,

the three are collectively referred to as "Schaeffer et al.") were CIA case officers whose

responsibilities may have included coordinating the CIA field officers that were the

perpetrators of the unlawful acts with respect to which Plaintiff had visited the

Consulate to complain about in the first place. In addition, it is also possible that

Schaeffer et al. could have shielded the individual rogue CIA officials about whose

misconduct Plaintiff had made protestation from scrutiny by the CIA/OIG by not

reporting Plaintiff's allegations "through the appropriate channels", etc.


116. Initially there had been a complete absence of responsiveness, on

the part of Schaeffer, and Plaintiff was compelled to take the initiative and prod

Schaeffer for a response, eventually receiving the email reply from Schaeffer

stating, *"Rest assured that I have taken your concerns on board and will pass*

*them on through the appropriate channels"*.


117. Here, attention should be drawn to the fact that the instant case involves

an unusual situation in which a federal official (CIA case officer) had been stationed

under the guise of impersonating another federal official (DOS American Citizen

Services Section Chief); wherein, the public office occupied by the impersonating CIA

officer encompasses a fiduciary duty to American citizens overseas, such as Plaintiff,

commensurate therewith. That is to say, the CIA officer has been caused to assume a

false title and impersonate the role associated with the fictitious title while actually

conducting CIA business. Plaintiff alleges that in the instant case, though the misleading

representations by Schaeffer et al. were made by "email" instead of postal mail, said

CIA practice of causing its covert officers to assume of the false title of "Chief,

American Citizen Services Section", has thereby resulted in violations of the spirit, if

not the letter, of 18 USC 1432. Moreover, 18 USC 241 (Conspiracy Against Rights) and

18 USC 242 (Deprivation of Rights Under Color of Law) would seem to be implicated

as well insofar as there are a plurality of federal officials assigned overseas under

assumed identities that have and continue to conspire to deprive Plaintiff of his rights

and privileges protected by the United States Constitution, though Plaintiff is not

apprised of knowledge confirming the extraterritorial applicability of said statutes.


118. Moreover, the instant case presents circumstances demonstrating that in

posting covert CIA officers to the post of American Civil Services Officer in order to

secure diplomatic immunity for said CIA officers to protect them from being held

accountable for violations of Japanese law committed in the course of carrying out the

covert operations with which they have been tasked to oversee, the CIA has facilitated

the subversion of the Department of State's Office of American Citizen Services at the

Consulate in Osaka by affording said covert CIA officers appointed to said Office an

excessive degree of discretionary power. That is evident in light of the apparently

misleading response—and deliberate withholding of otherwise necessary information

from Plaintiff (e.g., the need to report such allegations directly to CIA/OIG, etc.)—with

respect to remedying the unlawful misconduct of the rogue CIA officers described in

the protestations made by Plaintiff.


119. Not only did Schaeffer et al. deny Plaintiff the services incumbent upon

his Office, thereby failing to fulfill his fiduciary duty to Plaintiff, he conspired with

others to deny said services in a purposeful manner to serve personal and political

interests. The situation was perpetuated by the failure of Schaeffer et al. to inform

Plaintiff that such complaints against CIA officers are required to be filed directly with

the CIA/OIG, causing Plaintiff repeatedly file further complaints with the Consulate,

though the complaints were frustratingly ineffective, causing Plaintiff substantial

emotional duress over a period extending into years.


120. Plaintiff alleges that Schaeffer et al. conspired to deflect Plaintiff's

complaints, thereby denying Plaintiff his entitlement and right as an American Citizen

to receive the services commensurate with said office, for personal reasons associated

with promoting their careers in the CIA, etc., intentionally and conspiratorially abusing

the undue discretionary power afforded to them under the circumstances.

121. As is evident from the above-described interactions with Peterka and

Roughan, a plan had already been launched by rogue CIA officers aiming to displace

Plaintiff from Kyoto years before Schaeffer was assigned to the Consulate in Osaka.

Peterka and Roughan both had connections to the finance sector in Tokyo: Peterka was

sent to displace me from Kyoto partly by trying to lure me back to Tokyo to work for

Goldman Sachs; and Roughan, who worked in the finance sector in Tokyo, had also

repeatedly informed Plaintiff of job opportunities there, as described above with respect

to Nomura, after Plaintiff had performed the aforementioned small translations projects

for Mizuho Finance. In fact, Roughan contacted Plaintiff in January of 2012 mentioning

that his wife wanted to talk to Plaintiff about some translation work, perhaps just a

pretense. Roughan last contacted Plaintiff by email in October of 2012 to complain

about Plaintiff's blog postings about Roughan's suspected status as a CIA officer, etc.

122. As described above, Plaintiff has since come to understand that almost all of the Westerners Plaintiff has interacted with personally in Kyoto over the years have been intelligence officers. In fact, the scale of the all-encompassing covert operations of Western intelligence agencies in Kyoto made it apparent that the CIA et al. constituted a veritable class unto themselves. Plaintiff was literally surrounded by Western intelligence officers from the day he moved into the Villa Tonodan apartments. Douglass, for example, lived two doors down from Plaintiff's for 7 years before buying a house and moving. Under the circumstances, there was absolutely no possibility that Plaintiff would not daily come into contact with covert CIA officers in his daily life.

123. As a student of East Asian history and languages, it appears Plaintiff was to be excluded from that class because the knowledge Plaintiff had acquired informed Plaintiff's interests and provided Plaintiff with a bond of affinity that was intrinsically opposed to the readily apparent operations aimed at subverting civil society and rending the social fabric in the ancient cultural and religious capital of Kyoto. The arbitrary acts undertaken against Plaintiff in diverse form over a period spanning many years by rogue CIA officers and proxies acting on behalf of said officers and in the pay of the Executive Branch of the government of the United States of America should shock the

conscience of the court. It is likely that CIA officials in supervisory roles have acted so

as to cover up the unlawful acts of the rogue CIA officers reported by Plaintiff, and

have thereby facilitated further such violations, said covering up also being carried out

for personal and political purposes. It is not clear that the political objectives, such as

promoting Osaka Mayor Toru Hashimoto (hereinafter "Hashimoto"), of rogue CIA

officers are compatible with the official foreign policy being pursued by the United

States. It is clear, however, that Plaintiff has been targeted in a conspiratorial manner by

rogue CIA officers and continues to be so targeted into the present, as demonstrated by

the recent events described herein.

124. In short, Plaintiff has been purposefully targeted by rogue members of a

veritable colonizing class of CIA officers intent on displacing Plaintiff from Kyoto

because they wished to infiltrate and control the spaces inhabited by Plaintiff in his

normal everyday existence in Japanese civil society in the city of Kyoto. It is clear that

Plaintiff was considered to be an obstacle impeding the achievement of the

corresponding personal goals of each respective rogue CIA officer described herein, and

continues to be so to this day. Such targeting, etc., represents a flagrant attempt to

deprive Plaintiff of his rights secured by the Fifth Amendment of the U.S. Constitution

((*Snyder v. Massachusetts, 291 U.S. 97 (1934)*); (*Rochin v. California,* 342 U.S. 165,

172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)); ( *Palko v. Connecticut,* 302 U.S. 319,

325-326, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937))) as well as the Fourth Amendment

and Fourteenth Amendment of the U.S. Constitution.


125. Several aspects of that agenda involve religion-and-the-state, as

documented on Plaintiff's blog, and are pointedly at odds with the American

Constitutional doctrines of separation of Church and State as well as the protection of

freedom of religion. Not only has Plaintiff been accosted by CIA officers attempting to

hide their pernicious attempts to misappropriate the Christian religion for use against

Japanese civil society, but has met with personal affronts in relation to his appreciation

of Buddhism, in particular.


126. When Plaintiff settled in Kyoto, the CIA et al. were concurrently

operating two widely-distributed local English language print publications: Kansai Time

Out (hereinafter "KTO"), and Kyoto Journal (hereinafter "KJ"). Said publications to

have served as vehicles through which individual intelligence officers that were part of

the sprawling intelligence network were provided cover as photojournalists and

promoted as such, and as vehicles through which disinformation and propaganda could

be spread. Said disinformation and propaganda was instrumental not only for

(dis)informing public opinion, but propagating a representative paradigm of Westerners

as a form of background intelligibility, a background against which Plaintiff stood out.


127. The Japan Times article this link points to illustrates one node in the

interlinked networks of intelligence officers and the English language media:

http://www.japantimes.co.jp/community/2011/05/03/issues/its-innovate-or-die-in-today

s-mad-mag-world/#.VaZ3UvntlBd


128. That is, said article features interviews with three (and discusses one

more) intelligence officers Plaintiff has had cause to identify on his blog due to obvious

disinformation they've published, etc., and Plaintiff's presumes that all people

mentioned in the article are intelligence officers. The three Plaintiff has blogged about

are: suspected CIA officer, Eric Johnston (hereinafter "Johnston "; now a staff

columnist with the Japan Times, formerly a KTO contributor), suspected Irish foreign

intelligence service (hereinafter "G2") officer Michael Lambe (hereinafter "Lambe";

operates blog called "Deep Kyoto", does PR for KJ, etc.), and suspected CIA officer

Colin Buchan Liddell (aka "C.B Liddell"; hereinafter "Liddell"; Japan Times columnist,

and author of the aforementioned KTO article (2008) on Japanese Freemasonry, which

Plaintiff has posted in its entirety on his blog in its entirety).

129. Plaintiff adduces that his presence broke the mold, so to speak, of the

uniform paradigm the CIA et al. sought to present through presenting a cast of a

predetermined range of archetypical characters, the roles of which had already been

filled, and the presence of other types of characters proscribed. Plaintiff likely was

perceived as a threat to those CIA et al. officers such as Dougill, for example, who

presented themselves as a sort of idiot savant with an ineffable affinity to Japanese

history and culture, as presented through CIA et al. influenced/controlled media outlets

such as the glossy photojournalism CIA front the KJ. The conspiracy described herein

has had the objective of displacing Plaintiff from Kyoto as its recurrent theme.

130. At one point, Plaintiff took the opportunity to question suspected MI6

officer John Dougill, who had published a substantial amount of disinformation,

including a piece in KTO about Sakamoto Ryoma called "A Hero for Our Time" that

Plaintiff found incredulously dubious, and which Plaintiff has posted in its entirety on

his blog

(http://kyoto-inside-out.blogspot.jp/2014/08/why-i-have-written-about-freemasons-3.ht

ml). Houser had also published in KTO, which shut down in 2007 with its website being

sanitized from the Internet, and the blog Deep Kyoto apparently being launched,

ostensibly by Lambe, with the aim of filling the void, etc.

131. Dougill and Houser stopped going to the Starbucks shortly after Plaintiff

discussed Dougill's article with him and introduced Dougill to historian Marius Jansen.

Plaintiff's blog has also includes analysis of a couple of Houser's KTO articles .

(http://kyoto-inside-out.blogspot.jp/2012/04/who-is-preston-houser.html,

http://kyoto-inside-out.blogspot.jp/2012/04/cia-meddling-in-japans-political.html).

132. Plaintiff has gone to the trouble of illustrating the above-described

connections because the extent of the CIA's activity here in Japan is so outsized that it

should shock the conscience of the court. The blatant promotion of intelligence

operatives through intelligence network connected English-language publishers and

media outlets, including the country's leading English language newspaper, and

otherwise high-profile activities of CIA officers are so readily apparent to an educated

eye as to leave one in disbelief. Intelligence officers such as Dougill could not avoid the

issues raised above after Plaintiff began taking them to task in relation thereto;
accordingly, Dougill and Houser chose to avoid Plaintiff.


133. More recently, the CIA et al. have moved into social media, such as
Facebook, attempting to enable the ludicrous number of officers stationed in Kyoto to
collectively present themselves to civil society online as normal citizens constituting an
"expat community" in Kyoto. Furthermore, the CIA et al. are promoting CIA fronts on
Facebook as well, such as "Deep English", ostensibly owned and operated by Douglass
and Aaron Campbell (hereinafter "Campbell"), another veteran of the CIA front Global
College Friends World Japan Center (hereinafter "GCJC"), officially affiliated with
Long Island University (hereinafter "LIU"). The CIA does not seem to mind that
Plaintiff has blogged about Douglass and Campbell; they have simply recycled them.


134. Plaintiff has examined on his blog a few pieces published in the Japan
Times that contained outlandishly fallacious (dis)information (on history, politics) or
promotional material pertaining to other intelligence officers (with no substantial
achievements), and duly exposed the CIA officers whose names were on the by-line.
The first such piece was by Johnston, and purported to be about the history of the first

capital of Japan, Nara:

(http://kyoto-inside-out.blogspot.jp/2011/10/who-is-eric-johnston.html). Another

piecewas by suspected CIA officer Kris Kosaka (hereinafter "Kosaka"), and was a

purely promotional piece on suspected CIA officer Lotman, and aimed to impart

Lotman's personage with a false stature as a literary figure/photographer, belying a

scheme to promote his false ascent in Japanese civil society:

(http://kyoto-inside-out.blogspot.jp/2013/05/who-is-sean-lotman-just-some-connected.h

tml). Lotman has a substantially non-existent history—let alone career—as a writer, and

Plaintiff had previously noted other suspect promotional pieces by Kosaka. A third was

by an associate professor of law at Doshisha University, Colin P.A. Jones (hereinafter

"Jones") that included blatant misrepresentations of the Japanese agricultural co-op and

a conspicuous absence of discussion about the highly subsidized American agribusiness

sector, lacking even the semblance of balance, and representing a propaganda piece

promoting the Trans-Pacific Partnership:

(http://kyoto-inside-out.blogspot.jp/2014/10/who-is-colin-p-jones.html).


135. There was a particular significance to Plaintiff regarding the article by

Kosaka, because Lotman had married a woman whose family runs a noodle shop in

Plaintiff's neighborhood, and the article was published subsequent to Plaintiff's

protestations filed with Schaeffer et al. regarding Dalsky and Bray, and blog posts about

Bray and Dalksy that addressed issues specific to Plaintiff's neighborhood. Plaintiff's

neighborhood has been intensively targeted by the CIA et al. Plaintiff had considered

naming Kosaka as a defendant in the instant case, but has decided to wait until further

evidence regarding the objectives of the false promotional piece she published about

Lotman are revealed through discovery. If, for example, Kosaka was directed by CIA

supervisory personnel (e.g., case officers or higher) to publish the article about Lotman,

that might change the complexion of the offense(s). Plaintiff has only seen Lotman once

in Kyoto; however, in light of the recent developments related to Zimbleman, Plaintiff

expects substantial evidence to come to light during discovery.


136. Another example of an attempt to re-establish a covert CIA officer active

in Plaintiff's immediate surroundings as a high-profile member of civil society can be

seen in the case of Blackman. After Plaintiff had reported Blackman to the Consulate in

relation to the fraudulent offer of translation work, the CIA had him right back to work

nearby; Blackman describes himself online as having "co-founded" "the largest English

language school (English Buffet) in Kyoto" in 2010

(http://anthonyblackman.brandyourself.com/). Granted, as that is self-promotion,

perhaps it simply reflects a degree of desperation on the part of Blackman himself.

Blackman appears to have since left that school (which is not far from Plaintiff's

residence) shortly after Plaintiff posted a blog post including evidential emails and

documenting his reappearance. Blackman currently appears to be teaching at a school

near his residence

(http://www.eieigo.net/%E3%83%9B%E3%83%BC%E3%83%A0/%E8%AC%9B%E5

%B8%AB%E7%B4%B9%E4%BB%8B/). In any case, the school English Buffet is yet

another 'intelligence community' front, and Plaintiff can confirm that he has met,

several times at the Starbucks, a suspected MI6 officer named Andy Couzens

(hereinafter "Couzens") who teaches there and is also a presenter at suspected CIA et al.

front PechaKucha Nights Kyoto—which is organized by Luong and Sasaki (Plaintiff

blogged about Sasaki's connection, and she was removed from this webpage:

http://web.archive.org/web/20150510162638/http://www.pechakucha.org/cities/kyoto)

—as well as the France-sponsored (i.e., DGSE produced) Kyoto Nuit Blanche event,

with which Luong, Sasaki, and Lotman were also involved. Sasaki's father did a PhD at

UC Berkeley, and it would not surprise Plaintiff if he were a CIA asset, too.

137. As described above, Plaintiff received no reply from the CIA in response to his offer to work as an independent contractor, and had not, in fact, expected to receive a positive reply from the CIA. However, the actual disposition of the CIA was not clear in light of developments on the ground, which oscillated between the projection of empathy from CIA officers amid positive signs that there might be an effort afoot to integrate Plaintiff into an evolving local intelligence network, on the one hand, and continued harassment by said network, on the other.

138. The first concrete evidence of such oscillation occurring after Plaintiff submitted the application to the CIA appears in the form of emails Plaintiff exchanged with Blackman. Blackman was introduced to Plaintiff by Paquette for the purpose of making Plaintiff a fraudulent offer of translation work. After much pointless wrangling about rates and discussion of various potential projects, it became clear that Blackman was attempting to manipulate Plaintiff, whereupon Plaintiff decided to call the Japanese client at his company's office (information provided by Blackman), and discovered that the proposed job had already been done, after having discovered that the translation company called TSA Translations Blackman claimed to be running did not exist. Plaintiff confronted Blackman in an email and accused him of being a CIA officer and

70

harassing Plaintiff. Plaintiff also confronted Paquette, who denied complicity and placed

the blame on Blackman in terms of a profit motive.

139. The above-described interaction with Blackman represented a blatant ruse

aimed at interfering with Plaintiff's pursuit of a lawful livelihood, and caused Plaintiff

to uselessly expend his time and effort in a frustrating pursuit of a fraudulently

represented job offer with a non-existent enterprise. Moreover, the collaborative effort

between Paquette and Blackman was a conspiracy intended to entangle Plaintiff in a

humiliating and demoralizing pursuit of said fraudulent offer of work, and presented

Plaintiff with the first material evidence, in the form of emails, that Plaintiff could

submit to U.S. government officials, whom Plaintiff assumed were the proper

authorities, in order to demonstrate, with proof, harassment, etc., by rogue CIA officers.

140. The further mention of an offer of work by Paquette without following

through as well as same from Roughan led Plaintiff to consider including a RICO claim,

but considering the scope and paucity of material damages (e.g., lost time and effort,

damaged hard disks), Plaintiff decided against that. Plaintiff is not sure whether other

acts could be tied together with those, such as Kudo's abortion, for example. Should

evidence be revealed during discovery indicating that RICO was violated, Plaintiff may

seek leave to add a RICO claim to the complaint.


141. Another incident involving Roughan, after the emails he had sent Plaintiff

regarding his wife's pregnancy—which had further demonstrated the existence of a

conspiracy as far as Plaintiff was concerned—involved a threatening series of emails

Roughan send Plaintiff trying to intimidate Plaintiff into removing blog posts Plaintiff

had made about Roughan and his suspected status as a CIA officer and connection to

the network of intelligence officers in Kyoto. Furthermore, Roughan also accused

Plaintiff of operating "an illegal business". Roughan's malicious accusation (and

implied threat of retaliation) clearly demonstrates a preoccupation on Roughan's part

with Plaintiff's livelihood. Roughan opted to threaten and attempt to intimidate Plaintiff

instead of filing a civil suit for defamation, which was his false accusation, basically.


142. Moreover, the above-described two incidents involving Roughan both

occurred after Plaintiff had reported him for harassment to the American Consulate in

September 2009, as evidenced by the initial email exchange with Schaeffer. Apparently,

the CIA believes that harassment does not constitute an invasion of the right to privacy

of a private American citizen residing overseas as secured by the U.S. Constitution, or

that its officers can violate the privacy of American citizens overseas with impunity.

143. Wessel was another CIA officer that frequented the Starbucks and had

attempted to convince Plaintiff that Kyoto wasn't the place for him. A woman that was

subsequently revealed to be Wessel's girlfriend, named Ai, appears to have been used as

a proxy against Plaintiff (i.e., may have been dispatched by Wessel against Plaintiff).

144. Further, it appears that two individuals Plaintiff was friends with while

serving in the U.S. Army—Taylor and Dan Kiely—have been involved, directly or

indirectly, in the-above described conspiracy to displace Plaintiff from Kyoto. One

indication of their possible involvement was the appearance in Kyoto of an individual

going by the name Scott Harris (hereinafter "Harris"), who claimed to be from Canada

and subsequently visited Kyoto several times from Thailand, where he claimed to be

working as an English teacher.

145. Harris tried to sell Plaintiff on Thailand as a desirable destination, but

Plaintiff made it clear to him that Plaintiff wasn't interested in going to Thailand.

73

Plaintiff indicated to Harris that Plaintiff thought Kyoto was the nicest city in Asia, and

had reasonably clean air to boot. Plaintiff further emphasized the fact that he was a

specialist in East Asian languages who translated patent specifications professionally,

and was a student of Japanese history and culture. It appeared to Plaintiff that Harris

was partly on a recruiting mission, and partly spying on Plaintiff.


146. Plaintiff had long ago adduced that both Taylor and Kiely appeared to

have joined the CIA and been stationed in Thailand starting in the 1990s, with Taylor

subsequently doing a stint in Tokyo. Plaintiff has kept in touch with Taylor over the

years, and Taylor had tried to sell Plaintiff on the idea of Thailand before he eventually

made it to Tokyo. He never visited Plaintiff in Kyoto during his three-year stint in

Tokyo, despite saying that he would and that he wanted to visit the city, etc. Plaintiff

did visit Taylor and his family once or twice in Tokyo.


147. Plaintiff suspect that Taylor and Kiely were involved in dispatching Harris

to Kyoto because the best they could do as low-level CIA operatives was to try and

convince Plaintiff to leave by offering an alternative, most likely at the behest of their

co-conspirator CIA cohorts. Plaintiff thinks that such practices on the part of the CIA

should shock the conscience of the court, and has been troubled at finding no adequate

alternative to naming Taylor as a Defendant. Plaintiff has reported the suspected

involvement of Taylor, Kiely and Harris to the CIA/OIG in conjunction with the

investigation of the complaints set forth herein, though Plaintiff has not yet produced

the many pages of emails he exchanged with Harris over a period of several years.


148. Scott Harris showed up in Kyoto in 2007, and the first email Plaintiff has

from him are dated to June 2007; the last, April 2012. Plaintiff conveyed to Taylor via

email his complaints about being set up to be physically assaulted at a local bar Plaintiff

had arranged to meet a CIA proxy named Yoshiyuki, whom Plaintiff had met through

Mike and Paquette, and other harassment by CIA officers and other intelligence officers

and proxies, whom Plaintiff also referred to as Freemasons so as not to put Taylor on

the spot to an excessive degree. In Taylor's reply of December 12, 2007 to one such

email, he stated, "Sounds like you need to find a new crowd in Kyoto". Normally, that

might sound like reasonable advice, but under the circumstances, it would simply have

required Plaintiff to avoid all public venues, such as cafes, bars and the like, frequented

by covert CIA officers and their proxies, which constitute a group that has collectively

sought to colonize civil society in Kyoto.

149. While Plaintiff is not aware as to whether or not Taylor had reported, as

apparently is required under EO12333, Plaintiff's allegation that he had been subject to

a criminal attack encompassing a conspiracy involving rogue CIA officers. Plaintiff had

noted the correspondence between the appearance of Harris from Thailand and his

attempts to encourage Plaintiff to leave Kyoto for Thailand, and the various time frames

at issue, including that of the attack and the appearance of Harris, coincide. Taylor

recently appeared to attempt to hide some photos of him and Kiely that he had posted

on his Facebook account and on which Plaintiff had commented, so Plaintiff, finding

himself in a conundrum, raised that issue with Taylor in an email. Taylor responded that

he had accidently removed the photos and reposted them, but that it was basically none

of Plaintiff's business. Plaintiff has discussed the lawsuit with him out of a feeling of

shared obligation, but Taylor recently de-friended Plaintiff in relation to the issue,

apparently after Plaintiff chose not to reply to a Facebook message to a mutual army

friend (Michael Whelan) with whom Taylor had recently had lunch asking Plaintiff to

return to the Bay Area, basically. Plaintiff has not named Kiely as a defendant because

he has not interacted directly with him, but may seek leave to amend the Complaint on

the basis of evidence revealed during discovery.

150. Here, Plaintiff cites a paragraph from an email addressed to Snider that Plaintiff sent on October 20, 2011 to the American Consulate in Osaka, the email having subsequently been provided to the DOJ as well:

> *After being attacked in the bar called the HUB, the next time I was in there I was talking to a guy named Marcus, a German doing something at Kyoto University in the Science, and obviously an intelligence dweeb. We were talking about the attack when I was compelled to come out and say loudly that Glenn was in the CIA, whereupon Marcus tried to deny that and quickly change the subject to the guy who had attacked me, telling me he was Moroccan and trying to get me interested in other information. More recently, after the topic again came up with a Dan Douglass assuming a higher profile, apparently more time to spend at the café after losing his job, whereupon he also tried to put me on the trail of the Moroccan guy, telling me the guy was studying martial arts and that Dan, too, had found him to be an individual with a chip on his shoulder. In summary, both Marcus and Dan tried to steer me*

*onto a revenge trail against my attacker in order to divert my attention*

*from analyzing the setup and those behind it.*

151. At the time, Plaintiff had been under the impression that many of the CIA officers were Freemasons, for various reasons, including his study of history. On the other hand, Plaintiff would also refer to Freemasons as a euphemism for Judeo-Christian co-religionists when discussing Buddhism and the Western intelligence agencies and officers (e.g., CIA officers) in Kyoto, as can be seen in the title of an email exchange with Paquette from 2007, only a trace of which remains:

*"republicans, free masons and buddhism, and more!!!! TABOO*

*=_= DELEEEEET___..."*

152. Plaintiff had begun discussing related aspects with Paquette, in particular, starting around 2005 or thereabouts, Paquette being the only intellectual in the group. For example, Plaintiff showed Paquette a book he had recently read by Malcom Barber—a British Medievalist—"The Trial of the Templars", in which Barber examines the trial by Philip IV of France of the "Poor Knights of Christ of the Temple of

Solomon", along with another book Plaintiff was currently reading, "Counsel to the

President", an autobiographical book by Clark Clifford (with Richard Holbrooke)

recounting Clifford's term as counsel for President Harry S. Truman. Those books

served as a basis for discussing religion and the state, the military industrial complex

and President Eisenhower, etc., with the focus eventually being brought around to Japan

and Kyoto. One juxtaposition that Plaintiff recalls using in a conversation with

Paquette—and perhaps in the deleted email—in regard to the crusading Templars and

Freemasons in the CIA was that the only "temples" that Plaintiff thought Kyoto needed

were Buddhist temples. Paquette did not seem to find that analogy very amusing.

Plaintiff eventually posted a brief entry on his blog (circa 2012) linking to references:

http://kyoto-inside-out.blogspot.jp/2012/07/eisenhower-philip-of-france-truman-war.ht

ml


   153. Another reason, however, that Plaintiff broached the question of

Freemasons was the connection that materialized out of nowhere between Abdelsamad

and David Chapman (hereinafter, "Chapman"), a friend from Berkeley with whom

Plaintiff had remained in contact to some extent. Chapman is married to a Japanese

national, and he proclaimed to Plaintiff a number of years ago that he was considering

moving to Japan. Plaintiff is as certain as a non-Freemason can be that Chapman is a

Freemason in light of various circumstances and occurrences during our personal

interactions over the years, upon which Plaintiff can elaborate, as necessary. In short,

the connection between Chapman and Abdelsamad and the subsequent impact thereof

on Plaintiff (upon which Plaintiff will elaborate in due course, as appropriate) are

evidence of Abdelsamad's role in the conspiracy. Plaintiff, as a matter of course,

presumes that the connection between Chapman and Abdelsamad was based on

Freemasonry (i.e., that both are Freemasons), but more importantly, that Abdelsamad

was a CIA officer, which Plaintiff believes that evidence revealed during *in camera*

proceeding or discovery will prove. Abdelsamad was a student at Kyoto University, at

which Glenn Paquette had been teaching, and he also frequented the Sanjo-Ohashi

Starbucks, occasionally in the company of a woman he said was his wife. It should be

noted that the article in the Kansai Timeout about Freemasonry in Japan had been

published in May, 2008. Aside from the fact that Plaintiff believes that Abdelsamad was

involved in a conspiracy in which he undermined Plaintiff's friendship with Chapman

for personal reasons related to his desire to remain in Kyoto, like the other CIA officers

that sought to displace Plaintiff from Kyoto, on the outside chance that Abdelsamad is

(was) not an officer or agent of the CIA (or MI6 proxy, etc.), it would only be because

he is a Freemason.

154. Another disturbing aspect about Paquette was that he had been dating female college students that were working as hostesses, and had attempting to discuss the plight of one or two of such women with Plaintiff. However, as Plaintiff mentioned in complaints to Schaeffer et al., Paquette appeared to be intent on promoting the adult entertainment industry businesses operated by Japanese organized crime groups in the neighborhood, and attempted to accost Plaintiff when he didn't exhibit an inclination to be supportive of that sort of attempted misappropriation of the Starbucks.

155. It should be noted that, in the interim, historically significant measures have been implemented by the Japanese Government that have some bearing on this civil action; more specifically, the "Organized Crimes Exclusion Ordinances" that came into effect on April 1, 2011 in Kyoto. In short, the Ordinances are aimed at excluding organized crime groups from civil society. Plaintiff has encountered a number of instances in which the CIA/MI6 et al. appeared to be operating on the premise of cultivating contact with individuals/groups associated with said organized crime groups. Meanwhile, considering that the CIA et al. have endeavored to collectively present

81

themselves as an "expat community" and do, in fact, constitute a virtual class unto

themselves, insofar as the CIA et al. have been seeking to colonize civil society in

Kyoto, the association of covert officers of the CIA et al. with persons associated with

Japanese organized crime groups can be said to have served an enabling role with

respect to the activities of said persons in civil society in Kyoto.


156. For example, Plaintiff has disclosed his findings related to the so-called

"college" at which Plaintiff's long-term neighbor Douglass had been working, but with

respect to which Douglass had been deceptively secretive about. The Wikipedia entry

for LUI Global describes it as "a discrete educational entity of Long Island University",

which has since removed all information regarding the "Japan center" from their

website, and the Wikipedia article describes it as "suspended". A web-archive page

(http://web.archive.org/web/20071217023809/http://www.brooklyn.liu.edu/globalcolleg

e/about/history.htm) of the former website of the "Japan center" shows the following

paragraph in the introduction.


*Founded by the New York Yearly Meeting of the Society of*

*Friends (Quakers) in 1965, Friends World (now Global College),*

*became nonsectarian in the mid 1970s. In the 1991-92 academic year,*

*Friends World affiliated with Long Island University. Long Island*

*University is accredited by the Commission on Higher Education of the*

*Middle States Association of Colleges and Schools*

157. Here, it should be noted that Plaintiff had posted a link on his blog to a

video, which was available on YouTube at the time, which has subsequently been

denoted as "private". Given the nature of the situation, Plaintiff decided to post on his

blog the version of that video that he had personally downloaded and archived. Plaintiff

presumes that every individual featured in said video is an intelligence officer.

158. In fact, the GCJC was a CIA front at which one CIA officer (Houser) had

been teaching a course of which the syllabus seems to demonstrate a sympathetic

disposition to the situation of the former outcaste class known as the Burakumin in

Japan, who are predominately found in the Kansai area, in which Kyoto is located.

According to Japanese police statistics, Burakumin account for 60% of Japanese

organized crime groups, ethnic Koreans 30%, with the remaining 10% being Japanese

not of Burakumin descent. The LIU GCJC was closed in December, 2009

(http://web.archive.org/web/20110824104645/http://www2.brooklyn.liu.edu/globalcolle

ge/worldwide.html). On this web-archive page, it can be seen that their website hosted

links to other CIA et al.-front groups, such as English languages publications KTO,

Deep Kyoto, Kansai Scene, and the Kyoto Visitors Guide.


159. The Starbucks at Sanjo-Ohashi is located approximately one mile north of

the corporate headquarters of the largest organized crime group in Kyoto. The group

operates numerous drinking establishments and sex shops in the vicinity, the latter

having been opened after an elementary school in the neighborhood had been closed

under questionable circumstances in 1995. Starbucks has been targeted by proprietors of

such businesses who send hostesses to the café, for example, fishing for clients.


160. Douglass had also been employed at GCJC, which in fact consisted

merely of a small two-floor rented house in a residential district inaccessibly far up in

the hills to the northwest of the city center. As mentioned above, Douglass and Plaintiff

lived in the same apartment building, Villa Tonodan, the occupancy of which was

comprised of at least 1/2 intelligence officers, including, for example, John Hart Benson,

Frank Carter, Paul Crouse, Ryan Buttigieg, and several others whose names Plaintiff no

longer recalls.

161. The scope of the CIA's operations here in Kyoto is expansive, encompassing multiple overlapping networks. One such network is the network associated with suspected CIA officer John Einarsen (hereinafter "Einarsen") and the KJ, which has become a digital only publication in recent years. Another such network is that associated with the event called The Flame held at Papa John's café operated by Roche. Both of those networks comprise intelligence officers long established in Kyoto.

162. Brian Schultz (aka Brian Uneme, a suspected South African intelligence officer; hereinafter, "Schultz") was a suspected CIA proxy connected to the KJ network who had been studying the shakuhachi, a Japanese bamboo flute that I also study. He sometimes took lessons from Houser, whom I suspect may have been operating behind the scenes coordinating Schultz efforts to interest me in the KJ group, etc. Schultz had invited me to join a monthly meeting of the KJ crowd held by suspected CIA officer Stewart Wachs at a small temple (as I recall) near the Yoshidajinja shrine (note: Buddhist buildings are referred to as "temples", and Shinto buildings as "shrines"). Plaintiff declined, being fully engaged with other scholarly and cultural pursuits, and

mentioned that he considered the KJ to be superficial, glossy photo-journalism, which

was basically incompatible with the pursuit of genuine scholarship.


163. Here it bears noting that the network established by the CIA et al.

basically seems to have one or more officers involved in every cultural pursuit that is

found in Kyoto (a not insignificant number); that is to say, the CIA and cohort

intelligence agencies appear to be attempting to monopolize civil society by establishing

a comprehensive network encompassing the entirety thereof. Accordingly, the CIA et al.

have created networks the survival of which is dependent on the ability of the

constituent intelligence officers to exclude (or incorporate) private citizens such as

Plaintiff that happen thereupon in the course of their normal activities in Kyoto.


164. In this regard, the case of Houser is illustrative with respect to Plaintiff's

plight, as both of us study the same form of traditional Japanese music associated with

Zen Buddhism, and are familiar with its history. Part of the reason that Plaintiff felt

compelled to expose Houser was the discovery in his published writings of

misrepresentations of the history of said musico-religious tradition which had political

import. As described with respect to disinformation on the history of Nara in the Japan

Times, for example, Plaintiff has encountered the tactic repeatedly.

165. Furthermore, with respect to Houser, it will now be necessary for Plaintiff

to explain this suit to Houser's teacher (Yodo Kurahashi, hereinafter "Kurahashi"), who

was a student of Plaintiff's teacher. Plaintiff has made polite excuses why he has been

unable to accept the open invitation to visit Kurahashi's residence in Kyoto because of

this situation, though Plaintiff has performed ensemble pieces with Kurahashi's wife,

who plays string instruments, and met Kurahashi occasionally at musical events.

166. Plaintiff notes that he has never personally had any problems with Houser,

and has interacted with him on a cordial basis in civil society. Accordingly, Plaintiff's

allegations against Houser primarily have to do with whether he was involved in

coordinating the activities of a proxy from South Africa who was an occasional student

of his, Schultz, who had visited Plaintiff's apartment, etc., before turning antisocial.

167. It bears drawing out the fact that an individual interested in culture,

tradition and history for their intrinsic value would have to go against their conscience

to engage in the type of betrayal of the tradition evinces by Houser through his

87

dissemination of disinformation in relation thereto for political purposes. Meanwhile,

because Houser was not a scholar of East Asian history and language when he joined

the CIA, he would have been more receptive to the notion at the time of his deployment

to Japan. Plaintiff has repeatedly made it clear to a succession of CIA officers as well as

government officials at multiple agencies that he did not approve of the pernicious

sociopathic activity of the sort he has documented on his blog; therefore, it should have

been obvious that Plaintiff would not act against his conscience to partake in such

debased and depraved acts. Moreover, any attempt by a state actor, such as a covert CIA

officer, to coerce Plaintiff to act against his conscience would amount to a violation of

Plaintiff's rights protected by the First Amendment of the U.S. Constitution.


168. Over the course of the past five years since first visiting the American

Consulate in Osaka to make protestations in person about harassment by rogue CIA

officers, a succession of newly introduced or re-introduced individual CIA officers and

proxies have appeared at the Starbucks and attempted to engage Plaintiff in a cordial

manner, apparently with the aim of further spying on him and/or delaying Plaintiff's

efforts to draft this Complaint by leading Plaintiff to believe that the CIA was about to

make some sort of offer to him in order to reconcile the situation. Plaintiff attempted to

engage such individuals in good faith, but their disposition would sometimes change

suddenly, becoming overtly hostile at times, belying a subterfuge or ulterior motive.


169. CIA officers that were newly introduced after Plaintiff had initiated his

complaints with Schaeffer et al. include, for example, Dickinson, Dalksy, Bray, and

O'Day. Plaintiff first encountered Dalsky at the Kamogawa river where Plaintiff

practices the shakuhachi (a Japanese woodwind instrument) and takes his children to

play. Dalsky was there with his daughter one day when Plaintiff had come down with a

virulent cold. Dalsky made a somewhat untoward snidely comment upon learning that

Plaintiff was suffering from a cold. Plaintiff played off the remark as a joke, but was

immediately put on guard.


170. The next time Plaintiff saw Dalsky was at the nursery school with respect

to which Plaintiff had to sue the city administration in order to gain admission. Dalsky's

daughter had only been granted a one-day a week attendance at the time, as the school

has a wait list. Under the circumstances, it seemed in order to mention to Dalsky that

Plaintiff had been compelled to sue the city of Kyoto to get his son into the nursery

school. That discussion worked its way around to the topic of history and Kyoto, and

Plaintiff mentioned Marius Jansen's book on the Meiji Ishin. Plaintiff also offered to

send Dalsky and another guy (suspected MI6 officer David Chandler, associate

professor at Doshisha University; hereinafter, "Chandler")) whose daughter was

attending the same nursery school a link; here, the response—this time from both

individuals—was that neither of them wanted to exchange email addresses, and that

seemed rather unusual under the circumstances, not to mention unsociable.


171. The next time Plaintiff talked to Dalsky Plaintiff mentioned that the mayor

of Kyoto had lost a pair of civil suits that had been brought against him for the illicit

provision funds to companies operated by Burakumin and affiliated with organized

crime groups, and mentioned that Plaintiff had had problems with CIA officers. Dalsky

seemed somewhat taken aback, and Plaintiff didn't see him for a couple of weeks.


172. When Dalsky did show up, once again along the banks of the Kamogawa

river, his disposition was noticeably altered, and after talking for a few minutes, during

which he brought the conversation around to his situation at Kyoto University and some

problems he had there, he revealed to Plaintiff that Dalsky was suffering from bipolar

disorder. Plaintiff offered his sympathies, and Dalsky started talking about his

medications, saying that they helped take the edge off. He offered the medications (three

types) to Plaintiff, saying that they helped take the edge off. Plaintiff responded that he

needed his edge, and politely declined, but accepted a few pills from him when he

insisted, with Plaintiff saying that Plaintiff would look the pills up on the Internet to see

what they were.

173. The conversation then turned to a specific episode that Dalsky described

as having occurred at Kyoto University. He started by mentioning that there was an

intramural sports team that was called "the gangsters", and claimed that he had once

pulled a fire alarm near his office because he thought that the Chinese occupying in the

next room were spying on him. He presented the story in a convincing manner, evincing

a palpable degree of emotional instability and edge, but Plaintiff always had the

impression that Dalsky was engaged in some sort of impromptu performance, and

recalls thinking that Dalsky might be a decent spy, if he had a legitimate target.

174. Plaintiff played along with the skit, and asked Dalsky why the Chinese

would want to spy on him, whereupon his countenance changed expression, and he said,

"that's just it, they weren't, I was delusional", or words to that effect. Plaintiff then

mentioned that there certainly were problems at Kyoto University, and described his

experience in dealing with Paquette. Plaintiff explained how Paquette appeared to have

been recruiting his students and colleagues at the university as agents for the CIA, and

deploying some them against Plaintiff at the Starbucks. As it had become obvious that

Dalsky was trying to convey the message that Plaintiff might be clinically delusional,

Plaintiff also mentioned that he suspected Paquette might also be a Freemason that had

infiltrated the CIA, etc. Dalsky professed his faith (Christian, Plaintiff presumed),

presumably to dispel the notion that he might be a Freemason, and asked Plaintiff if

Plaintiff was a religious person.


175. At this point, Dalsky said something to insinuate that when Plaintiff talked

about the CIA, etc., Dalsky thought that maybe Plaintiff was demonstrating that he was

out of touch with reality. Plaintiff responded directly asserting that he was not

delusional, and emphasized that he had to resort to filing a complaint with the DOJ to

have Paquette removed. Dalksy became reflective for a moment, and eventually asked

that Plaintiff return his medications, claiming that they were expensive, and that his

wife didn't give him much pocket money since they had bought a condominium. He

then emphasized that he was "all in, man", which Plaintiff subsequently learned was a

phrase that echoed a statement made by President Obama regarding the so-called "pivot

to Asia" as well as the title of Petraeus' ill-fated biography.

176. Plaintiff attempted to report Dalsky to the Japanese police, but was told

that since he had returned the drugs to Dalsky, there was no proof, and that the exact

nature of the drugs would be at issue. Plaintiff also attempted to report the incident to

the administration at Kyoto University, to no apparent effect.

177. Plaintiff subsequently looked up Dalsky's email address at the university

and sent the following email discussing religion—which he had raised—and various

connections between religion, intelligence agencies (including the CIA) and organized

crime as well as scholarship, including links to specific works, while the encounters

were fresh in mind. Dalsky did not send Plaintiff a reply, even though Plaintiff provided

the social psychology professor who had attempted to manipulate Plaintiff

psychologically in part by making an appeal to religion, and in part by insinuating that

he was delusional, plenty of material with which to follow through in relation to those

maneuvers in rhetorical space. It was apparent that Dalksy was not going to present

Plaintiff with any emails which might subsequently serve as evidence, but the following

email illustrates important context as well as the good faith efforts Plaintiff has

continually made to engage the CIA officers with respect to the matters at hand.

> *Please excuse the sudden intrusion via email.*
>
> *My mind is a little blunted at present due to whatever physical ailment I have, which seems to be affecting my brain a little, so your big question about religion wasn't processed as quickly as it might otherwise have been.*
>
> *Anyway, you asked me if I was religious, and I thought I should write this out while it was on my mind. I certainly can't say that I am religious compared to some people—like Muslims that pray five times a day—though I guess I'm more religious than others. I am not necessarily against religion per se. On the other hand, with respect to the religion in which I am currently most interested—Mahayana Buddhism—one important teaching relates to the accommodation of the thoughts of others, including religious beliefs. In that manner, Buddhism is a fairly open religion, and what is sometimes referred to as a "doctrine of accommodation" is an aspect of Buddhism that*

contributed to the development of a syncretic belief system in Japan. There is, perhaps, a built-in recognition (some might call it an insight) of the anthropological origins of religion, in that doctrine. Maybe that is an aspect in which I find resonance.

At any rate, you seem to show a little aversion to my talking critically about the incomprehensible publishing of highly flawed research by Americans that are putting out a bigoted agenda against Buddhism, sometimes anti-Japan overall. Anyway, here is a link to the now retired professor whose book I recommended to you.

http://www.umich.edu/~iinet/media3/cjs/10-11/borgen_20101014/

Maybe I'm stereotyping, but it seems likely to me that he is Jewish. I've met many Jews in academia. As I mentioned though, he is a normal scholar whose research does not reflect a warped epistemology or attempt to manipulate the reader by withholding information, etc. His work has opened up the horizon [f]or students of the relevant subject matter, and in a manner that critically examines the misuse of superstition and lies by what was in effect a politically powerful priest caste family against a scholar. That is also noteworthy, because the

*pseudo-scholars I am trashing would seem intent on fashioning themselves as a sort of priest caste.*

*Anyway, the point is that religious bias probably has no place in scholarship. That is not to say that research supporting or elaborating a certain belief system is not valid. That is not the type of content that I am addressing with respect to the three individuals connected to Columbia University. And I have already addressed some similar problems in the work of a PhD from Oxford, so there is a pattern. That guy is a British MI6 agent, who recently published a book on Christians in Japanese history. His PhD is in Slavic studies, however, so it is little wonder that his knowledge of Japan is limited.*

*Incidentally, there used to be a problem in Kyoto with transient Israelis selling cheap jewelry, etc., on the streets, working through an Israeli guy that was connected to the yakuza. They were eventually shut down about 6-7 years ago. I don't know if you had arrived in Kyoto before they were already gone. They had basically colonized the walkways, glad to see them gone.*

*By the way, here is another link, to the talk by the other author,*

*Robert Whiting on the yakuza, the CIA, etc.*

*http://fora.tv/2012/02/16/Tokyo_Underworld_2012_An_Evening_with_*

*Robert_Whiting*

*The historical connection between the CIA and the yakuza /*

*right wing nationalists is also not something that I have imagined.*

178. Dalsky has subsequently approached me once or twice along the river, the

last time a couple of months ago, when he muttered something about belonging to the

IRS, not the CIA, and that Plaintiff shouldn't mess with the IRS.

179. Bray had also approached Plaintiff during approximately the same time

frame in which Plaintiff encountered Dalsky. Apparently, Bray lived in the same

neighborhood, and seemed to be trying to convince Plaintiff to leave. Bray indicated

that he was divorced from his wife, who was Japanese, but that they had a son who went

to the same schools in the neighborhood that my son would attend. He indicated that the

schools didn't measure up to the hype of their reputation, which Plaintiff knew nothing

about beforehand. Bray also said that his son was working a lousy job at a local

restaurant (El Fogon), and had decided to go to go to college in the USA.

180. Bray seemed to be trying to convey to Plaintiff that the path he had chosen

was a dead end, but that there was still hope if Plaintiff didn't make the same mistakes

as Bray, such as educating my children at the local schools.

181. Plaintiff talked a fair amount about his experience in having to sue the city

to get his son into the nursery school, and Bray suggested that Plaintiff didn't really

want to send his kids to that school and should drop the suit. Bray said that there were a

lot of "rich people" in the neighborhood, and he complained that after NHK—the

national public broadcaster—had done a documentary on the outstanding school system

in the neighborhood, a lot of apartment buildings were built and people started moving

in for the schools.

182. Plaintiff was in shock, but remained silent. Bray seemed to be saying:

"There went the neighborhood!" It hadn't dawned on him, perhaps, that he was, to some

extent, talking about Plaintiff. Although Plaintiff hadn't known that there had been a

documentary made about the schools there, etc., Plaintiff was one of the people living in

an apartment building, and certainly couldn't be bracketed into the economic class of

"rich people", considering that the apartment Plaintiff lives in is, in fact, rent-subsidized.

Plaintiff didn't bother to follow through with emailing Bray, though he provided

Plaintiff with his business card.


183. Plaintiff has described interactions with O'Day to a limited extent in a

report to the CIA/OIG, the most recent of which occurred subsequent to Plaintiff having

lodged protestations in the form of emails to the American Citizen Services Officer (or

other Consular officials monitoring the email) regarding her spying and attempts to

manipulate me at the Starbucks, with one case of her explicitly advising me against

filing a lawsuit against the U.S. government. Plaintiff has also described her suspected

involvement in a plot to recruit the attorney (Mrs. Kei Funahashi) Plaintiff hired when it

became necessary to file a lawsuit against the city government of Kyoto for refusing to

admit Plaintiff's son to the neighborhood nursery school. Here, it should be noted that

the only other foreigners whose children were enrolled at that school where intelligence

officers, including: CIA officer Dalsky; MI6 officer Chandler; and two French DGSE

foreign intelligence officers, namely, Stephane Vogley, who runs a company called

Technology Marketing & Management Solutions (TMMS: http://tmms.co.jp/en), and

Alexandre Thorr, who is an attorney from France that runs a school with his wife

offering patisserie and language classes in Plaintiff's neighborhood

(http://www.kanae-kobayashi.com/Access.html,

http://kanae-kobayashi.com/menu.html), instead of practicing law. In short, as in the

case of his old neighborhood, which is a mere 2+ kilometers to the north, Plaintiff finds

himself again surrounded by officers of Western intelligence agencies and their proxies

in his new neighborhood, including Dalksy and Bray and the three Europeans (one Brit

and two Frenchman) as well as newcomers Lotman and Zimbleman, which is

completely unacceptable. Plaintiff will refrain from listing each of the many intelligence

agency fronts within a two kilometer radius of his residence for the present.


184. After O'Day resurfaced and evidenced further suspect conduct (described

below), Plaintiff did some research on her online and discovered that she was associated

with the network of intelligence officers connected to the Kyoto Journal, and had been

promoted as a photographer herself in an event in Kyoto held in 2002

(http://kyotokawaraban.boo.jp/ibento/) in which O'Day exhibited photography along

with a long list of other suspected intelligence officers, including: Aaron Berman, Albie

Sharpe, Dylan Rice, Jacoba Akazawa, John Ashburne, Einarsen, Lisa Mahoney Beltran,

Micah Gample, Paul Crouse, Robert Kowalczyk, and Tom Collins. As mentioned above,

Crouse had been a resident at the Villa Tonodan, and Einarsen founded the KJ, with

which other individuals listed above are also associated, while Ashburne has published

sponsored disinformation pieces in the Wall St. Journal promoting the policies of the

now infamous mayor of Osaka, Hashimoto (the pieces are linked to on Plaintiff's blog).

185. Dickinson, meanwhile, had also introduced Plaintiff, while Plaintiff's wife

was pregnant with our son, to a Japanese woman, Kuniko Sato (hereinafter "Sato", that

was planning to go to graduate school in the United States. Dickinson appeared to be

attempting to interest Plaintiff in the woman romantically, with the presumed intent of

deliberately trying to sabotage Plaintiff's marriage and family.

186. Here, Plaintiff cites the Supreme Court case Moore v. City of East

Cleveland 431 U.S. 494 (1977):

> *Our decisions establish that the Constitution protects the*
>
> *sanctity of the family precisely because the institution of the family is*

*deeply rooted in this Nation's history and tradition. It is through the*

*family that we inculcate and pass down many of our most cherished*

*values, moral and cultural.*

187. Plaintiff exchanged email addresses with Sato and helped her with the 'statement of purpose' she was preparing to append to her application to the Maxwell School at Syracuse University, learning what he could about her before she disappeared, apparently because Plaintiff did not show a romantic interest. Like Kudo, Sato has no presence on the Internet.

188. Plaintiff is aware of the fact that CIA officers are trained to deceive; furthermore, although Plaintiff is also aware that the CIA has no police powers, it is not clear as to how CIA officers are trained to handle incidental contact and interaction with private American citizens in an overseas area in which they are conducting a covert operation. It is clear, however, even from EO12333 and the like, that CIA officers are expressly prohibited from engaging in acts that violate the rights of American citizens overseas protected by the Constitution.

189. The planning and execution of the various plots against Plaintiff, starting with the contrivance of having Peterka pretend to coincidentally bump into Plaintiff in Berkeley, California and then travelling to Japan to try to convince Plaintiff to pursue a career in the finance sector in Tokyo with Goldman Sachs, clearly represent part of a conspiratorial pattern of activity aimed at displacing Plaintiff from Kyoto, encompassing various schemes and ploys over many years through to the present.

190. Bringing the narrative into the present, recently, Plaintiff was contacted by suspected CIA officer, psychologist Zimbleman, and invited to participate in the literature discussion group, MSG, including a number of suspected CIA officers as well as suspected officers of other countries' intelligence agencies, some of whom Plaintiff had already blogged about, as described above.

191. Here, it should be noted that Plaintiff had met and been introduced to Zimbleman's wife, Inaoka, after leaving the "Kodomo Miraikan", which is a children's play center/library, etc. Plaintiff and his wife and children had visited, with our children in tow on the way to the park along with another mother from the nursery school and her children, including a classmate of Plaintiff's son. Inaoka seems to have been

acquainted with the other mother, who introduced us. Inaoka gave Plaintiff her business

card, on which she first wrote her email address and the name of her husband and son as

well as her mobile number. Plaintiff emailed her, and received a reply from Zimbleman.


192. Plaintiff has only communicated with Zimbleman through email, with the

planned meeting having been cancelled due to Zimbleman's coming down with the

"flu", which later was said to have been diagnosed as pneumonia, whereupon the

meeting was cancelled for the entire summer. Shortly thereafter, however, Plaintiff saw

Zimbleman at the nursery school, whereupon Zimbleman averted his eyes from Plaintiff

and continued a discussion he was having with a mother of a toddler enrolled at the

school. Plaintiff noted that Zimbleman looked healthy, and noted that in a followup

email sent in succession to an email to which Zimbleman had failed to respond. The

encounter appears to represent another possible instance of attempting to bait Plaintiff

by holding out the possibility of reconciliation, etc., and the CIA coming to terms with

Plaintiff. Such incidents have been a continual distraction to Plaintiff, diverting his

energy from researching the law and court precedents related to the drafting of this

Complaint, and been a source of continual emotional distress to Plaintiff, causing him to

suffer from insomnia and taking a serious toll on his health.

193. Furthermore, there were two other occurrences that share respective

tangential connections with the encounter with Zimbleman. Plaintiff suspects that those

encounters were staged in coordination with the encounter with Zimbleman.


194. Within a day or two of contact from Zimbleman, Plaintiff was approached

in the Sanjo-Ohashi Starbucks by an individual calling himself "Steve" and claiming to

be an Englishmen that had been residing in Australia for fourteen years who was in

Kyoto as a volunteer through his church, being affiliated with a Filipino Evangelical

church in Kyoto called Assembly Kyoto Church as well as some Koreans, including a

professor at Doshisha University (a Christian university:

https://www.doshisha.ac.jp/en/information/history/neesima/neesima.html). He basically

tried to missionize Plaintiff, inviting him to Bible studies and the like, and sought to

gain Plaintiff's agreement to his missionary presence and activities, ignoring to hear

what Plaintiff taught him about Japanese religion and Christianity in Japan (and Korea),

and not emailing Plaintiff in relation to books regarding which Plaintiff had offered to

send links. He appeared again even more determined with an equally intransigent

disposition, trying to evangelize Plaintiff.

195. Plaintiff quickly deduced that Steve was an intelligence officer acting in concert with other, but his objective was not clear. Plaintiff notes that his blog post on Lotman also describes Lotman cohort and suspected CIA officer Manny Santiago, who claims to be an ordained Christian minister, and apparently has incorporated as a non-profit on the basis thereof, though his online activity shows nothing related to Christianity. Moreover, Zimbleman is employed by Doshisha working with children in their vertically integrated school system.

196. Plaintiff suspects that the appearance of Steve (reported to Consulate) may have been connected to an attempt to recruit Plaintiff on the basis of gaining Plaintiff's ascension to participate in the Christianizing cause of Doshisha University. However, if the above-described scenario was in fact a coordinated recruitment attempt, it would represent a bad faith attempt, because it would run against Plaintiff's conscience and values, which have been clearly and emphatically set forth on Plaintiff's blog and in emails, etc., to the Consulate, DOJ, etc., over a course of years. To be clear, while Plaintiff would not object to teaching at Doshisha, for example—were he qualified to do so—Plaintiff would not agree to do so under the stipulation that his pedagogy promote a

version of history, etc., biased in favor of Christianity or any other ideological priority

of the CIA. That would not be compatible with academic freedom, etc., and would

represent an attempt to subvert the goals of higher education with a pedagogy based on

a religious and/or political subterfuge, which, as Plaintiff has shown, does seem to

represent part of the CIA's agenda. Accordingly, it should have been obvious that

Plaintiff would not be interested, and such coordinated acts would thus represent

harassment in the form of an overture made in bad faith, etc., and be tantamount to

taunting Plaintiff by trying to tempt him to go against his conscience, etc.


197. Meanwhile, considering that Plaintiff does not have a PhD, and that

Doshisha is not a university that would not necessarily be compatible with respect to

Plaintiff's scholarly interests were Plaintiff to pursue a PhD at this stage in life, being

54 years old and having a family to support, the basis of such a stealth overture by the

CIA circle associated with Doshisha is suspect. Furthermore, it should be noted that for

approximately thirteen years Plaintiff has been studying a form of music associated with

the Rinzai school of Zen, the head temple of which, Shokokuji, is located directly north

of the old imperial palace grounds. The Doshisha campus itself was built on grounds

appropriated from Shokokuji temple during the early Meiji era when Buddhism was

subject to persecution with the "restoration" of the emperor as sovereign. Accordingly,

insofar as Plaintiff practices a variant of Rinzai Buddhism, it is possible that the

harassment to which he has been subjected also violates his rights protected under the

First Amendment of the U.S. Constitution with respect to yet another aspect thereof.


198. Another possible aspect of the coordinated recruitment ploy can be seen in

the random contact Plaintiff received via Facebook from a young woman with a

Chinese name (沈铭钦) residing in Kyoto who had started a Facebook account during the

same time frame, and invited Plaintiff to be her friend on June 12, 2015. Plaintiff

checked her Friends list, because he didn't know her, and noticed thereon:


- suspected CIA officer Frank Carter (hereinafter "Carter")—a CIA officer that had

  resided at Villa Tonodan and whom Plaintiff has mentioned in that regard on his

  blog and who is also a friend of suspected CIA officer, Doshisha University

  professor Tim Craig, and suspected CIA officer John Hart Benson, also a former

  resident of Villa Tonodan who had presided as priest at Craig's wedding, at which

  Carter served as photographer

  (https://www.facebook.com/photo.php?fbid=260345287325123&set=pb.100000489

627199.-2207520000.1443455019.&type=3&theater); and

- suspected CIA officer Fanon Wilkins (hereinafter "Wilkins"), an associate professor

of American Studies at Doshisha University whom Plaintiff has noticed at the

Starbuck on occasion and who appears in this photo

(http://3.bp.blogspot.com/-5uDf1L59Y0I/U09oinwg1xI/AAAAAAAAIKg/GKHLdi

_U-FQ/s1600/2014-04-15+16.54.06.jpg) of an English bible study meeting at

Doshisha (i.e., the same to which Steve invited Plaintiff).


Seeking to learn more, Plaintiff accepted her invitation. There are many people

associated with Doshisha University on her Friends list, including another suspected

CIA officer who is a student at the business school where Craig teaches, J.J. Price

(hereinafter "Price"). Wilkins and Price are members of a Facebook group called

Blasian in Kyoto (https://www.facebook.com/groups/272368666296782/), which

includes other suspected CIA officers, such as Paul G. Richardson.


199. Though Plaintiff had seen Wilkins at the café before as he appears on his

Doshisha profile, Wilkins showed up in the guise in which he appeared on his Facebook

page (since changed), with sunglasses and a baseball cap covering his bald head, etc.

Plaintiff does not believe that was another coincidence, and considered it to form part of

a continuum he considered to be an overture starting with the meeting with Inaoka,

followed by the email from her husband, Zimbleman. Plaintiff has contacted Wilkins

through Facebook messaging, and Wilkins has denied being a CIA officer. Plaintiff has

not added Wilkins as a defendant, but may seek leave to do so on the basis of evidence

revealed during discovery.


200. Accordingly, assuming that there is a connection between the

above-described series of events (Chinese woman with connections to the Doshisha

network befriending me on Facebook, Zimbleman/Lotman, Steve the evangelical

missionary) the coordinated ploy represents yet another unwarranted intrusion into

Plaintiff's life, and is tantamount to being a form of psychological warfare

('harassment' doesn't capture the scope and sophistication) having the purpose to inflict

emotional distress, etc., which Plaintiff has suffered to the point of distraction.


201. Given the involvement of suspected CIA officer Lotman and suspected

Canadian intelligence officer Luong, both of whom Plaintiff had blogged about prior to

the encounter with Zimbleman, the fact that Zimbleman is the brother-in-law of Lotman

and works at Doshisha, and that Plaintiff has submitted two reports to the CIA/OIG and

disclosed his blog, Plaintiff can only question the functioning of the CIA/OIG. Under

the circumstances, Plaintiff presumes that Zimbleman is a CIA officer; therefore, he

should not have been permitted to approach Plaintiff, even indirectly.

202. Plaintiff would expect, on the basis of his reports to the CIA/OIG and the

DOJ, that such encounters would have been proscribed as a result of Plaintiff's

allegations as well as the information contained in Plaintiff's blog. Plaintiff presumes

that his status should be known in advance (through official notice by the CIA) to all

CIA officers and proxies thereof in Kyoto, including those on the emailing list of the

literature discussion group. Several of the names on said list were new to Plaintiff, but

there is no reason to suspect that they are not CIA et al. intelligence officers or proxies

thereof, said list including: Jeremy Rappleye, William Hall, Kaylie Palmer, Hallam

Udell, and Maana Sasaki.

203. Plaintiff has blogged about Jones, who teaches at Doshisha University,

because of blatant propaganda he has published in the Japan Times, but has long been

aware of other suspected CIA officers that are professors at Doshisha University, such

as Susan Pavloska, who is also associated with the Kyoto Journal.

204. Aside from the continual non-responsiveness and deception on the part of the consular officials at the American Consulate in Osaka, it appears that said consular officials were actually CIA case officers likely involved in coordinating the covert operations of the CIA field officers in Kyoto about whose unlawful acts Plaintiff had complained. Accordingly, said CIA case officers may bear responsibility for their actions in a supervisory role in relation to the incidents comprising the conspiracy.

205. Recently, Plaintiff became aware of a suspected CIA officer named Brad Olsen in San Francisco that is acquainted with Plaintiff's sister, Tracy Vasaturo. Plaintiff noted from Olsen's Facebook page that he had mentioned Kyoto as being his "old home city" in Japan (July 7 post to Facebook), and is connected on Facebook through Alex Trouchet (https://www.facebook.com/alex.trouchet/friends) to the Kyoto CIA network including Douglass and numerous others suspected intelligence officers (some about whom Plaintiff has blogged; e.g., Ashburne (MI6), Gordon Maclaren (CIA), Justin Giffin (MI6), Barbara Stein(CIA)). Olsen has also published books on the esoteric, leading Plaintiff to adduce a possible association with Dickinson and suspected CIA

officer Kevin Turner, or at least the pseudo-religion modus operandi thereof. Olsen also

has published a series of travel books, like suspected intelligence officers Dougill and

Chris Rowthorn. In short, every individual Plaintiff has met in Kyoto sharing the

above-described characteristics with Olsen is a suspected intelligence officer. Plaintiff

has ascertained that his sister's acquaintance with Olsen is unrelated to Plaintiff's

circumstances here in Kyoto, but is wary of anyone suspected to be a CIA officer who is

connected to those listed as Defendants in this Complaint socializing with his family

and friends, and notes this here with the preventative aim of avoiding further trouble.


206. Plaintiff intends to avoid unduly intruding into his sister's private life,

even if her circle includes advocates of belief in the "paranormal", etc.; however, in

light of the fact that Olsen may be a covert CIA officer connected to the extensive

network including a defendant named in this Complaint, Plaintiff has had to broach the

situation with his sister, causing Plaintiff substantial emotional stress and exacerbating

his insomnia. Moreover, Plaintiff was impelled to let his mother know that Taylor,

whom Plaintiff's mother has known for many years and met again on Plaintiff's last trip

to the USA (March-April 2014), has been named as a defendant, etc.

207. Should Olsen actually be a CIA officer, perhaps the sheer extensiveness of

the network with which Plaintiff has been grappling will thereby be demonstrated to be

part of the problem. In the final analysis, the extensiveness of the network is related to

the fact that the CIA and other Western intelligence officers are conspicuously

occupying positions throughout academia and the English language news media, for

example, said intelligence officers being state actors that are illicitly occupying stations

in civil society that belong to the People. Furthermore, said intelligence officers have

targeted Plaintiff because he is both vocally aware of their monopolistic presence and

vocally in disapproval of it.


208. The numerous complaints and protestations Plaintiff has made regarding

the recurrent violation by rogue CIA officers of Plaintiff's civil rights protected under

the United States Constitution, including violations of Plaintiff's rights secured by the

Fourth Amendment and Fifth Amendment of the Bill of Right as well as the Fourteenth

Amendments of the U.S. Constitution, have been met with deception and

non-responsiveness by federal officials conspiring to cover up the alleged violations,

and the allegations themselves. The authority of *Bivens* enables a private action to be

brought with respect to such violations.

VI

THIRD CAUSE OF ACTION

(Honest Services Fraud, pursuant to 18 USC 1341/1342/1343/1346/1349)

209. Plaintiff incorporates herein, as though fully set forth, all of the allegations

contained in paragraphs 1 through 208, above, as though fully set forth.

210. Plaintiff first made allegations to the U.S. government about the alleged

violations of Plaintiff's rights secured by the U.S. Constitution by visiting the American

Consulate in person, after making an appointment therefor in advance with the express

intent to directly make protestations to the responsible Consular official about

harassment, etc., by CIA officers in Kyoto and their proxies.

211. In a reply Plaintiff eventually received from Schaeffer to a

follow-up email Plaintiff sent to Schaeffer complaining about Schaeffer 's

non-responsiveness with respect to an initial email Plaintiff had sent to Schaeffer

requesting acknowledgement regarding the matters raised by Plaintiff during the

in-person consultations with him at the Consulate, said follow-up email

including a list of names of CIA officers and proxies thereof alleged to have

committed violations, Schaeffer emailed Plaintiff the reply stating, *"Rest*

*assured that I have taken your concerns on board and will pass them on through*

*the appropriate channels"*.


212. In the light of continuation of the harassment and other events that

transpired after the aforementioned visit to the Consulate (and over the course of the

succeeding six years into the present), Plaintiff adduces that either:


- Schaeffer deliberately decided not to report the allegations "through the proper

  channels";

- Schaeffer did report the complaints through the proper channels, but his superiors

  receiving said complaints, whom I presume would include "senior officials of the

  Intelligence Community", such as the Director of the CIA, did not report the

  allegations to the CIA/OIG;

- Schaeffer's superiors did report the allegations to the CIA/OIG, but the OIG failed

to conduct an investigation and/or find that corrective measures were required by

law; or

- The CIA/OIG received the report of the allegations, conducted an investigation and

ordered corrective measures in accordance with the law, but the implementation

thereof was deliberately obstructed.

213. Schaeffer et al. (i.e., CIA officials posing as American Citizen Services

Officers) appear to have been duty-bound by law (including the Memorandum of

Understanding between the CIA and DOJ on reporting federal crimes (hereinafter

"MOU") as well as EO12333 to report the alleged federal crimes committed by covert

CIA officers as reported by Plaintiff to Schaeffer et al.

214. Due to the continued harassment, however, Plaintiff was impelled to

continually submit emails to the American Citizen Services officer (Schaeffer et al.)

over a course of approximately five years, detailing further violations of Plaintiff's

rights protected by the U.S. Constitution.

215. Not once was Plaintiff told that he should report such allegations directly

to the CIA/OIG, which Plaintiff later discovered was the required action. Accordingly,

the representation by Schaeffer regarding "pass[ing] along" of Plaintiff's *"concerns"*

"through the appropriate channels" is considered by Plaintiff to be a fraudulent

representation of the actual course of action taken by Schaeffer, and the pattern of

(non)responsiveness thereinafter by Schaeffer et al. to represent a further manifestation

of the deliberate course of inaction that had been adopted by Schaeffer et al., in

violation of the law.

216. The "concerns" of Plaintiff, as referred to by Schaeffer in a manner not

affording the appropriate significance thereof, correspond to federal crimes and/or

tortious acts committed by federal officials against Plaintiff. Aside from the fact that the

CIA has no police powers, Plaintiff's right secured by the Fourth, Fifth, and Fourteenth

Amendments of the U.S. Constitution are inviolable.

217. Moreover, it is possible that the non-responsiveness and deception on the

part of the Schaeffer et al. was part of a deliberate ploy aimed at the gathering of

"intelligence" on Plaintiff —by encouraging Plaintiff's continued submission of

complaints directly to the Consulate, causing Plaintiff to disclose details of his private

life, inner thoughts, etc.—as opposed to having Plaintiff submit the complaints directly to the CIA/OIG (i.e., "through the appropriate channels"), said 'intelligence' being used to formulate further schemes by the CIA et al. to displace Plaintiff from Kyoto.

218. In this regard, it must be emphasized that the CIA has deployed against Plaintiff numerous officers—who in turn have deployed proxies—said CIA officers including three psychologists and another with a degree in psychology: Dalsky has a PhD in psychology, Zimbleman has PhD in psychology, O'Day is working on her PhD in psychology, and Bray has an undergraduate degree in psychology. A succession of such schemes has been conducted against Plaintiff over a period spanning more than ten years, some of said schemes being detailed herein and others (e.g., described on Plaintiff's blog, in emails to DOS/DOJ, etc.) with respect to which Plaintiff may seek leave to amend this Complaint according to evidence revealed in discovery.

219. Furthermore, with respect to Defendants Schaeffer et al., who appear to have been CIA case officers stationed at the American Consulate in Osaka under official cover as American Citizen Services Officers, it is not clear to Plaintiff whether each of said Defendants Schaefer et al. should also be sued as officials of the DOS as well as the

CIA. Suffice it to say that the custom of such posting of covert CIA officers as

American Citizen Services Officers and practices associated therewith are a subject of

this Complaint, addressed primarily in a subsequent cause of action presented in a

*Monell* claim; however, it appears that there may be an entangled confluence of *Bivens*,

Honest Services Fraud as well as obstruction of justice issues that may be clarified with

evidence revealed during discovery, whereupon Plaintiff may seek leave to amend the

Complaint, as appropriate. Plaintiff has filed an FOIA request with the DOS, as

described elsewhere herein, but is not capable of ascertaining at this point whether

Schaeffer et al. were acting in a manner such as to deliberately violate official policies

(e.g., DOS regulations pertaining to the handling of allegations by an American citizen

overseas pertaining to federal crimes and/or tortious acts committed by CIA officers

against an American citizen) or whether said official policies (customs and practices)

were culpably inadequate (or, in the case of aforementioned regulations, nonexistent).


220. The failure to adequately remedy the situation after Plaintiff made

protestations in person followed by continual submission of further complaints to the

Osaka Consulate prompted Plaintiff to next try contacting his congressional

representative in the House of Representatives, Congresswoman Barbara Lee. The

response Plaintiff received from the staffers in Congresswoman Lee's offices in

Oakland California and Washington DC was unsatisfactory, and disappointing, to say

the least, with the case worker I'd finally been assigned, Elaine McKellar, eventually

asking me just what it was that I wanted them to do during the last telephone call

Plaintiff ventured to the Congresswoman's office. Plaintiff believes that, with respect to ,

too, it would seem that an American citizen in his predicament should be able to turn to

their elected officials, such as Congresswoman Lee, with the aim of receiving the proper

information for guidance as to the proper manner in which to proceed in such a case.


221. Plaintiff was dumbfounded at the response he received from McKellar. It

should be noted that McKellar was one of several of the congresswoman's staffers with

whom Plaintiff exchanged emails, etc.


222. The runaround Plaintiff received through Congresswoman Lee's staffers

was an utter and demoralizing waste of time and effort, causing no small degree of

emotional duress to Plaintiff. Plaintiff believes that it is necessary for the Court to

examine whether the office of Congresswoman Lee should have been aware of the

information related to the necessity to file a report directly with the CIA/OIG that

Plaintiff received from the office of Senator Feinstein, in order to ensure that American

citizens overseas facing a situation such as that faced by Plaintiff are provided with

accurate information from the offices of their Congressional representatives in a timely

manner about the required administrative steps to take.

223. Accordingly, Plaintiff then embarked on the course of action that seemed

to be the logical next step in contacting the Civil Rights Division of the DOJ. The

misleading response and misdirection Plaintiff met with from the DOJ served to prolong

the harassment, while leading Plaintiff to believe that relief in the form of an

investigation was underway. In fact, Plaintiff encountered intensified harassment over

the course of the ensuing eleven months before receiving the brief and dismissive

written response (a scanned image of the response has been posted on Plaintiff's blog -

http://kyoto-inside-out.blogspot.jp/2012/07/response-from-usa-department-of-justice.ht

ml), dated May 8, 2012, that went so far as to mischaracterize Plaintiff's allegations.

224. The blithe reply from Kappelhoff (signed by Kappelhoff, written by

Callahan) of the DOJ that was mailed to me includes several baffling statements that

belittled and mischaracterized the allegations, and would appear to have been aimed at

discouraging Plaintiff's further pursuit of the allegations as being misguided and

without basis in law, thereby attempting to misdirect me. As a matter within the scope

of common legal knowledge that an attorney at the DOJ working in relation to civil

rights, it should have been obvious to Mr. Kappelhoff that CIA officers have not

infrequently demonstrated a propensity to abuse their office and violate the rights of

American citizens overseas protected by the U.S. Constitution. Plaintiff has learned of

numerous Bivens actions, for example, that have been filed against CIA officers

heretofore, and even of cases in which American citizens overseas have been murdered

by local CIA proxies, allegedly with the approval of their CIA officer handlers: for

example, the cases of Charles Horman and Frank Teruggi (and another which I noted in

a report to the DOS).


225. The letter that Kappelhoff mailed Plaintiff describes the scope of civil

rights abuses in an excessively narrow manner, apparently with the aim of excluding

consideration of the federal crimes and/or tortious acts committed by the CIA officers

described in the evidence Plaintiff submitted to the DOJ. That is, though it should have

been readily apparent that at the very least Plaintiff had alleged violations of his rights

secured under the Fourth Amendment, Fifth Amendment, and Fourteenth Amendment

of the U.S. Constitution. Said violations had been perpetrated by CIA officials in

violation of clearly established federal law, and were therefore obviously actionable

under Bivens, at the very least.


226. Plaintiff was nonetheless treated in a manner such as to suggest that he

had submitted unintelligible, uneducated and unfounded complaints with no basis in the

law.


227. The written reply signed by Kappelhoff implies that because the CIA

officers were not "law enforcement officers", their unlawful actions did not constitute

violations of Plaintiff's civil rights. However, Plaintiff understands that violations of

rights protected under the Bill of Rights of the U.S. Constitution and violations of

substantive due process rights protected under the Fourteenth Amendment of the U.S.

Constitution are violations of "civil rights". Kappelhoff did not describe a viable excuse

for not launching an investigation, he simply deflected Plaintiffs allegations in a

dishonest manner so as to deceive Plaintiff and deny him of his right to seek justice.


228. Evidence Plaintiff submitted may have been acted on secretively by the

Executive Branch. Paquette was removed from Plaintiff's immediate surroundings, but

no criminal investigation was launched, and injuries suffered by Plaintiff were not

remedied; in fact, Plaintiff was humiliated and embarrassed by the written reply signed

by Kappelhoff, further compounding Plaintiff's injuries. Furthermore, Plaintiff was

abandoned by his government to cope with the CIA officers about whose misconduct

he'd complained that were permitted to carry on in Plaintiff's immediate surroundings

as if nothing had happened, CIA officers whose mere presence was menacing.


229. In addition, Callahan had intentionally misled Plaintiff into believing that

an investigation was in the process of being launched when he provided Plaintiff with

an email address (as mentioned by Plaintiff on his blog shortly thereafter:

http://kyoto-inside-out.blogspot.jp/2012/04/non-responsive-doj-new-influx-of-cia.html)

to the Special Litigation Department of the Criminal Division for the purpose of making

further submissions of evidence or detailing complaints. However, Plaintiff

subsequently discovered that the violations alleged in his complaints do not fall under

the remit of said Department in the first place, as shown on their webpage on the DOJ

website (http://www.justice.gov/crt/about/spl/):

*"The Special Litigation Section is one of several Sections in*

*the Civil Rights Division. We work to protect civil rights in the following*

*areas: 1) the rights of people in state or local institutions, including:*

*jails, prisons, juvenile detention facilities, and health care facilities for*

*persons with disabilities; 2) the rights of individuals with disabilities to*

*receive services in their communities, rather than in institutions; 3) the*

*rights of people who interact with state or local police or sheriffs'*

*departments; 4) the rights of youth involved in the juvenile justice*

*system; 5) the rights of people to have safe access to reproductive*

*health care clinics; and 6) the rights of people to practice their religion*

*while confined to state and local institutions. We can also act on behalf*

*of people at risk of harm in these areas."*


230. Moreover, Plaintiff never received a single response to any of the multiple

emails he sent to said email address detailing relevant events, personages, etc.

Accordingly, the provision of said email address to the Special Litigation Department of

the Criminal Division of the DOJ in and of itself represents a deliberate act of

misdirection, as that office is not tasked with handling complaints such as those

presented by Plaintiff, causing Plaintiff to needlessly expend time and effort in an

utterly unproductive manner with respect to the allegations at hand.

231. Here, Plaintiff notes that the FBI's response to his Privacy Act request

indicated that there had been no investigation by the FBI, as there were no records

whatsoever indexed to Plaintiff's name.

232. Meanwhile, Paquette, who had been one of the primary sources of

harassment and recurrent trouble, appeared to have met with disciplinary action, as

Plaintiff does not recall having seen him for several months before he radically altered

his emailing habits, including the cancellation of his long-standing email account. It was

only later that Plaintiff discovered that his Hotmail account had been hacked and

relevant emails exchanged with Paquette prior to 2007 deleted.

233. Insofar as Kappelhoff et al. not only refused to launch an investigation of

the alleged violations, but belittled and humiliated Plaintiff for having submitted a

complaint in the first place, and denigrated the import of the alleged violations detailed

in the complaint, instead of serving to put an end to the violations of Plaintiff's civil

rights, Kappelhoff et al. and the DOJ became parties thereto.

234. Aside from the fraudulently misleading written response Plaintiff received

from the DOJ misrepresenting the facts Plaintiff had presented in the complaints he's

submitted to the DOJ, the DOJ also failed to provide notification to the effect that

Plaintiff should submit further such allegations against CIA officers directly to the

CIA/OIG. Thus, this civil action poses not only a question as to the scope of

discretionary authority as to whether or not to launch an investigation into Plaintiff's

allegations, but also a question as to the status of the deliberate misrepresentations made

by federal officials to Plaintiff with the intent of misleading Plaintiff, despite his

entitlement to receive honest services from said DOS (i.e., nominally DOS officials,

actually CIA officers operating under diplomatic cover) and DOJ officials.

235. While Plaintiff has assumed that many of the CIA officers that are subjects

of this Complaint were acting as rogues in their individual capacity, Plaintiff presumes

that the DOJ officials can be said to have been acting in their official capacity within the

degree of discretionary decision making power apparently sanctioning their acts of

deception in the name of national security under the apparently classified Procedures

established by Holder pursuant to the MOU (described below) between the DOJ and

CIA. Plaintiff further presumes that said DOJ officials and employees may have been

acting as rogue individuals as well, depending upon the actual content of said

apparently classified Procedures. That is to say, if said MOU can be interpreted to

authorize DOJ officials who receive allegations against CIA officers, such as the

allegations submitted by Plaintiff, to mislead the citizen submitting said allegations

while dealing with the CIA officers in a secret manner in order to protect intelligence

"sources and methods", Plaintiff presumes that said DOJ officials would be deemed to

be following the directives set forth in the aforementioned apparently classified

Procedures as a matter of course, whereas if the DOJ officials were violating said

apparently classified Procedures, said DOJ officials would be deemed to be violating

the law in their respective individual capacity. Accordingly, Plaintiff presumes that the

question as to the Constitutionality of said apparently classified Procedures (i.e.,

established by the Attorney General according to the MOU) remains at issue and must

be resolved before the question of culpability of the DOJ officials can be evaluated, and

thus there is a separate cause of action set forth as a *Monell* claim related thereto

hereinbelow. In the case of inter-agency collusion among officials occupying

supervisory positions, as posited below, the extent of the conspiracy described above

takes on new proportions that should shock the conscience of the court. If the

aforementioned MOU and apparently classified Procedures established on the basis

thereof by the Attorney General can be seen to represent an interagency policy interface

that is conducive to interagency collusion in covering up violations by CIA officers of

the rights of Americans overseas as protected by the U.S. Constitution, wherefore

Plaintiff presumes that only a separate cause of action set forth as a *Monell* claim can

serve as the vehicle to address the Constitutionality of such an official policy.


236. Furthermore, Plaintiff notes that recently retired CIA/OIG David Buckley

did make public responses in relation to the recent scandalous conduct of CIA officials

involved in illegally accessing the computers of Senate staffers attached to the Senate

Select Committee on Intelligence. Meanwhile, Plaintiff has not even received

acknowledgement of receipt of complaints (two) filed.


237. The written reply signed by Kappelhoff that was mailed to Plaintiff by the

DOJ was a fraudulent reply intended to deceive Plaintiff into believing that his

allegations of civil rights violations had no basis in the law. The misdirection by

Callahan's providing an email address to a department not responsible for handling such

complaints was also a fraudulent indication that an investigation would be launched or

was underway. The statement by Schaeffer that Plaintiff's complaints of civil rights

violations would be reported "through the appropriate channels" was a fraudulent

representation, and the repeated failure to inform Plaintiff that he should submit such

complaints directly to the CIA/OIG was a deliberate attempt to prevent Plaintiff's

complaints from reaching the CIA/OIG. Finally, the DOS decision to implement an

automated reply system in 2014, instead of continuing to reply directly to Plaintiff's

emails, represents an attempt to evade accountability for further culpability as well as a

continuation of the refusal to provide honest services. 18 USC 1341, 18 USC 1342, 18

USC 1343, 18 USC 1346, and 18 USC 1349 provide respective private rights of action

for such violations.


238. Plaintiff notes that he has submitted a FOIA request to the DOS (Case

Control Number F-2014-21617) regarding regulations and standard operating

procedures pertaining to the handling by American Citizen Services Officers of

complaints from an American citizen overseas alleging violations by CIA officers of the

rights of an American citizen overseas secured under the U.S. Constitution, with an

estimated completion date of December 31, 2015.

VII

FOURTH CAUSE OF ACTION

(*Bivens* 2: Deprivation of right and entitlement to honest services from public officials;

Bill of Rights, the Fourteenth Amendment, etc., of the Constitution of the United States

of America)

239. Plaintiff incorporates herein, as though fully set forth, all of the allegations

contained in paragraphs 1 through 238, above, as though fully set forth.

240. It is clear from the foregoing description in relation to violations of 18

USC 1346 that each of the aforementioned officials acting in their official capacity was

also acting in their individual capacity in a manner demonstrating that they could only

have been fully cognizant of the violations of Plaintiff's right secured by the

Constitution that they were intentionally committing as they were committing said

violations, yet they committed said violations nonetheless. Such acts include acts

constituting violations defined in terms of "equal protection" and "due process", as

protected by the Fourth Amendment of the U.S. Constitution, the Fifth Amendment of

the U.S. Constitution, and the Fourteenth Amendment of the U.S. Constitution (*Bolling*

*v. Sharpe*, 347 U.S. 497 (1954)). This is brought into stark relief against the background

of the state of affairs (as described below in more detail) created by the CIA in which

the CIA officers in Kyoto, due to their sheer numbers and scale of their so-called

"covert operation" represent a veritable class of people unto themselves, and Plaintiff

has been discriminated against because he not only was not a part of that class, but

because of his initially implicit and subsequently explicit refusal to participate in what

Plaintiff has explicitly characterized and publically denounced as sociopathic behavior

that is obviously against both American values and Plaintiff's conscience.


241. Accordingly, in addition to the above-cited federal statute 18 USC 1346

pertaining to Honest Services Fraud, Plaintiff's right and entitlement to receive honest

services from federal officials is secured by the U.S. Constitution. Therefore,

considering that Plaintiff is a Pro Se litigant and is not well-versed in case law related to

the extra-territoriality of federal statutes, including 18 USC 1346, Plaintiff invokes

*Bivens,* which provides a cause of action with respect to the above-described violations.

VIII

FIFTH CAUSE OF ACTION

(*Bivens* 3, *Monell* 1: Fourth Amendment, Fifth Amendment, and Fourteenth

Amendment of the United States Constitution)

242. Plaintiff incorporates herein, as though fully set forth, all of the allegations

contained in paragraphs 1 through 241, above, as though fully set forth.

243. The policies of the various departments and agencies of the Executive

Branch described below as well as the customs and practices of the CIA, DOJ, and DOS

have facilitated or directly caused violations of Plaintiffs civil rights, including the right

to privacy, as protected by the U.S. Constitution.

244. The custom of the CIA of posting covert CIA officers under official

diplomatic cover as American Citizen Services Officer has facilitated and resulted in the

violation by federal officials acting under the color of law of Plaintiffs rights, including

Plaintiff's due process rights, secured by the U.S. Constitution. More specifically, the

protestations Plaintiff made in person with the American Consulate in Osaka, Japan,

continually over a period of approximately five years from 2009 to 2014 since first

visiting the Consulate in person were repeatedly ignored, or dealt with in an ad hoc

manner so as to deceive and misdirect Plaintiff into believing that remedial action had

been taken.


245. The deception encompasses the deliberate withholding of the fact that

Plaintiff should in fact have been filing such protestations directly with the CIA/OIG,

even after the Plaintiff had mentioned in an email to the Consulate that he believed the

CIA officers whose conduct was at issue needed to be disciplined by the (CIA) IG.

Plaintiff had learned of the existence of an administrative office called the Inspector

General while serving in the U.S. Army, but had no detailed understanding thereof

relevant to the federal agencies at issue in the instant case, until motivated by the

indications received from the office of the then Chair of the Senate Select Committee on

Intelligence, Senator Dianne Feinstein with respect to the CIA/OIG.


246. Said deliberate withholding of vital information from the Plaintiff

constitutes a practice that violates Plaintiffs due process rights protected by the U.S.

Constitution.

247. Plaintiff has submitted a FOIA request to the DOS (Case Control Number F-2014-21617) regarding regulations and standard operating procedures pertaining to the handling by American Citizen Services Officers of complaints from an American citizen overseas alleging violations by CIA officers of the rights of an American citizen overseas secured under the U.S. Constitution, with an estimated completion date of December 31, 2015. Plaintiff assumes that respondent documents will shed light on whether there exist regulations and the like prescribing the appropriate handling of such situations. Plaintiff further expects that said respondent documents may shed light on the issue of supervisory responsibility and the like, both with respect to the conduct of Schaeffer et al. as well as the field officers (e.g., Paquette) whom Schaefer et al. were presumably involved with managing. Plaintiff has only partially examined the past record of CIA abuses committed against American citizens overseas, and expects that there is much more to be revealed in that regard, wherefore Plaintiff adduces that it is only reasonable to expect that a body of corresponding regulations and the like have been established in relation to the handling by CIA officers of incidental contact and interaction with private American citizens overseas. Plaintiff may seek leave to amend

the complaint, as appropriate, on the basis of the facts revealed in documents respondent

to said FOIA request.


248. The implications of the above-described customs and practices facilitating

violations of rights of Americans overseas as protected by the U.S. Constitution are

manifold. First, regarding the CIA, the unlawful conduct of CIA officers and other

Executive Branch officials embodies an implicit a message to the effect that, "We are

the CIA on official government business, and we don't care if you don't like what we're

doing here in the country of your residence; moreover, we will continue to harass you

until we've driven you off, because you are impeding the progress of our presidentially

authorized covert operation(s)" is implied by the practice of ignoring complaints and

permitting the offending officers and their proxies to continue to carry on as if nothing

had happened, their very presence a menace to Plaintiff.


249. Secondly, the deliberate deflection of Plaintiff's allegations into channels

where they would not be heard or registered (i.e., prevent the relevant authorities from

becoming aware of the complaints) enabled the CIA officers about whose misconduct

Plaintiff had made allegations to continue, unabated, as if the complaints had not been

made at all. Such deliberate and planned non-responsiveness was an attempt to facilitate

the perpetuation of the conditions enabling the misconduct that was the subject matter

of the complaints, and by extension, the continuance of the types of harassment

described in said complaints as well. Such deliberate failure to rectify the conditions

that had given rise to the need for Plaintiff to file the complaints in the first place not

only further prolonged, but compounded the injuries inflicted suffered by Plaintiff due

to the presence of rogue CIA officers whose misconduct had not been checked.


250. The mere presence of said rogue CIA officers and/or proxies is a

menacing cause of continuous psychological distress to Plaintiff, and the U.S.

governments' brazen ignoring of the complaints made by Plaintiff as an American

citizen alleging misconduct against its officials has served to compound the distress.

Apparently, the Executive Branch deems that it is permitted to engage in such brazen

conduct due to the need to "protect intelligence sources and methods", which serves as a

preemptive meme permitting the implementation of policies that pose an inherent risk to

the health and welfare of its own citizens overseas.


251. In this regard, Plaintiff has endured, over the course of approximately ten

years, the menacing presence of a cast of covert CIA officers openly occupying a

diverse range of stations throughout civil society under obviously under false pretenses,

a cast so large it should shock the conscience of the court. That such as ludicrous

practice could be characterized as a "covert action" is ludicrous, and representative of

the level of cognitive dissonance Plaintiff has been dealing with for the past ten years or

so. Moreover, the last six years of harassment Plaintiff has endured can be attributed to

the failure of the respective Executive Branch departments and agencies to respond in a

timely manner to the allegations Plaintiff laid out, in person, to Schaeffer in 2009, and

so forth. The policies, customs and practices promulgated by the Executive Branch in

relation to the CIA, the DOJ, the DOS and other federal agencies are at least partially to

blame for said failure, and by extension, the injuries suffered by Plaintiff due to the

alleged violations of Plaintiff's rights secured by the U.S. Constitution.


252. An obvious and inherent conflict of interest arises when a covert CIA

officer, such as Schaeffer, for example, is posted to the position of Chief of Citizen

Services Section at a consular facility and an American citizen overseas has had cause

to report violations by CIA officers and their proxies of his or her rights protected by

the U. S. Constitution to said consular facility. Under such circumstances, a CIA officer

such as Schaeffer would be motivated by personal and political interests to seek to

promote his work as a CIA officer and the agenda of the CIA in order to further his own

career, etc., especially if he were a "case officer" that had been involved in coordinating

the activities of the CIA "field officers" and proxies thereof against whom the American

citizen has made allegations in the first place. Plaintiff is also under the impression that

the career interests of Schaeffer et al. corresponds to a financial interest as defined

under 18 USC 208, and that any dishonest act alleged herein deemed to be coordinated

with a career advancement/preservation goal would therefore concurrently constitute

corresponding violations of that 18 USC 208 as well.


253. Accordingly, the custom of posting CIA case officers under official cover

as American Citizen Services Officer should be prohibited generally, and particularly in

developed, allied, constitutional democracies with a thriving civil society. The

deliberate failure to rectify the problems related to complaints made through

protestations by Plaintiff should shock the court as much as the incomprehensively

expansive scope of the so-called "covert operations" of the CIA in Kyoto, Japan.


254. Because there is a publically documented history demonstrating the

140

existence of a clear and present danger arising where the respective spheres of activity

of private American citizens overseas and covert CIA officers overlap, there exists a

corresponding and obvious conflict of interest arising between the government's

assigning of a covert intelligence operative (e.g., a CIA "case officer") to fill an official

post encompassing a fiduciary duty to American citizens (i.e., American Citizen

Services Officer). Not only has the Executive Branch deliberately ignored said danger

and refuse to implement remedial measures—such as proscribing the stationing of CIA

officers under official cover as American Citizen Services Officer—on the basis of

incidents such as those described above (i.e., Charles Horman, Frank Teruggi), but

preemptively implemented policies aimed at facilitating the covering up of any

incidents that might result due to the implementation of bureaucratic configurations for

enabling said deliberate negligence, non-responsiveness and misdirection on the part of

such CIA officers (e.g., Schaefer et al.). That is to say, the MOU and EO12333 enabled

the DOJ to cover up the misconduct of Schaefer et al., for example, who had failed to

report the misconduct of Paquette et al., because Schaefer et al., had a dual identity that

enabled them to deceive Plaintiff.


255. That is to say, the danger posed to the health and welfare of American

citizens overseas by adopting the above-described policies, customs, and practices

related to the stationing of covert CIA officers to the post of American Citizen Services

Officer was intentionally ignored during the planning and implementation of relevant

policies, and the purposeful ignoring of said danger by the Executive Branch was

facilitated by the implementation of secondary policies enabling the Executive to cover

up its activities in the case that said activities result in the violation of the rights of

American citizens overseas protected by the U.S. Constitution. The existence of the

aforementioned conflict of interest is readily attested to by the succinct reply Plaintiff

received from the Ms. Pam Young of the DOS/OIG regarding the non-responsiveness,

misdirection and the like of Schaeffer et al, as follows.


*Dear Mr. Vasaturo:*

*The OIG has reviewed your complaint and we have determined that the*

*appropriate agency to address your concerns is the Central Intelligence*

*Agency, Office of Inspector General (CIA/OIG).   Your information has*

*been forwarded to that office for action; reference number H20141106.*

*Please contact CIA/OIG for any future inquiries regarding this matter,*

*reference hotline number H20141106.   You may contact the agency by*

*mail at:*

   *Office of Inspector General*

   *Central Intelligence Agency*

   *Washington, D.C. 20505*

*Thank you for bringing this matter to our attention.*

*OIG Hotline Staff*

*U.S. Department of State*

*Office of Investigations*

*800-409-9926*

*This email is UNCLASSIFIED.*

256. Such customs were adopted with deliberate disregard of the inherent

threat posed to Americans overseas due to the clear and present danger of a conflict

arising in the overlapping spheres of activity between private American citizens and

covert CIA officers targeting the civil society of Japan, in the instant case, or another a

constitutional democracy with a free-market economy. Such overlapping spheres of

activity present an obvious condition under which a CIA officer aiming to exclude the

private American citizen from his or her sphere of activity in order to carry out covert

operations unhindered would commit acts violating of the rights said private American

citizen protected by the U.S. Constitution, as per numerous examples of past abuses

committed by CIA officers against American citizens overseas, including private

individuals as well as federal officials assigned to other agencies, such as the Drug

Enforcement Agency (DEA; i.e., Richard A. Horn). Therefore, such customs (and

associated practices) should have been proscribed, in advance. Moreover, when

multiplied by the relative population density of the CIA et al. and proxies thereof

Plaintiff has had the misfortune of encountering at the Starbucks, for example, in Kyoto,

it would seem an inevitability that such violations are going to occur.


257. Furthermore, the implementation of policies spanning a plurality of

federal departments and agencies that can be seen to embody preemptive

countermeasures aimed at deflecting, through various bureaucratic and other means,

144

complaints such as those lodged by Plaintiff alleging federal crimes committed by CIA

officers, thereby perpetuating the conditions giving rise to the alleged violations,

conditions resulting from the adoption of policies, customs and practices implemented

across a plurality of federal departments and agencies, policies which should not have

been under consideration in the first place in light of the proven clear and present

endangerment to private American citizens posed thereby, represents a manifold (or

perhaps compound) violation of Plaintiff's due process rights protected by the U.S.

Constitution. Such policies add layers of supervision and control over such government

activities, across a plurality of federal departments and agencies, related to the handling

of allegations of federal crimes committed by covert CIA officers, etc.


258. As of October, 2013, the Consulate ceased communicating with Plaintiff

directly (i.e., through responses from individual American Citizen Services Officers),

and instead deployed an automated response system with a standardized message text in

subsequent replies. The sender of the last email Plaintiff received, informing Plaintiff

that Kennedy was no longer assigned to the Consulate, did not identify his or herself.

That was more than likely owing to the fact that I had posted some of the email

correspondence identifying Schaeffer et al. When Plaintiff subsequently requested the

145

identities of the consular officials that have held the post of Citizen Services Officers

since the departure of Kennedy, which Plaintiff was informed of in October of 2013,

Plaintiff was told to submit a FOIA request to the State Department. The adoption of

such practice represents an attempt to evade accountability for the continued deliberate

refusal to provide necessary information to which Plaintiff was entitled, and perhaps an

attempt to "protect intelligence sources and methods" in the form of the covert identities

of the CIA officers newly stationed under diplomatic cover at the Consulate. Said series

of actions can be said to represent another manifestation of the Executive Branch's

stonewalling American citizens such as Plaintiff, implying that mere citizens are not

permitted to officially complain about violations of their civil rights by CIA officers.


259. Here, the DOS (actually, the CIA, which appears to have coopted the

agency of "American Citizen Services Officer" at the American Consulate in Osaka, if

not the entire Consulate) deliberately adopted to implement a policy of

non-communication, retrenching their policy of non-responsiveness by raising the level

of silence, presumably deemed to be justifiable on the basis of the need to protect

"intelligence sources and methods", in this case, extending to the identities of CIA

officers stationed under official cover at the American Consulate in Osaka, because

Plaintiff had been exposing said CIA officers on his blog, but perhaps also as a strategy

for averting potential individual liability under a *Bivens* action. Again, it bears repeating

that such course was adopted without any official at the Consulate even suggesting that

Plaintiff report the alleged violations to the CIA/OIG, which, gathering from reply

Plaintiff received from the office of the then Chair of the Senate Select Committee on

intelligence, Senator Dianne Feinstein, appears to have been necessary information to

which Plaintiff was entitled to be informed of by the American Citizen Services Officer,

i.e., Schaeffer et al.

260. The fact that the above-described customs and practices may themselves

be said to correspond to "intelligence sources and methods" by the Executive Branch,

and therefore to require protection as "state secrets", is not a valid basis upon which to

grant immunity to the federal government against the liability it bears for violations

committed by its officials of the rights of American citizens overseas protected by the

U.S. Constitution.

261. The above-described actions of Schaefer et al. as well as said manifold (or

compound) violations of Plaintiffs due process rights with deliberate disregard for

Plaintiff's plight served to facilitate further harassment by CIA officers and their

proxies, depriving Plaintiff of his rights to liberty and privacy secured under the Bill of

Rights as well as the Fourteenth Amendment of the U.S. Constitution. *Bivens* provides

the authority to bring a civil action for said violations.


262. The promulgation by the Executive branch of EO12333 and the

Memorandum of Understanding between the CIA and the DOJ pertaining to the

reporting of Federal Crimes (hereinafter MOU) has served to create a scenario in which

federal officials, in particular:


1)      CIA officers engaged in covert operations under official (diplomatic) cover

working from the American Consulate in Osaka and the American Embassy in Tokyo

Japan in collaboration with their counterparts at relevant administrative centers in the

Washington DC area; and

2)      DOJ officials in the Civil Rights Division and Criminal Division


have been afforded an excessively permissive degree of discretionary power enabling

them to ignore and/or pass the responsibility (i.e., for handling Plaintiff's complaints)

internally from one administrative agency to another in a tailor made bureaucratic

labyrinth for facilitating said passing of responsibility in a nontransparent manner, and

incorporates a preemptive recourse to plausible deniability on the basis of the need to

protect "state secrets", while concurrently deceiving the American citizen submitting

the complaint, in a manner such as to lead said citizen to believe that the matter was

being investigated and the like, thereby perpetuating the circumstances constituting the

background against which the violations were committed in the first place and

facilitating further such violations.


263. Plaintiff alleges that the Executive Branch has demonstrated a deliberate,

systematic disregard for the due process rights of Plaintiff, and moreover, has

preemptively implemented bureaucratic countermeasures seeking to dissuade or prevent

American citizens such as Plaintiff, whose rights protected by the U.S. Constitution

have been violated by covert CIA officers, etc., from seeking redress ("through the

appropriate channels", etc.). In effect, the Executive Branch, through the promulgation

of the aforementioned MOU and EO12333 together with the adoption of practices such

as stationing cover CIA officers as American Citizen Services Officers have provided

CIA officers such as Schaeffer et al. with a license to mislead American Citizens

overseas seeking to report alleged federal crimes committed against them by CIA

officers, thereby erecting a bureaucratic shield protecting rogue covert CIA officers

from being held accountable for their alleged deprivation of the rights of American

citizens protected under the U.S. Constitution. The same could be said of officials at the

DOJ, in light of the misleading written reply the DOJ sent to Plaintiff. Plaintiff invokes

the private cause of action authorized by *Bivens* and present his claim through the

vehicle represented in the precedent set by Monell v. Department of Social Services,

436 U.S. 659 (1978) with respect to the implication of official policies, customs and

practices in such violations.

264. More specifically, with respect to policy, examining the first page of the

aforementioned MOU, for example, it can be seen that there are a number of exceptions

that render the procedural guidelines set forth in said MOU inapplicable. That is to say,

the reporting guidelines of the MOU themselves are subordinated to a second set

of—apparently classified—procedures "agreed upon between the Attorney General and

the head of the department or agency concerned".

265. Said MOU requires, in section I. Introduction, that:

*"senior officials of the Intelligence Community...report to the Attorney*

*General possible [emphasis added] violations of the federal criminal*

*laws by employees... as provided in procedures agreed upon by the*

*Attorney General and the head of the department or agency concerned,*

*in a manner consistent with the protection of intelligence sources and*

*Methods, as specified in those procedures."*

266. Here, while the threshold triggering a reporting requirement is indeed set

very low by the use of the term "possible", on the one hand, the subordination of said

reporting to the dictates of the phrase "in a manner consistent with the protection of

intelligence sources and Methods, as specified in those procedures", with the

aforementioned "those procedures" referring to said apparently already classified

procedures "agreed upon between the Attorney General and the head of the department

or agency concerned", on the other hand, renders the reporting requirements completely

opaque.

267. Moreover, "I. Introduction" of said MOU continues by indicating that

"Title 28, United States Code, Section 535 (b) requires that":

> [a]ny information, allegation, or complaint received in a department or
>
> agency of the executive branch of government relating to violations of
>
> title 18 involving Government officers and employees shall be
>
> expeditiously reported to the Attorney General by the head of the
>
> department or agency unless—
>
> (1) the responsibility to perform an investigation with respect thereto is
>
> specifically assigned otherwise by another provision of law; or
>
> (2) as to any department or agency of the Government, the Attorney
>
> General directs [emphasis added] otherwise with respect to a
>
> specified class of information, allegation, or complaint.

268. Here, while the threshold triggering a reporting requirement is again

indeed set very low by the use of the phrase, "any information, allegation, or complaint

received in a department of the executive branch of government", it is necessary to

examine in detail the implications set for in the exceptions (1) and (2) following

"unless".

269. The first exception, (1), relates to "another provision of law" taking

precedence in the case that investigative responsibility has been delegated thereby. With

respect to the CIA, the establishment of the CIA/OIG by U.S. Code Title 50, Chapter 46

§ 3517 would appear to correspond to such a provision of law. The most directly

relevant portions of said law establishing the CIA/OIG appear to be the following:

> *(c) Duties and responsibilities*
>
> *It shall be the duty and responsibility of the Inspector General*
>
> *appointed under this section—*
>
> *(1) to provide policy direction for, and to plan, conduct, supervise, and*
>
> *coordinate independently, the inspections, investigations, and audits*
>
> *relating to the programs and operations of the Agency to ensure they*
>
> *are conducted efficiently and in accordance with applicable law and*
>
> *regulations;*
>
> *(2) to keep the Director fully and currently informed concerning*
>
> *violations of law and regulations, fraud and other serious problems,*
>
> *abuses and deficiencies that may occur in such programs and*

*operations, and to report the progress made in implementing corrective*

*action;*

*(3) to take due regard for the protection of intelligence sources and*

*methods in the preparation of all reports issued by the Office, and, to*

*the extent consistent with the purpose and objective of such reports,*

*take such measures as may be appropriate to minimize the disclosure of*

*intelligence sources and methods described in such reports*


270. For future reference, Plaintiff would like to draw attention to the gist of

the passages stating:


*(1) "investigations... relating to the programs and operations of the*

*Agency to ensure they are conducted... in accordance with applicable*

*law";*

*(2) "to keep the Director fully and currently informed concerning*

*violations of law..., and to report the progress made in implementing*

*corrective action"*

*(3) to take due regard for the protection of intelligence sources and*

*methods in the preparation of all reports issued by the Office, and, to*

*the extent consistent with the purpose and objective of such reports,*

*take such measures as may be appropriate to minimize the disclosure of*

*intelligence sources and methods described in such reports*

271. Though a primary objective of the CIA/OIG is to conduct investigations aimed at ensuring that the CIA is operating in accordance with the law, the reference to "protection of intelligence sources and methods" in conjunction with the reference to "the purpose and objective of such reports", etc., seems to present cause for concern. That is to say, while the "purpose and objective" of CIA/OIG reports does not appear to be subordinated as such to the "protection of intelligence sources and methods", the manner and extent to which the requirement to "take such measures as may be appropriate to minimize the disclosure of intelligence sources and methods described in such reports" impedes the reporting of violations of law by CIA officers is an important primary concern in the instant case.

272. Meanwhile, the second exception in the MOU, (2), appears to include a grammatical error masked by a typographical error. The phrase "Attorney General

directors otherwise" would appear to be written in error for "the Attorney General has directed otherwise". The reasons are obvious but, first of all, the temporal frame of reference in the case of the present tense, "directs" would be wrong because the report (i.e., the "*[a]ny information, allegation, or complaint received in a department or agency of the executive branch of government relating to violations of title 18 involving Government officers and employees*") would have already have been "received" and presumably "reported" to the Attorney General barring the existence of a pre-issued directive instructing otherwise. Accordingly, the phrase can only refer to the situation in which the Attorney has made a directive in advance "as to any department or agency of the Government... with respect to a specified class of information, allegation, or complaint".

273. Here, the issue becomes a question as to what is meant by "a specific class of information, allegation, or complaint", on the one hand, and whether that means that the aforementioned "*information, allegation, or complaint*" pertained to information, an allegation, or complaint "*relating to violations of title 18 involving Government officers and employees*" is not reported at all; that is to say, to neither the Attorney General nor the CIA/OIG. There is no alternative to the reporting regime presented above, which

*i*

raises the later question. That is to say, if the Attorney General has directed the Director

of the CIA to have any such *"information, allegation, or complaint"* reported internally

to the CIA/OIG, there would appear to be ample scope for discretionary decision

making within the CIA's bureaucracy to divert the reporting of such *"information,*

*allegation, or complaint"*, thereby preventing the reporting thereof to the CIA/OIG. An

American citizen in the position of Plaintiff has no way to confirm the status one way or

another, aside from recourse to the Judicial Branch. In other words, what officials in the

CIA's bureaucracy have the discretionary decision making authority to determine

whether or not an allegation of a federal crime meets the criteria requiring the reporting

to the CIA/OIG thereof as such. This is yet another reason why there should be a

blanket prohibition on the posting of covert CIA officers under official cover as

American Citizen Services Officer, as they represent an opaque, covert level of

unaccountable bureaucracy.


     274. In regard to the above-described exception (2), Plaintiff would like to pose

a somewhat obvious hypothetical question. What reporting action would the MOU

mandate in the case of a complaint submitted by a private citizen (i.e., Plaintiff) alleging

unlawful misconduct by CIA officers that involved violations of the rights of Plaintiff

protected by the U.S. Constitution as well as information disclosing "intelligence

sources and methods"? Implanting the above-described hypothetical question into the

scenario in which the report (by Plaintiff) was made to a covert CIA officer posted

under official cover as American Citizen Services Officer makes the inherent conflicts

of interest and multilayered opacity in the bureaucracy readily apparent.

275. Presumably, the hypothetical scenario would in fact be covered by

exception (1), and the allegations investigated by the CIA/OIG. However, in the instant

case, Plaintiff was compelled, due to continual unabated harassment, to further submit a

complaint to his representative in the House of Representatives, Barbara Lee, and when

that proved to be an utterly ineffective and frustrating waste of time and effort, followed

through by lodging a complaint directly with the DOJ, again not being advised of the

necessity to report such allegations to the CIA/OIG, even with respect to the future.

276. The stage prior to Plaintiff's submitting the allegations to the DOJ

presents at least the four possible scenarios described in Paragraph 212 above.

277. The stage after Plaintiff submitted the complaint to the DOJ presents a

range of other possible scenarios, none of which represent a dutiful and proper handling

of the complaint by the DOJ. Moreover, in light of the continuation of the harassment

after the DOJ mailed Plaintiff the written response described above, even though two of

the more egregious offenders had been removed from Plaintiff's immediate

surroundings, it is apparent that the CIA did not implemented any changes aimed at

reducing the scale of the covert operations being conducted in Plaintiff's immediate

surroundings, they'd simply made some personnel changes.


278. Without going into further detailed analysis of the aforementioned MOU,

suffice it to say that the very existence of said MOU attests to the fact that the Executive

was clearly aware that there exists a clear and present danger of American intelligence

officials committing federal crimes against American citizens overseas in countries

where said intelligence officials are engaged in covert operations.


279. Accordingly, the promulgation of a policy (i.e., the MOU) that on its face

is purported to be an oversight mechanism of a sort intended to prevent unlawful

misconduct and promote the carrying out of justice, but also includes stipulations that

appear to render the most central and important provisions of said MOU ineffective by

subordinating said provisions to classified procedures intended to prevent exposure of

the very existence of the intelligence officials committing the alleged Constitutional

violations, seems intended to preempt the holding accountable of intelligence officials

alleged to have violated the constitutional rights of American citizens. That is to say, the

policy itself is drafted in a manner aimed at facilitating the cover up of Constitutional

violations committed by American intelligence officials against American citizens

overseas, in the name of protecting "intelligence sources and methods", and that is a

direct violation of Plaintiff's rights to due process protected by the U.S. Constitution,

and in all likelihood also an obstruction of justice.


280. As described above regarding the hostile and threatening emails from

Roughan, which are representative of the hostile disposition of all the

disposition-oscillating CIA officers about whom allegations are set forth herein, that

Roughan sent Plaintiff in relation to his blog posts about Roughan, many of the alleged

acts of invasion of privacy and harassment occurred after Plaintiff had

reported—through what Plaintiff assumed were the "appropriate channels", starting

with the American Consulate—rogue covert CIA officers presumably acting in their

individual capacity.

281. Here, Plaintiff has surmised that, in order to conceal the (already exposed on Plaintiff's blog) classified identity of a rogue CIA officer that is engaged in covert operations and whose "cover" (i.e., assumed identity in civil society) is also classified in conjunction with the imperative to "protect intelligence sources and methods" per the MOU, EO12333, 50 U.S.C. 403g, etc., said CIA officer having been the subject of a citizen report according to said MOU and alleging the commission of federal crime against an American citizen, the CIA customarily has the thus reported CIA officer carry on as if there had not been such a report. Plaintiff has witnessed and directly experienced the adverse consequences of said custom first hand repeatedly over the course of the past approximately ten years (six years of which correspond to the period after which Plaintiff first presented allegations to an officer of the Executive Branch). Perhaps the line between a "federal crime" and a "constitutional tort" is a line that the MOU and EO12333 attempt to straddle, and are thus intentionally drafted in a manner providing discretion regarding the delineation between a "federal crime" and a "constitutional tort" and the application of the letter of the law; however, such a customary practice would amount to the adoption of a policy preemptively condoning the willful neglect of the right to privacy and/or liberty interests of the victim that

reported the alleged crime in the first place, including the victims right to be free from

unwarranted intrusion of the government in the form of the very presence of the

menacing sociopathic CIA officers that were the subject of a previous report by said

victim alleging commission of federal crimes. Such has been the intolerable

environment Plaintiff has been subjected to over the years. In this regard, said MOU

and EO12333 (and correlated classified procedures) are drafted so as to afford an

exceedingly broad scope of discretion to whatever officers of whichever federal

department and agency is accountable for the execution thereof.


282. The fact that individuals that Plaintiff has complained about in the past

have repeatedly reappeared in my immediate surroundings, with one incident involving

Dickinson, Falun Gong Mike, and a CIA officer masquerading as a would-be shaman

named Kevin Turner resulting in my calling the local police to the Starbucks, clear

demonstrates that appropriate corrective measures had not been implemented.


283. Since it has been impossible for Plaintiff to know what is going on in the

Executive Branch in relation to his complaints, Plaintiff has mailed a letter and sent two

emails directly to President Barack Obama at the White House. Plaintiff has received no

reply from the White House.

284. Plaintiff also notes that he has subsequently submitted two (to date) reports to the CIA/OIG thus far in relation to matters pertaining to the instant case. Plaintiff has not received a single acknowledgement that the reports were received, let alone any indication as to the status of any investigation, whereas in the denial of Plaintiff's Privacy Act request, Plaintiff did receive a terse response neither denying nor confirming the existence of responsive records based on national security grounds. Furthermore, it should be noted that the CIA/OIG did make public statements in relation to the recent scandalous misconduct of CIA officials involved in illegally accessing the computers of Senate staffers attached to the Senate Select Committee on Intelligence. Plaintiff believes that the policies related to the handling of the allegations he presented to the CIA/OIG have not facilitated Plaintiff's receiving a proper response from the government agency in question, violating Plaintiff's rights to due process protected under the U.S. Constitution.

285. Plaintiff asserts that, even under the implausible circumstance that the Executive Branch can at present continue claim with valid legal basis that there exists a

"classified relationship" between Plaintiff and the CIA, the CIA/OIG cannot deny that

Plaintiff has submitted reports thereto alleging the commission of federal crimes by CIA

officials against Plaintiff, and should be obligated to provide an official response, even

if it refers to a national security exception regarding the degree of (non)disclosure of

relevant information, as in the case of the declined Privacy Act request.

286. The policies and practices examined herein represent a deliberate attempt

to obstruct Plaintiff from seeking justice in relation to the alleged federal crimes

committed against him by federal officials, and therefore represent a denial of due

process, and violate Plaintiff's liberty interests including the protection against

unwarranted government intrusion, by facilitating the furtherance of the near daily

continual harassment by covert CIA officers that was the substance of the initial

allegations made by Plaintiff to the American Consulate in Osaka.

287. Plaintiff, having read the above-described EOs and policies, has come to

the conclusion that the common thread running therethrough pertaining to the

"protection of intelligence sources and methods" is being used by the Executive to

preemptively subvert the original functions of government agencies, such as the Office

of American Citizen Services, to the secretly established covert agenda of the CIA

without due consideration of the various and several rights of American citizens

residing overseas protected by the U.S. Constitution.

288. To reiterate, the "protection of intelligence sources and methods" appears

to be serving as the justification for not even acknowledging that a complaint has been

made to the CIA/OIG alleging the commission of federal crimes by CIA officials

against an American citizen overseas, despite a history of such crimes. A same or

similar pattern is found in the deliberate lack of responsiveness to complaints related to

the CIA by the consular officials serving as American Citizen Services Officers, and is

accentuated by the eventual decision to cut off all personal contact, requiring that I file

an FOIA request even to learn the identity of the current American Citizen Services

Officer. Meanwhile, it took approximately eleven months before Plaintiff received the

above-described written reply from the DOJ.

289. Accordingly, there is a question as to whether customs and practices

facilitated by the above-described EO and MOU afford an excessive scope of discretion

with respect to the determination as to whether or not to investigate alleged violations

by federal officials, such as covert CIA officers, of the Constitutional rights of an

American residing overseas.

290. Here, a statement that sounds like a disclaimer can be found in section 2.8

*Consistency with Other Laws* of EO12333.

"Nothing in this Order shall be construed to authorize any activity in

violation of the Constitution or statutes of the United States."

That appears to be too vague, however, to have the intended effect, perhaps due to the

term "construed". In fact, in no sense can it be said that EO12333 has served to prevent

Plaintiff's rights secured under "the Constitution or statutes of the United States" from

being violated by CIA officers, etc. Here, section 2.2 *Purpose* explicitly states:

"Set forth below are certain general principles that, in addition to and

consistent with applicable laws, are intended to achieve *the proper*

*balance* between the acquisition of essential information and protection

of individual interests." [italics added]

Here, assuming it to be self-evident that the rights protected under the Bill of Rights and

the Fourteenth Amendment of the Constitution of the United States of America are

inviolable, to what, perchance, could said "proper balance" refer in a case such as

Plaintiff's? Furthermore, with regard to the very next line:

> "Nothing in this Order shall be construed to apply to or interfere with
>
> any *authorized civil or criminal law enforcement responsibility of any*
>
> *department* or agency." [italics added]

Plaintiff wonders to what said "authorized civil or criminal law enforcement

responsibility of any department" refers with respect to the DOJ, in particular. Again,

the use of "construed" seems to bely a presumption that interpretation of the text of

EO12333 will be an issue. Meanwhile, it bears noting that section 2.4 *Collection*

*Techniques* provides that:

> "...shall use the least intrusive collection techniques feasible... directed
>
> against United States persons abroad."

implicitly recognizing the right to privacy and the right to be free from unwarranted

intrusion by the government, though said provision has not been followed/enforced.

291. Furthermore, in the instant case, there would appear to be two categories

defined in EO12333 which could presumably apply to Plaintiff. The first category

would be as an applicant for employment with the CIA, as per the aforementioned

application Plaintiff filed online in April 2009, and the second category would be as a

private American overseas that has been targeted by an international criminal

organization of which the American intelligence agencies were aware.

292. Here, although Plaintiff may be deemed to fall under the above-described

categories for the narrow purposes associated therewith, information obtained about

Plaintiff through electronic and physical surveillance by "elements of the intelligence

community" was diverted for use in the unlawful purpose of attempting to displace

Plaintiff from Kyoto by CIA officers, their cohorts from the intelligence services of

other countries and locally recruited Japanese proxies, as demonstrated by the related

sophomoric efforts of Roughan against Plaintiff.

293. In the instant case, individual CIA officers such as Peterka, Roughan and

Paquette were deliberately engaged in carrying out, acting in their individual capacity as

rogue federal officials, conspiratorial criminal acts with respect to which they were fully

cognizant of the Constitution violations they were committing; however, the

insufficiently prohibitive wording of EO12333 and other configurational deficiencies

with the related policies contributed to producing an environment conducive to

intelligence officers and the intelligence community assuming that an excessively broad

degree of discretion was afforded by said EO12333 and other policies than is

permissible under the Constitution of the United States of America, thereby constituting

policies that facilitated the alleged violations of the rights of Plaintiff protected by the

U.S. Constitution. Here, it remains to be seen to what extent—if any—Schaefer et al.

were involved in coordinating the subversive acts against Plaintiff by Paquette et al.


294. Furthermore, having had Privacy Act requests denied by the CIA and

NSA on the basis of national security exemptions, Plaintiff would include Executive

Order13526 (hereinafter "EO13256") as a policy supporting the labyrinth-like

bureaucracy that the Executive has constructed in order to facilitate the concealment of

violations by the CIA of constitutional rights of American citizens overseas.

295. Meanwhile, there is a conspicuous lack of a formal Administrative Procedure for filing complaints such as those by Plaintiff starting with the visit to the American Consulate in Osaka, Japan. That would seem to represent a deliberate omission, again with the above-described aim of concealment of wrongdoing, etc.

296. Accordingly, taken severally and considered in concert, the above-described official acts, including policy promulgation, etc., of U.S. government officials demonstrate policy-based customs and practice that facilitate self-serving bureaucratic interests as opposed to regulating the dutiful performance of the functions owed to the American citizens according to the public office occupied by said officials, thus facilitating the violation of Plaintiff's rights protected under the U.S. Constitution.

297. At this point, it is necessary to revisit the DOJ's handling of Plaintiff's complaints with respect to the stipulations set forth in EO12333 and the Memorandum of Understanding between the DOJ and CIA on the reporting of federal crimes as well as the customs and practices associated therewith.

298. Though the classified status of the procedures drawn up by the Attorney

General are unknown to Plaintiff, there would seem to be a systemic deficiency in

relation thereto that produces a disincentive for covert CIA officers posted under official

cover as American Citizen Services Officers to fulfill the corresponding fiduciary duty

to American citizens incumbent thereupon; thus, said procedures must also be presumed

to be culpably inadequate. Moreover, in light of past egregious violations of the civil

rights of American citizens overseas by rogue CIA officers, only a deliberate refusal

to implement remedial policies and measures could account for the lack thereof. Such a

deliberate refusal to implement remedial measures has facilitated the violation of

Plaintiff's aforementioned civil rights. Such remedial policies and remedies would, as a

matter of course, encompass a corresponding regime for the training of covert CIA

officers posted under official cover as American Citizen Services Officers.


299. The DOJ's actions and refusal thereof (i.e., to launch an investigation into

Plaintiff's allegations) facilitated by said culpably inadequate policies, customs and

practices, demonstrated deliberate indifference to Plaintiff's plight and served to

facilitate further such harassment by CIA officers and their proxies which should

otherwise have been prevented. Such inadequacy has resulted in the egregious violation

of Plaintiff's right to privacy protected under the Fourth Amendment, and rights to due

process protected under the Fifth Amendment as well as the Fourteenth Amendment of

the U.S. Constitution. *Bivens* provides the authority to bring a civil action for said

violations, and *Monell* claims provide the proper vehicle therefor.


300. Last but not least, Plaintiff has encountered, in his eventual need

to pursue litigation against the CIA et al., that the CIA has enacted a regulation

(32 CFR 1904) appearing intent on preemptively enabling it to facilitate

evasion tactics on the part of its officers, agents and employees so that they can

avoid being served process when a civil action such as this is brought against

them. Said regulation includes a disclaimer in 1904.1 stating, *"This part is*

*intended to secure the orderly execution of the Agency's affairs and not to*

*impede any legal proceeding"*, and other stipulations that lead Plaintiff to

believe that evasive actions he has noted on the part of CIA officers here

recently seeks to exploit said regulation in order to evade being served process

in relation to this civil action. That would serve to retroactively legitimate the

deprivations of rights of Plaintiff protected under the Constitution through a

regulation (i.e., policy) and customs and practices associated therewith.

Accordingly, said regulation (i.e., policy) along with the customs and practices

associated therewith would serve to directly facilitate the deprivation of

Plaintiff's due process protected under the Fifth Amendment as well as the

Fourteenth Amendment of the U.S. Constitution by enabling the CIA to use its

unlimited resources to ensure process is not served on its officers, agents and

employees in civil action such as this civil action, and amount to a form of

obstruction of justice. *Bivens* provides the authority to bring a civil action for

said violations, and *Monell* claims provide the proper vehicle therefor.

IX

SIXTH CAUSE OF ACTION

(*Bivens* 4, *Monell* 2: Procedural Due Process, Substantive Due Process;

Fifth Amendment, and Fourteenth Amendment of the U.S. Constitution)

301. Plaintiff incorporates herein, as though fully set forth, all of the allegations

contained in paragraphs 1 through 305, above, as though fully set forth.

173

302. In the Fifth Cause of Action, Plaintiff has attempted to focus on the nexus

of policies and practices/customs as enabling a systematic deprivation of Plaintiff's

aforementioned civil rights. Here, Plaintiff wishes to focus more narrowly on the role of

the policies in depriving Plaintiff of his right to procedural due process. The

above-described attempts by Plaintiff to file a complaint alleging violations of his rights

protected by the U.S. Constitution, including, for example, the right to privacy, were

met with dead ends, non-responsiveness and deception on the part of the federal

agencies receiving Plaintiff's complaints, including the DOS, DOJ, and CIA/OIG.


303. Furthermore, while the above-described MOU and EO12333 have been

established, no formal Administrative Procedure has been established for enabling

American citizens overseas to report alleged violations by CIA officers of rights of an

American citizen overseas protected by the U.S. Constitution. The absence of a formal

Administrative Procedure at each of said federal agencies is conspicuous in the light of

past abuses by the CIA such as those described herein as well as the circumstances of

the instant case, and should be seen in stark contrast to the promulgation of both the

aforementioned MOU and EO12333, the existence of which is a testimony to the

foreknowledge of the respective officials of the Executive Branch agencies with respect

to relevant matters including matters such as those described herein.

304. Moreover, in one way or another, both of the aforementioned MOU and

EO12333 as well as the apparently classified procedures to be established by the

Attorney General in relation to said MOU would appear to correspond to:

"...*law*[s] *which shall abridge the privileges or immunities of citizens*

*of the United States*"

305. Plaintiff's privacy and dignity have been severely infringed upon by

federal officials including suspected CIA officers, and Plaintiff was entitled to honest

services from the federal officials of each federal agency to which he made repeated and

continual protestations both verbal and in writing seeking to bring an end to the

above-described misconduct of rogue CIA officers and other federal officials, including

deprivations of Plaintiff's rights secured by the U.S. Constitution. Plaintiff alleges that

such denial of honest services was due at least in part to the fact that no official

Administrative Procedure for receiving such complaints as the aforementioned

complaints made by Plaintiff whereas the history of similar abuses by rogue CIA would

seem to require that a corresponding Administrative Procedure be established in order

to protect the rights of American Citizens overseas as secured by the U.S. Constitution.

Said MOU and EO12333 have been promulgated in a manner such as to deprive,

preemptively and in stealth, American citizens' aggrieved by violations of their rights

secured by the U.S. Constitution of recourse to an appropriate Administrative Procedure

to address said grievances.


306. The absence of a formal administrative procedure at any of the

corresponding Departments of the Executive Branch thus facilitated the unabated

continuation of said misconduct violating Plaintiff's due process rights protected by the

U.S. Constitution. Accordingly, Plaintiff alleges that the absence of a formal

Administrative Procedure at any of the Departments of the Executive Branch is itself

the cause of creating a bureaucratic environment of permissiveness that facilitated

continual violations of Plaintiff's rights secured by the U.S. Constitution, violations that

should have otherwise been halted by sufficient government action in relation to the

reporting thereof through the "appropriate channels" by means of a formal

Administrative Procedure therefor. That is to say, though Plaintiff was informed of the

existence of "appropriate channels" therefor, said "appropriate channels" were not

specifically identified to Plaintiff; moreover, Plaintiff was not provided access thereto in

the form of an official Administrative Procedure. Plaintiff has been deprived of his right

to procedural due process protected under the Fifth Amendment of the U.S. Constitution

in a manner facilitated by the promulgation of said MOU and EO12333 in violation of

the Privileges or Immunities Clause of the Fourteenth Amendment of the U.S.

Constitution. *Bivens* provides a cause of action against such violations, and a *Monell*

claim provides the proper vehicle therefor.

X

SEVENTH CAUSE OF ACTION

(Obstruction Of Justice, pursuant to

18 USC 1505: Obstruction of proceedings before departments, agencies, and

committees;

18 USC 1512: Tampering with a witness, victim, or informant;

18 USC 1514 Civil action to restrain harassment of a victim or witness; and

18 USC 1519: Tampering with evidence)

177

Plaintiff incorporates herein, as though fully set forth, all of the allegations contained in paragraphs 1 through 311, above, as though fully set forth.

307. Among a number of such examples, one example of tampering with and harassing a victim (i.e., Plaintiff) can be seen in the harassment and attempts to intimidate and threaten by Roughan in personal emails and the like, followed by his apparent assumption of a false identity (i.e., Plaintiff's name) to make derogatory comments on Plaintiff's blog. Roughan had requested in a menacing manner that Plaintiff remove posts describing Roughan as a CIA officer and his related acts against Plaintiff, and Roughan has repeatedly insinuated that Plaintiff's allegations against him and the CIA were indicative that Plaintiff had mental health problems. Most recently an individual named Jonathan Fields, whom also resides in Kyoto, apparently, commenting on an article on the Japan Times (http://www.japantimes.co.jp/news/2015/09/11/national/kyoto-pushes-wealthy-western-tourists-luxury-accommodation-short-supply/#.Vf-g2_mqpBc) claiming to have found my blog also questioned Plaintiff's mental health, stating, "*You need help, man... You're exhibiting signs of schizophrenia*", and then claims to be in the CIA himself in an

attempt to mock Plaintiff. Plaintiff believes that to be his actual name, so the Court

should be able to determine whether he is in fact yet another CIA officer attempting to

stifle Plaintiff's freedom of speech in order to promote the agenda of the CIA, using an

apparently common tactic of asserting that anyone happening upon the perverse

activities of the CIA that calls them out on it is delusional. Plaintiff presents this as

another example of a covert CIA officer attempting to subvert a civil society venue.


308. Another example of tampering can be seen in the continual attempts to

dissuade Plaintiff from pursuing legal action by deceiving Plaintiff into thinking that the

CIA was about to propose a settlement or reach some agreement accommodating my

demands, such as agreeing to the terms of employment as an independent contractor,

etc., Plaintiff had offered.


309. The CIA projected an ominous and menacing presence through the

continual resurfacing of CIA officers and proxies thereof about whom Plaintiff had

complained, or through the introduction of new CIA officers into Plaintiff's immediate

surroundings who would socialize with Plaintiff at the Starbucks in a manner such as to

suggest that some positive developments were pending, including, for example, that the

of the problematic rogue CIA officers about whom Plaintiff had complained had been

removed. Such false overtures amount to an attempt to influence Plaintiff in a manner

such as to consume his time and divert his efforts toward pursuing legal action, thereby

delaying the filing of this Complaint. That is to say, instead of pursuing legal action,

Plaintiff was instead indirectly encouraged to bide his time await further signs and

developments while socializing with the newly introduced CIA officers, etc.


310. In this respect, the nature of the so-called "classified" relationship

between Plaintiff and the CIA referenced in the refusal of Plaintiff's Privacy Act request

to the CIA requires scrutiny. Plaintiff is certain that the full scope thereof is not

encompassed by the relationship created on the basis of Plaintiff's application for

employment therewith as an independent contractor.


311. Plaintiff notes that he had contacted Taylor and reported the attack

Plaintiff had suffered at a local bar at which Plaintiff had an appointment to meet a CIA

proxy named Yoshiyuki (reported to Consulate along with mobile telephone number)

whom Plaintiff had met at the Starbucks through Peterka, Mike, and Paquette. Taylor's

reply of December 12, 2007 included the statement, "Sounds like you need to find a

new crowd in Kyoto". Normally, that might sound like reasonable advice, but under the

circumstances, that would simply require Plaintiff to avoid all public venues, such as

cafes, bars and the like, frequented by covert CIA officers and their proxies, who

constitute a group that collectively had sought to colonize civil society in Kyoto. Tatlor

would presumably have been aware of that. Plaintiff notes that he raised the issue of

civil society in his first email to Schaeffer et al. It should be noted here that Yoshiyuki

was frequently in the company of Mike as well as Paquette, and there is no question in

Plaintiff's mind that he was set up to be attacked by said CIA officers or their proxies

with the complicity of said CIA officers.


312. While Plaintiff is not aware as to whether or not Taylor reported, as

apparently would be required under EO12333, Plaintiff's allegation that he had been

subject to a criminal attack encompassing a conspiracy involving rogue CIA officers.

Plaintiff has noted the correspondence between the appearance of Harris from Thailand

and his attempts to encourage Plaintiff to leave Kyoto for Thailand, and the fact that

Taylor and Kiely had been stationed in Thailand for many years. Furthermore, the time

frames overlap.

313. Here, Plaintiff cites a paragraph from an email addressed to Snider that Plaintiff sent to the Consulate on October 20, 2011, the email having subsequently been provided to the DOJ as well:

> *After being attacked in the bar called the HUB, the next time I was in there I was talking to a guy named Marcus, a German doing something at Kyoto University in the Science, and obviously an intelligence dweeb. We were talking about the attack when I was compelled to come out and say loudly that Glenn was in the CIA, whereupon Marcus tried to deny that and quickly change the subject to the guy who had attacked me, telling me he was Moroccan and trying to get me interested in other information. More recently, after the topic again came up with a Dan Douglass assuming a higher profile, apparently more time to spend at the café after losing his job, whereupon he also tried to put me on the trail of the Moroccan guy, telling me the guy was studying martial arts and that Dan, too, had found him to be an individual with a chip on his shoulder. In summary, both Marcus and Dan tried to steer me onto a revenge trail against my*

*attacker in order to divert my attention from analyzing the setup and*

*those behind it.*

314. It bears repeating that the incidents continued after Plaintiff reported the

rogue CIA officers to the Consulate, started blogging about the scenario and exposing

the culprits, and informed the Consulate about the blog, before eventually reporting the

problems to the DOJ, etc. The modus operandi of the CIA encompasses tactics for

skirting local law, because it is difficult and costly to seek redress through the judiciary

in Japan, and CIA officers have continually violated Plaintiff's rights protected by the

Constitution because they thought they could evade accountability, making it basically

impossible for an aggrieved American citizen overseas such as Plaintiff to put an end to

CIA harassment without making recourse to the Judicial Branch, which represents an

extremely heavy, practically onerous burden to an American residing overseas.

315. Among aforementioned re-introduced individuals is O'Day, for example.

The emails Plaintiff exchanged with O'Day related to the translation of a few sentences

she had requested in relation to a lawsuit in which she purportedly was involved due to

a traffic accident in which she was injured. More recently O'Day had been complaining

to Plaintiff about her work situation and asking for legal advice. Plaintiff didn't have

much advice to offer, but the gist of the matter related to her supervisor, the head of the

Applied Linguistics Department at Kyoto Prefectural University of Medicine, where

O'Day has a contractual position as an English instructor and researcher (she

emphasized two papers she had published through said institution), apparently.

Although O'Day stated she was contemplating taking legal action, on several occasions

when Plaintiff mentioned that he was also in the midst of trying to put together a lawsuit

against the U.S. government, O'Day repeatedly advised against doing so, saying it

would be "best to avoid that".


316. Though Plaintiff had initially thought that might be a sign O'Day had been

resurfaced by the CIA in order to facilitate a settlement, the CIA apparently had simply

intended O'Day as both a delaying mechanism and a representative of a status quo

scenario that appealed to them. It should be noted that when Plaintiff says resurfaced, he

means after O'Day had been removed from Plaintiff's immediate surroundings after

Plaintiff had complained about her to the Consulate, she subsequently reappeared.

Plaintiff first encountered O'Day at the Starbucks in or around early 2012, though she

had been a resident of Kyoto for many years.

317. When Plaintiff first complained to the Consulate about O'Day, it was partly due to some of her early questioning about Plaintiff's appeal of the verdict of court of the first instance to the Osaka High Court. Plaintiff suspected that she may have been party to a plot to corrupt Plaintiff's attorney—who had been less than cooperative at times—in his lawsuit against the city of Kyoto for illegally denying our son entry into the neighborhood nursery school. It bears repeating that the only foreigners whose children were enrolled were intelligence officers, as described above. Before complaining about O'Day's apparent attempts to spy on Plaintiff, manipulate him, etc., to the Consulate, Plaintiff had sent her a message through her Facebook account explicitly stating that he knew she was a CIA office and considered her to be hostile. She resurfaced and projected a degree of empathy so effectively that Plaintiff felt bad for sending her the offensive comment, and subsequently deleted it. Eventually, however, Plaintiff was impelled due to further suspect behavior on the part of O'Day, as described above, to escalate the level of complaint (brief description to CIA/OIG).

318. The above-described exchange of emails with Zimbleman falls under the same category of tampering with a victim. Here, it must be emphasized that the CIA has

185

either deployed against him or permitted Plaintiff's being continually targeted by

numerous covert CIA officers—including psychologists—who in turn have further

deployed proxies. All of said individuals have tried to elicit empathy from Plaintiff in

one manner or another as part of their respective schemes to manipulate Plaintiff.


319. The misleading conduct seen in the treatment he received from the DOJ,

including the above-described written reply signed by Kappelhoff, also constitutes

tampering with a victim. Plaintiff was misleadingly provided with a useless email

address to an uninvolved office in the DOJ, the aforementioned written reply

mischaracterized Plaintiff's allegations, and belittled the allegations, adding insult to

injury in an apparent attempt to dissuade Plaintiff from pursuing the allegations via the

Judicial Branch, which in retrospect appears always to have been the only option from

the start, practically by design. Moreover, Plaintiff was maintained in a state of

suspended animation for eleven months, during which harassment continued, before the

DOJ mailed Plaintiff the aforementioned dismissive, misleading reply.


320. The first instance of tampering with evidence has been described by

Plaintiff in the second report he submitted to the CIA/OIG and relates to the hacking

into Plaintiff's Hotmail account to carry out a selective deletion of all emails exchanged

between Plaintiff and Paquette before 2007, some of which included Plaintiff

addressing issues related to the CIA/MI6 and the use of religion for subversive purposes

in Kyoto, said selective deletion being coordinated with the subsequent abandonment by

Paquette of his long-term personal email account, presumably aiming to thereby render

the evidentiary emails inaccessible: gcpaquette@cs.com. It also appears that an email

exchange with Roughan from January 2008 is scrambled, and some mails may have

been deleted, said exchange relating to a trip Plaintiff made to Tokyo to see a

performance by his teacher at the National Theater of Japan.

321. Plaintiff had been extremely shocked to find the emails exchanged with

Paquette to be missing, because he is certain that he had saved them in a user-created

folder, as per the emails dating to 2003 from Peterka. Plaintiff had actively been storing

such correspondences in respective folders created by Plaintiff. In the case of Paquette,

there is a partial email from June 2007 that is the earliest remaining record of email

communications between Paquette and Plaintiff, and the next email is not until May

2008, which indicates that any emails between those dates were also deleted.

322. In October of 2014 Plaintiff became aware of media reports indicating that the CIA was seeking permission to delete email correspondences of non-senior officials. Plaintiff noted that in the following paragraph from the aforementioned report (dated October 28, 2014) to the CIA/OIG:

*First, as noted on my blog, I have learned that the CIA has requested permission to delete email correspondences of rank-and-file officers. In the case I have presented to you thus far, emails are practically the only material evidence I have, and any relevant emails of the following individuals would obviously be corroborating material evidence to this case...*

323. Plaintiff is concerned that the CIA's proposal was partly aimed at destroying the email evidence yet to be discovered in the course of this civil action, which Plaintiff has long since informed the Executive Branch of his intent to file.

324. Assuming that Holder authorized interception of Plaintiff's electronic

communications and physical surveillance as per EO12333, perhaps at different points

in time for different respective reasons as per EO12333, it has to be assumed that he

would have an abiding interest in the situation. Once the Attorney General authorizes

the collection of data on a private American citizen overseas under the provisions of

EO12333, the thus collected data becomes highly sensitive.


325. In fact, the following sections of EO12333 set forth specific provisions

related to the collection of information on U.S. persons.


- "1.3 *Director of National Intelligence* (b)(9)(B)",

- "2.3. *Collection of Information*"

- "2.4. *Collection techniques*"

- "2.5 *Attorney General Approval*" and

- "2.8 *Consistency With Other Laws*"


326. Here, the circumstances of the instant case give rise to the question as to

whether the prescribed procedures were followed as well as the question of the

propriety of said procedures. With respect to the above-described incidents related to

Roughan and others, Plaintiff doubts that the procedures were followed, but would not

be surprised should evidence revealed during discovery disprove that doubt. The

question as to whether the procedures are defined in a manner rigorous enough to have

prevented the alleged abuses would remain, in either case. That is due to the fact that the

procedures outlined in EO12333 are themselves further dependent on other procedures

that would appear to be classified, and the procedures presented to the public are too

vague to permit an accurate assessment as to the adequacy thereof. This problem

represents yet another aspect of the instant case that can only be illuminated through the

Court's adoption of CIPA-like procedures.


327. The DOJ mislead Plaintiff to believe that his complaints were being taken

seriously, and then sent him a brief and dismissive written reply belittling and

mischaracterizing the allegations. Plaintiff was under the impression that an

investigation was already underway, and was shocked by the written reply signed by

Kappelhoff. Moreover, not only did the DOJ refuse to launch an investigation, they

delayed replying to Plaintiff for eleven months while apparently dealing with Peterka

and Paquette by subjecting them to some form of administrative discipline.

328. That is to say, not only did the DOJ's aforementioned written reply mislead Plaintiff in a manner such as to mislead and persuade Plaintiff into believing that his civil rights secured by the U.S. Constitution had not been violated by the CIA officers against whom Plaintiff had made the allegations, including Peterka and Paquette, the DOJ had presumably (based on the MOU, etc.) been engaged in a non-public investigation of Plaintiff's allegations, said non-public investigation resulting in some form of administrative discipline against Peterka and Paquette, on the one hand, and a fraudulent misrepresentation of the actual state of affairs to Plaintiff, on the other.

329. Justice was thereby deliberately denied to Plaintiff by the DOJ, apparently with the aim of covering up, in collusion with the CIA and perhaps other federal agencies (e.g., NSA), the alleged violations by rogue CIA officers of Plaintiff's rights secured by the U.S. Constitution. In addition to physical assault and conspiracy, Plaintiff's complaints described, for example, multiple violations by rogue CIA officers of his right to privacy protected under the U.S. Constitution, and should have resulted in the DOJ's launching of a formal (and public) investigation of Plaintiff's allegations.

330. Here, it is inconceivable that even the paralegal, Callahan, let alone Kappelhoff, would have been unaware of the fact that civil rights violations are actionable under *Bivens*. In fact, in 2009 the Executive Branch had been compelled to reached a settlement with plaintiff Richard Horn in the above-cited case of Horn v. Huddle, in which the defendant was sued as a rogue CIA officer. It is unclear to Plaintiff as to precisely where the line between a "federal crime" and a "constitutional tort" is to be drawn; however, it is undeniable that the written reply sent to Plaintiff by the DOJ was misleading.

331. Therefore, the DOJ not only deliberately ignored violations of the Plaintiff's rights protected by the Constitution of the United States of America, the DOJ obstructed justice by issuing a misleading, deceptive reply after delaying for the protracted period of eleven months during which other misleading acts were committed by DOJ officials, with the aim of covering up readily apparent federal crimes (and/or constitutional torts) committed by rogue federal officials, instead of launching a criminal investigation into the allegations thereof, or at the very least informed Plaintiff that his allegations were of a civil, not criminal nature.

332. Furthermore, with regard to the CIA/OIG, assuming that the complaints were forwarded to the CIA/OIG through the Consulate (Schaeffer et al., etc.), either the CIA/OIG did not investigate the complaints and order appropriate corrective measures, or the CIA/OIG did investigate and order appropriate corrective measures that were subsequently not implemented as ordered. The later would seem to represent an obstruction of justice on the part of those tasked with implementing corrective measures ordered as a result of the investigation of the allegations by the CIA/OIG, while the former (i.e., refusal to investigate) would as well, if the allegations set forth by Plaintiff correspond to violations of his rights protected by the U.S. Constitution.

333. Finally, assuming that the allegations Plaintiff made verbally in person at the Consulate and complaints Plaintiff as well as in subsequent emails to Schaeffer et al. correspond to violations of Plaintiff's rights protected by the U.S. Constitution, the failure to forward said complaints to the CIA/IG would also seem to clearly represent an attempt to obstruct justice by preventing the allegations from being brought to the attention of the department authorized by law to conduct an investigation into said allegations. Plaintiff was emphatic that he considered the transgressions to be criminal and there was no possibility of Schaefer mistaking that; furthermore, EO12333

repeatedly refers to the Constitution, and even if vague, the reporting duty under MOU

would seem to apply, as opposed to enabling Schaefer to cover up the allegations.

334. Plaintiff also would like to note that, had a formal investigation of the

allegations he made been launched, it would presumably have been a criminal

investigation pertaining to federal crimes committed by covert CIA officials involving

"intelligence sources and methods", wherefore a court case resulting therefrom would

have automatically involved CIPA procedures.

335. The above-described acts constitute violations of 18 U.S. Code § 1505, 18

U.S. Code § 1512, and 18 U.S. Code § 1519, which provide respective private rights of

action.

XI

EIGHTH CAUSE OF ACTION

(*Bivens* 5, *Monell* 3: First Amendment and Ninth Amendment of the U.S. Constitution)

336. Plaintiff incorporates herein, as though fully set forth, all of the allegations contained in paragraphs 1 through 335, above, as though fully set forth.

337. The daunting challenges posed by the need to describe the socio-political circumstances under which Plaintiff has been aggrieved by violations committed by rogue CIA officers and a slew of other federal officials of his civil rights secured by the U.S. Constitution are offset by the compelling need to bring such activities of the government to the attention of the People. Furthermore, it is in said circumstances that the crux of the violations of the Ninth Amendment is to be found. Plaintiff has taken up the challenge to undertake a brief exploration of history in order to articulate, to the best of his ability, the unenumerated rights protected by the Ninth Amendment of the United States Constitution with respect to which Plaintiff has been subject to deprivations by the veritable colonizing class of CIA officers and their proxies here in Kyoto, Japan at the start of the 21st century.

344. First, the sheer scale of the so-called "covert" operations of the CIA here in Kyoto encountered by Plaintiff are evocative of the term "neo-colonialism", with the important caveat that their manifestations are not acknowledged as being funded out of

195

the public coffers of the People by the American government, as opposed to expressions

of normal economic activity in a so-called globalizing free-market. That is to say, due to

their state-funded (albeit covert) nature, all-encompassing scope, and inherent aim of

transforming modern Japanese civil society in the ancient cultural capital of Kyoto, the

CIA has been engaged in an attempt to implement a project that could readily be

described as having characteristics associated with imperialism. Plaintiff has

characterized Japanese civil society as "modern" here to emphasize that he is referring

to the aspects of civil society related to the republican political rights secured for the

People of Japan under the Constitution of Japan throughout Japan, while the reference

to the "ancient cultural capital" bears on aspects of civil society in Kyoto that are not

necessarily related to the public or the political, but do have a long standing vibrant

tradition that is not incompatible with modernity.


345. At this juncture, it is imperative to declare in the most general terms that

the most fundamental aspect of the common shared heritage of Americans is the fact

that the United States of America is a Republic that was founded through a fight against

the imperialist British Empire to secure the freedoms (i.e., privileges and immunities:

republican political rights, and liberal civil rights) enshrined in the Constitution of the

United States of America. Plaintiff intends to articulate the relevant aspects of

republican government and liberal civil rights herein only insofar as it serves to

illustrate Plaintiff's plight with respect to the CIA in Kyoto as they become relevant in

the course of elaborating the violations of Plaintiff's rights secured by the First

Amendment and Ninth Amendment of the U.S. Constitution.

346. In the broadest sense, Plaintiff's grievances have arisen as a result of his

calling attention to aspects of the CIA's operations here in Kyoto Japan that contravene

deep-rooted American values, and law, coupled with his refusal to even consider the

unconscionable, which is to say, to consider betraying his own conscience in order to

participate in the sociopathic activities of the CIA et al in Kyoto. Upon noticing that

Plaintiff had not only become aware of the operation(s) in which the CIA officers were

engaged, but had proactively let said officers know that he had become aware and taken

them to task philosophically as the occasion presented itself in relation thereto,

Plaintiff's profile as a target appears to have been elevated, as opposed to being

removed from the gallery. That is to say, instead of Plaintiff's desired effect of alerting

the CIA that he was aware of their presence, thereby intending to prevent further

displays of hostility from covert CIA officers, etc., Plaintiff was more intensively

targeted due to his perceived insolence in the face of the all-powerful CIA.

347. The CIA et al. have infiltrated every niche of civil society in Kyoto, whether the officers could speak Japanese or were culturally literate or not, and Plaintiff has experienced first-hand the over-the-top effort focused on the Starbucks cafes as staging grounds for groups of CIA et al. officers, proxies, and perhaps local organized crime affiliates engaged in what to Plaintiff evoked a type of group posturing philosopher Jurgen Habermas has referred to as "representative publicness" (The Structural Transformation of the Public Sphere, MIT Press, 1989).

348. The CIA has thoroughly infiltrated (and saturated) the tertiary education system with clandestine operatives in a manner so thorough that Plaintiff believes there must be some sort of exclusivity agreement between the government of Japan and the Western intelligence agencies that enmeshes the universities and colleges. Plaintiff had contemplated suing the various institutions involved after exposing the practice, but the recently enacted State Secrets Act, apparently at the behest of the United States, includes intelligence agreements with other countries in the scope of classified material, as one would expect, effectively premising recourse to the judiciary--assuming Plaintiff

had the financial means to pursue civil actions against Kyoto University, Doshisha

University, etc.—to be premised on the Constitutionality of said Act and its application.

In retrospect, Plaintiff now knows that every individual he has encountered over the

years that worked at a college or university has been an intelligence officer, starting

with an elderly American named John McAteer.


349. Plaintiff's interaction with CIA officer John McAteer (hereinafter,

"McAteer") is illustrative with respect to a couple of policies/customs/practices. Even

though McAteer did not have any appreciable proficiency in the Japanese language, he

tried to recruit Plaintiff to participate in Noh play production of a Robert Frost poem he

was directing. Plaintiff found the notion to be a somewhat quaint and perhaps

appropriate mode for a culturally illiterate and monolingual semi-retired Westerner to

engage Japanese culture, but politely declined the offer. McAteer was persistent,

however, and Plaintiff, who was then in his early forties, had to emphasize to McAteer

on more than one occasion that Plaintiff was a professional translator and a student of

East Asian history, religion, culture, and classical music before McAteer relented.


350. A further example tending to support the hypothesis of an agreement

between the governments of Japan and the United States related to civil society can be

seen in the Japanese government's decision to recognize Einarsen with an award for

promoting Kyoto overseas

(http://www.japantimes.co.jp/news/2013/06/30/national/media-national/cultural-agency

-doles-out-awards-to-those-promoting-japan/). The Japan Times article states:

> *The Kyoto Journal, which Einarsen founded in 1986, is*
>
> *published tri-annually, and operates entirely on a non-profit, volunteer*
>
> *basis. The journal grew out of the Kyoto expatriate community, of which*
>
> *Einarsen is a central figure.*

Plaintiff refuses to entertain the notion that elements of the Japanese government do not

know that Einarsen is an officer in the CIA. Accordingly, the award represents the

recognition of the Executive Branch of the government of Japan of the activities of a

covert official of the government of the United States engaged in subverting civil

society in a manner deemed personally advantageous to the officials of both said

governments, though unquestionably disadvantageous to the People of both Japan and

the United States. Again, there is no "expatriate community" in Kyoto outside that

contrived and (re)presented by the Western intelligence agencies, as amply

demonstrated by the content in this Complaint. The fact that the Japan Times is also

editorially compromised by the CIA only compounds the issue of this (re)presentation.


351. The CIA et al. operations also encompassed such an emphasis on modern

culture, ill-conceived attempts at fusion, etc. The CIA et al. have sent various

semi-talented people to perform music and dance at local night-life venues in an attempt

to create a "scene", so to speak, as a site similar to the Starbucks staging ground with

variations on the theme. Since the CIA et al. were apparently intentionally composed of

individuals that knew nothing about the history and culture of Japan, Plaintiff adduces

that the focus on modern culture was to serve as both a cover for infiltrating officers as

well as supporting the propagation of an alternative to the wealth of traditional cultural

pursuits and activities to be found at establishments throughout Kyoto. At any rate, the

CIA is pervasive in Kyoto civil society. In short, the CIA et al. in Kyoto comprises

multiple overlapping networks the members of which are engaged in a collective effort

to project and mutually support their respective stature as individuals that have

productive lives in civil society in Kyoto. One purpose served thereby is to support the

efforts of said CIA officers to recruit Japanese civilians as spies to act against Japan: the

targeted recruits' country of birth and citizenship, and Plaintiff's country of residence

since 1997. Plaintiff notes that, as described herein, CIA officers have used such

recruits as proxies against him, too.


352 Plaintiff asserts that he has always had every right to lead a normal life in

civil society in Kyoto, Japan, without needing to be concerned about operations by

covert CIA officers, in accordance with the principles reiterated in the various

precedents quoted, for example, in (Ingraham v. Wright, (1977) No. 75-6527):


> 'The liberty preserved from deprivation without due process
>
> included the right 'generally to enjoy those privileges long recognized
>
> at common law as essential to the orderly pursuit of happiness by free
>
> men.'( Meyer v. Nebraska, 262 U.S. 390, 399 (1923))
>
> The right of personal security is also protected by the Fourth
>
> Amendment, which was made applicable to the States through the
>
> Fourteenth because its protection was viewed as "implicit in `the
>
> concept of ordered liberty' . . . enshrined in the history and the basic
>
> constitutional documents of English-speaking peoples." Wolf v.

*Colorado, 338 U.S. 25, 27 -28 (1949).*

>*It has been said of the Fourth Amendment that its "overriding function . . . is to protect personal privacy and dignity against unwarranted intrusion by the State." Schmerber v. California, 384 U.S. 757, 767 (1966).*

349. The agenda of the CIA here in Kyoto—and Japan in general—is, as a matter of course, geopolitical; however, the nation state of Japan is a peacetime constitutional democracy with a free-market economy, and an ally of the United States of America. The Japanese People have the right of self-determination as a nation, as does Plaintiff in his individual capacity; in Plaintiff's experience, the CIA has demonstrated, through the above-described deprivations wrought by its rogue officers as well as systematic corruption, an unlawful antipathy to both. In fact, said deprivations were committed in violation of both the Constitution of the United States of America and the Constitution of Japan.

350. The expansive scale of the covert operations of the CIA et al. in Kyoto is being implemented by a correspondingly expansive population of Western intelligence

officers, said population constituting a veritable class unto itself. In retrospect, Plaintiff

has come to understand that substantially all of the Westerners with whom he's

interacted with in Kyoto over the years have been intelligence officers, and cannot

presently name a single Westerner in Kyoto not in that category. To introduce a last

series of examples of the scope of the CIA et al. network, Plaintiff presents Geoffrey

Moussas (hereinafter "Moussas"), whom Plainittiff first met around 2008, and last met

in 2012, since which Moussas has avoided Plaintiff (not replying to an email sent per a

discussion at a neighborhood café/eatery regarding nursery school issues), even though

he lives nearby. Ironically, Plaintiff's wife is an architect with a license for preservation

of traditional structures, and she once showed Plaintiff an article in Japanese about

Moussas, whereupon I told her that I had met him several years earlier, and concluded

that he was CIA. Plaintiff has not blogged about Moussas, but has discussed him in

emails to Schaefer et al. Here is an entry on Lambe's blog for an event featuring

Moussas (http://www.deepkyoto.com/category/city-design/). This CNN piece features

Moussas (http://edition.cnn.com/2014/11/30/travel/kyoto-machiya-house-preservation/).

This recent CNN piece (http://edition.cnn.com/2015/09/28/travel/insider-guide-kyoto/)

is by Lambe, and promotes local establishments, at least two of which are operated by

suspected CIA et al. officers, Philippe Goulier (DGSE) and Robert Yellin (CIA). Here,

in relation to the multifarious and continual incursions into the public sphere through

the illicit cooption, etc., of media outlets, etc., for the purpose of promoting covert CIA

(et al.) officers and disseminating propaganda and disinformation, the status of the

provisions of section 2.13 *Limitation on Covert Action* of EO12333 is impinged.

351. Plaintiff has adduced that, as a student of East Asian history and

languages, there had never a possibility of anything but Plaintiff being excluded from

said class constituted of intelligence officers, due to the forgone conclusion that the

knowledge Plaintiff had acquired over the years had informed interests on his part and

served to cultivate an affinity that would always make him predisposed to be

intrinsically opposed, at heart, to the sociopathic operations of the CIA et al., which

Plaintiff has herein demonstrated to be predicated on anti-Japanese, and un-American

assumptions. Said operations are aimed at nothing less than subverting both modern

Japanese civil society as well as the manifestations of Japanese tradition that are alive

and well in the ancient cultural and religious capital of Kyoto and compatible with

modernity. In short, Plaintiff was targeted by the CIA for displacement from Kyoto as a

knowledgeable and conscientious individual that would inevitably frustrate their

respective attempts both collectively and as individuals to achieve their objectives.

352. Given the scale of the covert CIA operations, there can be no doubt as to

the involvement of CIA officials at the supervisory level. The degree of connectedness

to the actions of the individual CIA officers' engaging in conduct aimed at displacing

Plaintiff from Kyoto remains, however, unclear. It is clear, however, that the

supervisory level officials of the CIA have not been inclined to modify their preferred

methodology for implementing the covert mission in a manner such as to accommodate

Plaintiff or abandon certain objectives associated with the grand plans they had set in

motion, plans of a scale that should shock the conscience of the Court.


353. Accordingly, several levels of policy, customs, and practices are

implicated in the herein-described deprivations suffered by Plaintiff and wrought by the

CIA, the DOJ, the DOS, and the NSA. First, the practice of attempting to saturate civil

society with CIA officers produced the conditions under which there would be an

inevitable conflict between Plaintiff and CIA officers due to overlapping spheres of

activity, as described above, and mutually incompatible goals and dispositions. Second,

Plaintiff again points to the CIA's custom of not employing area specialists like Plaintiff

in Kyoto due to affinities and the like associated with previously acquired knowledge

and experience, etc., which also relates to Plaintiff's readily ascertainable disposition.

354. Plaintiff presumes that an authorized covert operation can itself be said to represent a form of policy with a limited horizon corresponding to the establishment of specific geopolitical objectives pertaining to a specific place within a specific time frame. Plaintiff believes that the incidents in this civil action implicate foreign policy, but not necessarily national security, considering that Japan is a peacetime allied country. Foreign policy is implicated, for example, because the president aims to carry out much publicized "pivot to Asia", and is trying to use the CIA to facilitate an increased American presence in East Asia.

355. The Honorable Court is faced with the question of special circumstances regarding this new context (i.e., violations of rights protected under the First Amendment and Ninth Amendment of the U.S. Constitution) for *Bivens* insofar as it pertains to foreign policy and the use of covert operations as a policy tool in a peacetime, allied country with a sociopolitical/socioeconomic system compatible with that of the United States and a population of private American citizens which, in the words of the Japan Times, constitutes an "expatriate community" in Kyoto. It is an unacceptable

course for the government of the United States to undertake a clandestine effort to

subvert the civil society of a targeted allied country with the aim of achieving a given

foreign policy goal while intentionally depriving American citizens resident in said

targeted country of their rights protected under the Bill of Rights as well as the

Fourteenth Amendment of the U.S. Constitution, even if the Executive Branch of the

government of said targeted country were in agreement therewith.


356. Here, the unenumerated rights protected by the Ninth Amendment of the

U.S. Constitution specifically at issue are: the reasonable and natural expectation of an

American citizen residing overseas in a peace time allied country with a constitutional

democratic form of government and a free market economy to not be deprived of liberty,

personal security, privacy, and dignity at the behest of federal officers, agents and

employees of the government of the United States or officers of the target country

colluding with said federal officers of the U.S.; and the reasonable expectation that the

government of the United States will not be engaged in a neo-colonial operation

targeting the civil society of a given allied country with a socio-economic and

socio-political system compatible with that of the United States.

357. The following passage is from a facsimile Plaintiff sent to the DOJ in February 2012:

> *I want to reiterate that Kyoto is and will remain my home, and I will not tolerate the presence of illicit media outlets and other debased activities by intelligence networks that have no legitimate business here. The primary business that the intelligence community should be interested in here is dismantling international organized crime networks, but the people I continually have to report are all trying to collaborate with organized crime, building new networks.*
>
> *Civil society is a sphere that is protected under the law from government intervention, and that is the fundamental concept underpinning civil rights, to my understanding. Japan is a democratic state under constitutional rule of law. The people in the intelligence networks that I'm calling to account are in violation of many of the laws of Japan, not to mention the laws of the United States with respect to harassing Americans residing abroad.*

358. Another aspect of the stationing of a small colony of CIA officers in

Kyoto is a tendency toward establishing defacto vested rights for said CIA officers,

their families, and their collaborators in Kyoto, thereby instantiating a defacto

feudalistic societal configuration centered on the interlinked networks of intelligence

agencies and officers. Plaintiff is aware of a substantial number of businesses operated

by current or retired suspected intelligence officers and/or their families, which are

generally publicized through intelligence agency media fronts, etc., and presented as

constituents of as a burgeoning grass-roots "expat community". For example, two

recently opened business by suspected CIA et al. officers or their family members

include Noru Kyoto, owned by Joshua Levine (American), and Mayday Coffee & Bar,

which appears to owned or otherwise associated with the father of Nina Hanson and

Maya Hanson (father is assumed to be American), who are associated (through

Facebook, Instagram, etc.) with Vogely as well as one of the son of one of the first CIA

officers Plaintiff encountered in Kyoto, David Kubiak, an American who worked at the

same office as Plaintiff and has since decamped to India. The Hanson women's father's

name is unknown (he is only known through photos on his daughter's webpages). He

may not be American (Maya, though born in Kyoto, went to high school at

Boroughmuir High School, in Edinburgh, Scotland). In any case, the CIA et al.

constitute a sort of landed gentry of foreigner intelligence officers that are on the payroll

of their respective countries and earn an income locally. Such business also have an

unfair competitive advantage with respect to local enterprises through their clandestine

networking and promotional activities, not to mention the buying power of the hundreds

of individual officers constituting the network.


359. It is not an exaggeration to characterize the phenomena as neocolonial in

nature, and Plaintiff's plight demonstrates the potential hazards to an actual private

American citizen when covert CIA officers are sent to clandestinely colonize civil

society. Plaintiff has been targeted as an individual representing a threat to the modus

operandi of such networks of foreign intelligence officers. Said modus operandi can be

further illustrated by the example of a store called Foodelica, which is owned and

operated by suspected MI6 officer John Ashburne's wife, Sasha Ashburne (a suspected

MI6 asset), who was a colleague of Douglass's and Houser's at the pseudo-Christian

GCJC CIA front, said store Foodelica being used as a venue for talks by suspected CIA

officer Eric Johnston, who has advertised at least one such talk and linked to

Foodelica's website in his Japan Times column (e.g.,

http://www.japantimes.co.jp/news/2014/11/15/national/kyoto-university-police-blitzed-l

ine-legal-protests/). Though Johnston's talk is not inherently objectionable to Plaintiff

(as his earlier disinformation pieces), the overall phenomena is still problematic. That is

to say, it is typical of the officers of the CIA et al. to project a benign image of their

activities, but the structural implications with respect to civil society are anything but

benign. Plaintiff notes that the CIA et al. have by and large ignored the fact that Plaintiff

has exposed each of the above-described individuals related to Foodelica and their

relationships with their respective intelligence organizations on his blog.

360. When Plaintiff encountered Dalsky, he noticed that Dalksy had made it a

point to emphatically use the phrase "I'm all in", more than once. When Plaintiff

subsequently learned of the remarks President Obama made to the Australian

Parliament in promoting his so-called "pivot to Asia" strategy. Plaintiff believes that

Dalksy was referencing the president's statement, which was also used by Petraeus' in

the title of his ill-fated biography. Plaintiff believes Dalsky was trying to taunt him so as

to imply that Plaintiff was powerless to stop the CIA from interfering in his life.

361. In this context, that is to say, a civil action brought against rogue CIA

officers and other federal officials acting in either their respective capacities as

individuals or officials, or both, for unlawful intrusions and disruptions of the life of a

private American citizen overseas, it is perhaps not unwarranted to examine aspects of

the president's foreign policy statements with respect to the context of the allegations.


> *So as two great democracies, we speak up for those freedoms*
>
> *when they are threatened.   We partner with emerging democracies,*
>
> *like Indonesia, to help strengthen the institutions upon which good*
>
> *governance depends.   We encourage open government, because*
>
> *democracies depend on an informed and active citizenry.   We help*
>
> *strengthen civil societies, because they empower our citizens to hold*
>
> *their governments accountable.   And we advance the rights of all*
>
> *people -- women, minorities and indigenous cultures -- because when*
>
> *societies harness the potential of all their citizens, these societies are*
>
> *more successful, they are more prosperous and they are more just.*
>
> [...]
>
> *This is the future we seek in the Asia Pacific -- security,*
>
> *prosperity and dignity for all.   That's what we stand for.   That's who*

*we are.   That's the future we will pursue, in partnership with allies*

*and friends, and with every element of American power.   So let there*

*be no doubt: In the Asia Pacific in the 21st century, the United States*

*of America is all in.* [President Barack Obama in comments to the

Parliament of Australia]

362. Was Dalsky, a PhD in psychology, acting on his own as a rogue in

parroting the messages of the president and Petraeus in a manner such as to identify

himself with authority to Plaintiff? Or was Dalsky acting in concert with other rogues in

violation of well-established law? Whatever Dalsky was doing, his message was clear

that since he was "all in", Plaintiff was to be driven "all out" (i.e., displaced from,

Kyoto), and that bringing about such a result was his objective.

363. Secondly, if it is true that O'Day et al. had recruited the Plaintiff's

attorney, whom Plaintiff had retained to sue the city of Kyoto for refusing to enroll his

son in the neighborhood nursery school, with the objective of having said attorney

sabotage the prosecution of Plaintiff's case, that would be exactly the opposite of

*"help[ing] strengthen civil societies, because they empower our citizens to hold their*

*governments accountable*".

364. Next, it is of no small consequence that Christianity is not an "indigenous culture" in Japan; in fact, there has never been an indigenous form of monotheism anywhere in East Asia throughout history. Meanwhile, Kyoto is the world's foremost center of Mahayana Buddhism, and, before the Western incursion in the form of American gunboat diplomacy, which produced the conditions leading to the Meiji Restoration, Japan had seen more than a thousand years of relatively harmonious coexistence between Shinto and Buddhism in a syncretic religious system.

365. The CIA's chosen mode of implementation here in Kyoto undoubtedly involves religion-and-the-state issues, as documented on Plaintiff's blog, in a manner contravening the separation of Church and State as well as the protection of freedom of religion, again impinging on the First Amendment of the U.S. Constitution. Meanwhile, though Japan has very little affinity with America in terms of religious beliefs, it does share a similar Constitution and modern socio-economic and political values.

366. Plaintiff has been targeted by CIA officers attempting to advance

themselves in civil society in Kyoto by propagating or otherwise fostering the spread of

Christianity, which in and of itself is an unwarranted intrusion into Plaintiff's life

insofar as it encroaches on Plaintiff's civil society milieu in Kyoto, directly impinging

on the spirit of the establishment clause of the First Amendment of the U.S.

Constitution and the separation of church and state, as described above.

367. Plaintiff's alleges that rogue CIA officers attempting to promote their

respective careers in the CIA through propagating Christianity in Kyoto have targeted

Plaintiff because of his forthright and vocal opposition to the very notion of the

propagation of religion by state actors, as a matter of principle. Plaintiff alleges that

such conduct by covert state actors attempting to propagate Christianity has violated

Plaintiff's rights protected under the First Amendment of the U.S. Constitution and the

Ninth Amendment of the U.S. Constitution in and of itself insofar as it represents an

unwarranted intrusion into Plaintiff's civil society milieu in the ancient cultural and

religious capital of Kyoto, Japan. If the CIA has, in fact, officially adopted the practice

of stationing of covert officers using Christianity as a cover and engaged in

proselytizing and other forms of promulgation of Christianity, etc., it would likely

represent a violation the spirit of the "establishment clause" of the First Amendment,

insofar as the First Amendment is applicable extraterritorially, and call for an injunction proscribing such activity based on elucidation of the First Amendment with respect to the activities of the Executive Branch.

368. Finally, Paquette often spoke of Koreans, including one friend of his whom he claimed was a patent attorney (Plaintiff works in the intellectual property field), and mentioned the possibility of connecting us to work together. The composition of the Japanese organized crime groups is 30% Korean (Zainichi) and 60% Burakumin, groups which correspond to the "minorities" mentioned by President Obama in his above-quoted remarks. If it is proven that Paquette et al. were collaborating with people associated with Japanese organized crime groups and felt that was justified because those people were "minorities" being somehow mistreated by the Japanese government/society, that would present further obvious threats to private American citizens overseas that were *not* inclined to collaborate with such people associated with organized crime groups. Plaintiff believes that evidence revealed through discovery will demonstrate that Paquette et al. were in fact collaborating with Japanese organized crime groups, and that said collaboration was a contributing factor in Paquette's motivation to violate Plaintiff's rights protected by the U.S. Constitution.

369. Plaintiff is generally in accord with the above-quoted foreign policy statements made by President Barack Obama in his remarks to the Australian Parliament; however, the declared objectives of said statements are not borne out by the contradictory actions elucidated by Plaintiff in this Complaint. If rogue CIA officers are undertaking activities of the sort described in this Complaint, which are all clearly diametrically opposed to American values and the U.S. Constitution as well as the presidents above-cited remarks, with the aim being to subvert modern civil society in Japan based on the rule of law, free-market economics, civil liberties, etc., then it can only be said that said rogue CIA officers as well as the officials in the Executive Branch that have acted to cover up said acts have also violated Plaintiff's unenumerated rights secured indirectly by the Ninth Amendment of the U.S. Constitution.

370. The following passage discussing the CIA et al. in civil society in Kyoto, including an indirect reference to the incident in which Blackman and Paquette were aiming to eliminate the competition (i.e., Plaintiff) in the translation field, is taken from the very first facsimile Plaintiff sent to the DOJ to initiate the complaints against the CIA, in which he also informed the DOJ of his blog:

*Note that everything these people do in an area of civil society*

*involves an illegitimate intrusion into the private sphere funded by*

*public funds from the USA and UK aimed at advancing some private*

*agenda, not the public interest. They are engaged in market distorting*

*activities by p[l]anting people in the translation field, which is fairly*

*impacted, where they serve to drive prices down and make work*

*inaccessible. CIA officers occupy all of the prime apartments in the last*

*building I recently moved out of (Villa Tonodan), even though they are*

*there only a couple of months out of the year, etc. Although I'm of*

*course grateful for the protection against organized crime groups*

*(which the CIA helped establish after WWII: Robert Whiting; Tokyo*

*Underworld), aspects of their presence are fairly conspicuous to an*

*observant American.*

371. Plaintiff notes that there was no government agency known as the CIA

until 1950, and even President Harry S. Truman, who'd signed the law bringing the CIA

into existence, repudiated the course that the agency had taken in statements such as that

made in a Washington Post article published in 1963:

https://www.cia.gov/library/center-for-the-study-of-intelligence/kent-csi/vol20no1/html/

v20i1a02p_0001.htm The fact is that the federal agency known as the CIA is itself a

relatively recent creation in the history of the United States of America. Meanwhile,

since the establishment of the CIA in 1950, the world has changed tremendously and we

are currently experiencing an era of so-called globalization, which has seen scores of

Americans going abroad to seek their livelihood overseas in one of the many democratic

countries that has a free-market economy and amicable relations with the United States.

372. Plaintiff is a private American citizen, and as such is not subject to the

arbitrary whims of any elected, appointed, or career official of the Executive Branch of

the government of the United States, whether Plaintiff is in the United States or

overseas, including here in Japan. The rights of private American citizens are protected

by the U.S. Constitution, and Bivens has established that remedies for violations of said

rights by federal officials are held to be implied by the U.S. Constitution. The CIA

would appear to be pursuing an agenda in Japan aimed at subverting modernizations

wrought to the Japanese political system as a result of WWII in order to serve

geopolitical aims in the pursuit of which this Complaint demonstrates covert CIA

officers showing a willingness to violate the rights of private American citizens

overseas protected by the U.S. Constitution. The CIA has in fact targeted the political

process as well as the Constitution of Japan by colluding with the Japanese executive in

a manner such as to undermine freedom of the press through the State Secrets Law and

draw Japan into American military adventures by having the LDP "re-interpret" Article

Nine of the Constitution of Japan, for example. The CIA almost completely controls the

English language news media in Japan, disseminating disinformation aimed at

preventing the English speaking community from interacting with Japanese people in an

informed manner with respect to current events. Furthermore, Plaintiff's comments

have been censored by Western intelligence operatives working at CIA media-fronts,

including Chris Betros of JapanToday, as detailed on Plaintiff's blog, when they did not

support the agenda intended to be promoted by a given article. Plaintiff has thus been

deprived of his republican political rights to participate in public discussion regarding

current events by a CIA front news media outlet that intended to instead promote its

target political agenda aimed at subverting the republican political process in Japan.


373. The conscience of the court should be shocked by the allegations set forth

in this Complaint. It is almost certain that the Executive will make a motion to dismiss,

invoking the state secrets privilege. In fact, as described in the petition, Plaintiff alleges

that certain policies, customs, and practices have been established in a manner tailored

such as to rely on a presumption of recourse to invocation of the state secrets privilege

before the Judiciary, aiming to use such invocation as a preemptive measure facilitating

the unchecked abuse of power by the Executive, thereby subverting the U.S.

Constitution.

374. One of the questions posed by the allegations in this civil action against

the CIA et al. is the question as to where the Constitution draws the line between

Executive Privilege and the rights both enumerated by the Constitution of the United

States of America and established through legal precedents as well as the rights implied

and "retained by the people" as set forth in the Ninth Amendment of the U.S.

Constitution, derived from the common law tradition, etc.

375. Were the allegations set forth in this Complaint to be dismissed in their

entirety on the basis of the Executive Branch's invocation of the state secrets privilege,

such dismissal would amount to: the conferring of an unprecedented degree of

absolutist authority to the Executive Branch that is not provided for in the U.S.

Constitution, the rendering the system of checks and balances moot, and the

contravening of the Bill of Rights as well as the Fourteenth Amendment of the U.S.

Constitution. *Biven's* provides the authority to bring a private action with respect to the

aforementioned violations by federal officials of Plaintiff's rights protected by the

Constitution of the United States of America.

XII

RELIEF REQUESTED

381. In light of the People's right and need to be well informed about actions of

their elected public officials and public officials appointed by said elected officials as

well as career public officials, including those described in this Complaint, and insofar

as the allegations set forth herein represent an egregious breach of trust by the Executive

Branch against an American citizen overseas perpetrated in order to facilitate the pursuit

of ends not in accord with the Constitution of the United States of America through

covert means hidden from the People, said breach of trust being facilitated by a body of

official policy as well as corresponding customs and practices tailored in a manner such

as to prevent Plaintiff from effectively having the problems corrected by any means

other than through recourse to the Judiciary and to prevent the People of the United

States of American from becoming apprised of said acts violating the United States

Constitution as set forth hereinabove, Plaintiff hereby requests a TRIAL BY JURY.

WHEREFORE, Plaintiff seeks judgment and Relief as follows:

1. For statutory, compensatory and punitive damages according to proof;

2. Damages for emotional distress and mental anguish caused by unlawful intrusion
   and disruption of Plaintiff's life by CIA officers and proxies;

3. Damages for personal discomfort and annoyance as well as emotional distress and
   duress caused by harassment at cafes, the hatching of depraved plots against
   Plaintiff including physical assault, hacking of Plaintiff's electronics devices,
   repeated suggestions that Plaintiff leave Kyoto, inducing the breakup of a long-term
   relationship of Plaintiff's by a recruiting a former girlfriend who the CIA
   subsequently caused to abort their child unilaterally, etc.;

4. Declaratory relief pertaining to the policies, customs and practices of the CIA, DOS,
   and DOJ that have resulted in violations of Plaintiff's Constitutional rights,
   including the declaration of EO12333 and the MOU as exceedingly vague and
   therefore failing to meet the requirements of the Constitution corresponding to their
   legal status, which Plaintiff gathers is nearly on a par with statutory law;

5. A permanent injunction enjoining the CIA, DOS and other Agencies or Departments

of the Executive Branch from posting CIA officers and the like under the assumed

title of American Citizen Services Officer in the DOS;

6.  A permanent injunction requiring the relevant Agencies and/or Departments of the

Executive Branch to implement steps necessary to improve transparency in the

reporting requirements related to the possible commission of federal crimes by a

CIA officer or a proxy thereof against an American citizen overseas;

7.  A permanent injunction requiring the Executive Branch and the Legislative Branch

to establish respective formal administrative procedures for reporting allegations of

federal crimes committed by covert CIA officers, etc., overseas against an American

citizen overseas;

8.  A permanent injunction requiring the CIA/OIG to provide notification to any

American citizen overseas submitting a report to the CIA/OIG alleging unlawful

misconduct against a CIA officer, proxy thereof, etc;

9.  A permanent injunction placing a restraining order on each of the CIA officers listed

as Defendants in this Complaint as well as proxies and the like thereof included

those both listed and not listed in this Complaint but described as being suspect of

culpability in conjunction with the violations relating to allegations set forth in

evidential communications submitted by Plaintiff to the DOS, DOJ and

CIA/OIG—and proven to be so through the course of these Proceedings—from

coming into proximity with Plaintiff, defining a reasonable daily activity sphere or

the like based on a radial distance from Plaintiff's residence, etc., preferably

removing said Defendants and proxies thereof from the precincts of Kyoto city; and

10. For reasonable attorneys' fees (should Plaintiff be represented by counsel

henceforth), investigation and litigation costs reasonably incurred and for such other

relief as may be appropriate.

Respectfully Submitted,

Darren R. Vasaturo
502 Sun Lotus Ikeji
217 Owaricho, Nakagyoku
Kyoto, Japan 604-0934

Dated: October 9, 2015