UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA


DARREN R. VASATURO


VS.                                    CIVIL ACTION NO. (1:15-cv-01736-JEB)


PETERKA ET AL.


## NEWLY ADDED DEFENDANT

John Kerry (Secretary of State: sued in official and individual capacities)

Exec. Office, Office of Legal Adviser, Suite 5.600, 600 19th Street NW., Wash. DC 20522

## SECOND AMENDED COMPLAINT

(For Damages for Violations of Civil Rights and Conspiracy, and Request for Jury Trial)

## I. PARTIES

**1.**      Plaintiff, Darren R. Vasaturo, in *pro se*, ("PTF") is and was at all times mentioned

herein, a private American citizen residing in Kyoto, Japan.

**2.**      Defendant ("DEF") Sasha Peterka ("Peterka"): CIA officer residing in Havertown, PA

**3.**      DEF Jamie Roughan ("Roughan"): CIA officer residing in Tokyo, Japan

**4.**      DEF Glenn Paquette ("Paquette"): CIA officer residing in Seattle, WA

**5.**     DEF Anthony Blackman ("Blackman"): CIA officer, <u>purportedly deceased</u>

**6.**     DEF A.J. Dickinson ("Dickinson"): alleged CIA officer residing in Kyoto

**7.**     DEF David J. Dalsky ("Dalsky"): CIA officer, residing in Kyoto, Japan

**8.**     DEF Dan Douglass ("Douglass"): CIA officer, residing in Kyoto, Japan

**9.**     DEF Dawn E. O'Day ("O'Day"): CIA officer, residing in Kyoto, Japan

**10.**    DEF Peter Laverne ("Laverne"): CIA officer, residing in Kyoto, Japan

**11.**    DEF Yahiya Abdelsamad ("Abdelsamad"): CIA officer, residing in Jamaica, NY

**12.**    DEF Preston Houser ("Houser"): CIA officer, residing in Kyoto, Japan

**13.**    DEF Bruce W. Taylor ("Taylor"): CIA officer, residing in Sunnyvale, CA

**14.**    DEF Sean Lotman ("Lotman"): CIA officer residing, in Kyoto, Japan

**15.**    DEF Colin Zimbleman ("Zimbleman"): CIA officer, residing in Kyoto, Japan

**16.**    DEF Gary Schaefer ("Schaefer"): CIA officer, official cover, residing in Wash., D.C

**17.**    DEF Marc Snider ("Snider"): CIA officer, official cover, residence unknown

**18.**    DEF Sylbeth Kennedy ("Kennedy"): CIA officer, cover, residing in Wash., D.C

**19.**    DEF John Brennan ("Brennan"): Director of the CIA

**20.**    DEF David Petraeus ("Petraeus"): former Director of the CIA

**21.**    DEF Eric Holder ("Holder"): former U.S. AG

**22.**    DEF Mark Kappelhoff ("Kappelhoff"): Deputy Asst. AG in DOJ Civil Rights Div.

**23.**    DEF Michael Rogers ("Rogers"): Director of the NSA

**24.**     DEF John Kerry ("Kerry"): Secretary of State

**25.**     DEF Kevin Callahan ("Callahan"): paralegal in the DOJ Civil Rights Div.

**26.**     DEF: The United States Central Intelligence Agency

**27.**     DEF: The United States Department of Justice

**28.**     DEF: The United States Department of State

**29.**     DEF: The United States National Security Agency

**30.**     DEF: Congresswoman Barbara Lee ("Lee"): member of U.S. Congress, HOR

**31.**     PTF believes that other Federal Officers/employees participated in the conspiracy,

etc., set forth herein, and intends to seek leave to amend this complaint upon discovery.

## II. JURISDICTION AND VENUE

**32.**     This suit is brought pursuant to: the 1st, 4th, 5th, 9th, and 14th Amendments of the U.S.

Constitution ("Amendments") under the authority of *Bivens (Bivens v. Six Unknown Named*

*Agents Of The Federal Bureau Of Narcotics* (1971), 403 U.S. 388) allowing a civil suit

brought by PTFs aggrieved by civil rights violations by Federal officials acting under color of

law in violation of clearly established law which they knew or should have known; and

common law, e.g., civil conspiracy, civil fraud, and intentional infliction of emotional distress.

**33.**     Thus, this suit involves a Federal question (28 USC § 1331) and questions arising

under the U.S. Constitution and laws of the U.S. Here, the right to judicial review of the

unlawful actions of the federal agencies and officials and employees thereof in question as

described herein is also provided for under title 5 of the United States Code section 702.

**34.**     Venue is appropriate in the District of Columbia, where a number of the Defendants are believed to reside, which is also the location of the DOJ and nearby the headquarters of the CIA and NSA, where one or more of the acts alleged herein took place.

## III. OPERABLE FACTS

**35.**     PTF is an American citizen who served in the U.S. Army Signal Intelligence Corps as a Voice Intercept Operator, Korean, and held a TS/SCI security clearance. After receiving an honorable discharged from the army, PTF re-entered college at the University of California, Berkeley, in January 1987, where he became acquainted with two of the named defendants, and completed the requirements for a Bachelor's degree in Interdisciplinary Studies in Social Sciences in 1994 focusing on 20th century Korea with respect to a theoretical framework of "modernity and identity". PTF has resided in Japan since 1997, holds permanent residency, and is married to a Japanese national with whom he has two children, ages 3- and 5-years old.

**36.**     PTF hereby incorporates by reference all pleadings/filings/exhibits by all parties, including the Amended Complaint, Oppositions, and Responses by PTF, etc., as well as Orders, etc., of the Court in these proceedings to date. PTF's Privacy Act requests to the CIA and NSA were both denied on national security exemptions, while completion date of same to DOS (Case Control Number P-2014-09239) has again been extended, to August 2016. PTF has exercised his 1st Amendment right to blog about these incidents, but knows this civil action

implicates 'state secrets', wherefore he requests in advance for the Court to adopt CIPA-like procedures to conduct these proceedings, as per the precedent set by the decision of the appeal to the D.C. Circuit Court (CASE NO. 09-5311) in relation to the Richard A. Horn v. Arthur Huddle case heard before this Court (CASE NO. 1 : 94-CV-0 1756-RCL).

**37.**     Peterka and Roughan were acquaintances of PTF's from UC Berkeley.

**38.**     Paquette was introduced to PTF through Peterka at the Starbucks in Kyoto.

**39.**     Asaho Kudo ("Kudo") was PTF's girlfriend when he introduced her to Peterka.

**40.**     Douglass lived two doors down from PTF for approximately seven years.

**41.**     PTF met Dalksy, adjunct professor at Kyoto University ("KU"), at the nursery school.

**42.**     The CIA has covertly supported politicians, including former class A war criminals of the Liberal Democratic Party ("LDP"), which was established with CIA funding, and persons affiliated with organized crime groups ("yakuza"), since shortly after the end of WWII.

## IV. FIRST CAUSE OF ACTION

(*Bivens* 1: 1st, 4th, 5th, 9th, and 14th Amendments)

**43.**     PTF incorporates herein as though fully set forth, paragraphs 1 through 42, above. All of the actions taken by the Defendants were taken under color of law, without lawful authority and in violation of clearly established law with the knowledge thereof.

**44.**     The unlawful interception and/or dissemination of PTF's electronic communications and/or information gathered by human networks engaged in providing for the personal safety

of PTF and his pregnant wife-to-be violated PTF's rights protected under 4th Amendment. Roughan contacted PTF out of the blue after PTF's future wife became pregnant and had visited the neighborhood maternity clinic. Roughan said his wife was due to give birth "in a few months", and PTF, having already reported Roughan, suspected a ruse to elicit data about PTF's girlfriend's pregnancy. PT did *not* provide data to Roughan, but then received a report from Roughan that his wife was in the hospital to deliver, months early than first reported. Roughan sent no more reports, and refused to respond to PTF's queries, belying his ulterior motive for contacting PTF to intrusively attempt to elicit private data on false pretenses.

**45.**     PTF reported Roughan's contact to Schaefer, but Roughan escalated, and PTF blogged about him, resulting in retaliatory harassment in, including thinly veiled threats about PTF's blog, etc. Upon being named as a defendant in this civil action, Roughan retaliated online, harassing PTF during these proceedings. PTF has been retaliated against for complaining by multiple defendants, including Kappelhoff and Callahan. PTF gathers that the Executive presumes it is not legally obliged to respond to a petition for a redress of grievances, but also gathers that if a federal official does respond thereto, they have a legal duty of loyalty as public officials to respond honestly. Kappelhoff and Callahan mailed PTF a response to that misrepresented PTF's allegations and falsely attributed to him a nonsensical fabricated allegation in retaliation, violating PTF's rights secured by the 1st and 4th Amendments.

**46.**     Schaefer et al. refused to inform PTF he should report his allegations to the CIA/OIG

directly, misleading him to believe same were properly handled and inducing the submission of further private, personal information that was used in further covert operations ("CO") subjecting PTF to harassment, violating his rights "to be let alone", to pursue happiness, etc.

**47.** PTF's computer was hacked multiple times, and emails with Paquette deleted. After Paquette deleted his long-term email account, PTF noticed that emails were missing from his Hotmail archives. Paquette had motive to destroy such evidence, and PTF thus believes he was behind the hacking. PTF has provided proof as to one attempt to hack into his computer.

**48.** Abdelsamad was a KU student and friend of Paquette's whom PTF met along the Kamo River, and at Starbucks. PTF learned of a connection between Abdelsamad and David Chapman ("Chapman"), a friend who married a Japanese national. Chapman and his wife had visited Kyoto without telling PTF, and happened to meet Abdelsamad by chance in Kyoto. When Chapman asked Abdelsamad if he knew PTF, Abdelsamad threatened to kill him if he mentioned to PTF that they had met, thereby constraining Chapman's freedom to express his thoughts to PTF about Abdelsamad, directly exerting a substantially adverse impact on PTF's right to freedom of associate, right to be let alone, etc., as Chapman's strange silence as to his sudden inexplicable relationship with Abdelsamad caused PTF substantial consternation and impeded his ability to freely communicate with Chapman, placing a substantial strain on their friendship, which started in the late 1980s. Chapman repeatedly asked PTF about Abdelsamad without explaining their connection, causing PTF anxiety, as he had already suspected the CIA

of interfering in his life. PTF followed up on his queries, but, the relationship of trust between PTF and Chapman was damaged. Abdelsamad intruded into the private sanctuary of PTF's friendship with Chapman aiming to undermine said friendship and intentionally inflict psychological distress on PTF, violating his rights secured under the 1st and 4th Amendments.

**49.**     Peterka recruited Kudo—with whom PTF had been intimate for a year or two before she moved to Tokyo for work and to whom PTF had introduced to him in Kyoto—with the aim of reintroducing her to seductively undermine PTF's 3-year relationship with his then girlfriend by exploiting their formerly romantic affinity, her personal knowledge and access to PTF, etc. Peterka thus violated PTF's rights secured under the 4th and 9th Amendments.

**50.**     The CIA continually intruded its personnel into PTF's life after he complained to the Consulate, e.g.: Dickinson, Dalsky, Laverne, O'Day, and Zimbleman, though aware that PTF was extremely apprehensive as to the CIA's CO in his immediate environs.

**51.**     Upon information and belief, PTF alleges that the defendants, and others, not yet known, conspired between and amongst themselves to unlawfully intrude into his life for personal and political reasons tied to the objective of displacing PTF from central Kyoto.

**52.**     As a result of the unlawful misconduct by the defendants, PTF has suffered humility, embarrassment, loss of personal privacy, emotional distress, and is entitled to compensatory damages in an amount according to proof, but in excess of the minimal amount for this Court's jurisdiction. The Defendants acts were willful, malicious and intentional entitling PTF to

punitive damages. PTF is also entitled to court costs as well as reasonable attorneys' fees.

## V. SECOND CAUSE OF ACTION

(Civil conspiracy; Conspiracy to interfere with civil rights: 42 USC 1985(3), 42 USC 1986)

**53.**     PTF incorporates herein, as though fully set forth, paragraphs 1 through 52, above.

**54.**     The conspiracy comprises conspiracies among CIA "field officers" targeting PTF

directly in Kyoto, as well as a broader conspiracy encompassing supervisory echelons in the

CIA, DOS, and DOJ. The broader conspiracy comprises: the DOS and the CIA, wherein the

DOS agreed to allow the CIA to co-opt the DOS post of ACSO and commit honest services

fraud and supervise the field officers in Kyoto; and the DOJ and the CIA, wherein collusion

was enabled by the execution of an MOU therebetween, as manifest by collusion between

Holder and Petraeus, etc., mandated by the MOU in relation to PT's petition to the DOJ.

**55.**     PTF was visiting Berkeley in @2001 when Peterka, then a graduate student, showed

up near the campus, and contacts were exchanged. Earlier in 2001, PTF had moved into the

Villa Tonodan apartments, later revealed to be approximately 50% CIA et al. in occupancy,

including Douglass. Peterka contacted PTF years later saying he was planning a trip to Japan

to visit friends in Tokyo, including an individual from UC Berkeley named Robert who

worked at Lehman Brothers and had majored in Japanese at UC Berkeley.

**56.**     Roughan showed up at a bus stop in Kyoto, and contacts were exchanged. PTF

socialized with Roughan, etc., when he visited Kyoto, and did one or two translation projects

9

for his finance sector employer. Roughan mentioned that he'd worked at Lehman Brothers and Nomura, and, like Peterka, attempted to interest PTF in returning to Tokyo.

57. Peterka and Roughan were both connected to Tokyo's finance sector and used similar modus operandi ("MO") to intrude in PTF's life aiming to lure him to Tokyo. As CIA officers, they acted in concert against PTF for personal aims associated with CIA CO. Peterka changed his given name to "Mira" upon being exposed as CIA on PTF's blog. Roughan retaliated against PTF for same, harassing him online. Roughan was familiar with the CIA et al. Irish pub scene in Kyoto, having insisted that PTF meet him at one bar and then visit another (Tadgs). It is reasonable to infer he was acting in concert with CIA et al. in Kyoto. PTF also indicated to Roughan that he suspected Roughan might be collaborating with the yakuza.

58. Peterka recruited Kudo in Tokyo, after she moved there for a new job. PTF introduced Peterka to Kudo in Kyoto before the move, and they'd exchanged contacts. Peterka re-introduced Kudo into PTF's life a couple of years later to interfere with PTF's romantic life, in a ploy seeing Kudo quit her job in Tokyo to move back to Kyoto ostensibly to attend graduate school and, expressly, to be with PTF, under a (false) implied intent to marry. After returning to Kyoto, Kudo became pregnant, whereupon she unilaterally decided to abort the child, against PTF's wishes and after claiming that abortion was against her religion. Kudo had succeed in seductively convincing PTF that he should let the relationship he was in flounder and get back together with her, but the false pretense (and conspiracy) was irrefutably

exposed with her decision to abort, leaving PTF devastated by the loss (*Meyer v. State of Nebraska*, (1923), No. 325). Then, Kudo persisted in interfering with PTF's life after PTF started dating a woman he subsequently met: his future wife. PTF was in the company of his new girlfriend one day when Kudo suddenly emerged from hiding near PTF's dwelling to intrude herself, baldly asserting that she herself was still PTF's girlfriend, etc., in front of PTF's new girlfriend, shamelessly trying to drive her off under false pretenses.

**59.**      Abdelsamad has described Paquette as "a former Kyoto resident, and friend, who was well aware of my movements etc.". Paquette and Abdelsamad could have agreed to act in concert against PTF with the aim of isolating him socially at any time over the course of more than a year after the time PTF came to know them, before Chapman visited Japan. The attempt by Abdelsamad to undermine said friendship carried out in conspiracy with Paquette, and aimed to intentionally inflict psychological distress on PTF as part of a general pattern aimed at subverting PTF's social relationships in order to socially isolate PTF, violating his right to the pursuit of happiness and freedom of association, with the ultimate aim of displacing him from Kyoto so that the CIA et al. could conduct CO unimpeded by the presence of PTF, an observant, culturally engaged area specialist. Abdelsamad didn't mention Chapman at all in his first affidavit, but then he denied ever having met him (or his wife) in his second affidavit. PTF has called Abdelsamad's credibility into question pursuant to Rule 806 of the Fed. R. Ev., as other blatantly contradictory statements by him belie his intent to deceive the Court. There

is no rational explanation as to Abdelsamad's brazen lie that he never met Chapman, etc. Here, as with the action Kudo attempted against PTF's future wife, Abdelsamad's tactic of intruding into Chapman's life targeted PTF indirectly, through Chapman, with the immediate objective being to undermine PTF's social relationships and isolate him.

60.     Plaintiff suffered assault and battery in December of 2007 when Paquette et al. set him up to be attacked at a bar where he'd agreed to meet Yoshiyuki for a drink. The attacker was purported to be a Moroccan by Douglass, who attempted to provoke PTF to take revenge on the culprit, belying his role in the conspiracy. It was revealed that Douglass was connected to Houser—both had worked at Global College Friends World ("GCFW")—an entity PTF did not learn of until it had closed. Houser taught shakuhachi to Brian Schultz ("Schultz"), who, along with Douglass, and other CIA et al. Justin Giffin ("Giffin"), and John Benson worked for a front (Lacroix Marriage) posing as Christian priests performing weekend wedding ceremonies. Houser was a contributor to the Kansai Time Out ("KTO") and Kyoto Journal ("KJ") along with his cohort John Dougill ("Dougill"), with whom he patronized Starbucks.

61.     Paquette indirectly conveyed a hint to PTF that he was acquainted with a friend PTF assumed had joined the CIA, the conveyance including an implicit suggestion that PTF should apply, too. After considering said conveyance, PTF submitted an online application to the CIA offering to serve as an independent contractor, stipulating that he would not collaborate with organized crime. PTF made prolific references to the yakuza in the application, showing he

12

was familiar with the history. PTF suspected Paquette was collaborating with the yakuza, and had observed other bigoted, etc., activities of the CIA et al. that quickened his resolve to firmly assert that he would not agree to do anything against his conscience. PTF received no reply from the CIA, but it was not clear what the actual disposition was in light of mixed signals, which oscillated between empathy from CIA officers, with signs that some sort of overture toward reconciliation was forthcoming, on the one hand, and continued harassment, on the other. The first evidence as to a concrete example demonstrating that such oscillation had been adopted as a tactic is found in emails exchanged in PTF's interaction with Blackman.

**62.** Paquette introduced Blackman to PTF for the express purpose of translation work. An American, Blackman was an English teacher who claimed to be running a translation company called TSA and have manuals needing translation, with respect to which a general rate range was discussed and a basic agreement informally reached. After communication by email began in earnest, Blackman backpedaled, giving PTF a runaround over the course of a month or so of futile emails, prompting PTF to investigate. PTF discovered that there was no such company called TSA, revealing a first blatant falsification by Blackman. PTF then discovered that the manuals Blackman claimed to want PTF to translate had already been translated ***before*** the introduction by Paquette, whereupon the offer of translation work was exposed to have been fraudulent. The fraudulent offer was a concerted ploy to intrude into PTF's life and interfere with his pursuit of a lawful livelihood, causing PTF to uselessly expend time and effort in

pursuit of a non-existent enterprise, and intentionally inflicting on PTF emotional distress and economic loss. In retrospect, considering that application to the CIA had a 40-day window of response that had already been exceeded, Paquette had recruited Blackman to harass PTF in retaliation for having submitted an application to the CIA that did not serve Paquette's personal goals, and had brought the yakuza and his suspected connection thereto to the fore. PTF was humiliated and demoralized by the pursuit of the fraudulent offer of translation work over a period spanning a month, but the emails exchanged with Blackman (and subsequently Paquette) in relation thereto did represent the first material evidence PTF was able to present to the U.S. government demonstrating he was being harassed by CIA officers in Kyoto. PTF confronted Blackman in an email, accusing him of being CIA and harassing PTF, and also confronted Paquette, who denied complicity and blamed Blackman for having a profit motive, further exposing his duplicity in the ruse, as the translation work was for profit from the start.

**63.** Schaeffer failed to respond to a first followup email from PTF requesting he confirm the nature and content of the meeting, so PTF raised that point explicitly in a second email despairing of his non-responsiveness and imploring him to acknowledge. Schaefer eventually sent a reply, stating: *"Rest assured that I have taken your concerns on board and will pass them on through the appropriate channels".* PTF had made allegations of conspiratorial violations of his civil rights, which Schaefer had called mere "*concerns*". PTF had described to Schaeffer incidents including being set up to be physically attacked, mentioned the friend

14

whom Paquette had conveyed a covert hint as to their acquaintance, and indicated that he

thought that the reported individuals needed to be subjected to discipline by the "IG". Plaintiff

had parried the overture from Paquette to apply to the CIA, with an explicit refusal to

collaborate with organized crime, etc., helping create a situation necessitating that the

CIA/NSA protect PTF from the yakuza, instead of colluding with them. Schaefer's reply

furthered the conspiracy by concealing his supervisory role as a CIA case officer therein.

**64.**     The reply PTF received from the DOS Office of the Inspector General ("DOS/OIG")

to his complaint as to misuse of office, etc., implied that Schaeffer and other named consular

officials (i.e., Snider and Kennedy) with whom PTF had exchanged emails ("Schaeffer et al.")

et al. were in fact a CIA employees ("case officers") posted as American Citizen Services

Officer ("ACSO") under 'official cover'. Schaeffer et al. were thus CIA case officers who had

been supervising CO of the CIA 'field officers' that were the perpetrators of the unlawful acts

with respect to which PTF had visited the Consulate to complain about in the first place.

Consequently, the misrepresentations and withholding of information from PTF by Schaeffer

et al. were intended to shield said CIA field officers officials from scrutiny with respect to the

federal crimes allegedly committed, and therefore represent acts that were committed in the

furtherance of the conspiracy, and with the conspiratorial complicity of the DOS.

**65.**     The escalation of harassment, apparently in retaliation for PTF's derogatory CIA

application and for exercising his 1st Amendment rights (i.e., right to petition, freedom of

speech) has been allowed to continue despite PTF's numerous complaints to the Consulate, DOJ, and CIA/OIG representing a pattern that persisted even after PTF filed this civil action. PTF repeatedly told the Consulate/DOJ that he wanted to be let alone, but the CIA continually introduced clandestine agents into his immediate environs to annoy and harass him.

66.     In February of 2010, Roughan obtained information about PTF's future wife's first visits to the maternity clinic after she became pregnant, and emailed PTF out of the blue under false pretenses in order to elicit further information, before cutting off email communications abruptly after PTF was not forthcoming with such information. Roughan then refused to answer PTF's queries as to the purported birth of his daughter—the false pretense under which he'd contacted PTF. Roughan had no legitimate "need to know" any information about PTF's personal life; therefore, it is reasonable to infer that he was acting in concert with other CIA et al. in the ongoing conspiracy against PTF, after PTF had reported him to Schaefer et al. In fact, Roughan and Laverne have continued to harass PTF, with Roughan repeated claiming PTF is mentally ill *after* this civil action was filed, in violation 42 USC 1985(2) (clause two), while evading PTF's attempts to effect service of process and refusing to Answer after having been provided notice of this action, though Roughan is following it online.

67.     Schaeffer et al. conspired with others to deprive PTF the honest performance of services incumbent upon their Office in a purposeful manner to serve personal and political interests, intentionally causing PTF emotional distress over a period extending into years. Still,

16

as is evident from the above-described interactions with Peterka and Roughan, a plan had already been launched by rogue CIA officers aiming to displace PTF from Kyoto years before Schaeffer was assigned to the Consulate in Osaka. PTF was surrounded by the CIA et al. from the day he moved into Villa Tonodan. There were overlapping spheres of activity, as PTF would come into contact with CIA officers on a daily basis; therefore, there was a clear and present danger, which was deliberately ignored by Schaefer et al. despite PTF's complaints.

68.     The CIA et al. concurrently operated two local English language print publications, the KTO and KJ, which provided journalistic cover to clandestine agents, and were used to spread disinformation and propaganda instrumental not only for (dis)informing public opinion, but also for propagating a representational paradigm of Westerners constituting an 'expat community' as a form of Mise-en-scene, against which PTF stood out conspicuously.

69.     PTF first mentioned Houser to Schaefer in a 2010 email, but he had known of him since 2006 and seen him at Starbucks. PTF did not know Houser was connected to GCFW until 2012, but knew that he played shakuhachi through Dougill (@2006), and another connection, Brian Schultz ("Schultz"), appeared in 2008, with a mutual interest in shakuhachi leading to socializing. Schultz tried to impress PTF with his knowledge, but once it became clear that PTF was well informed, Schultz touted his devotion to the instrument, again trying to impress PTF. Schultz mentioned that his teacher was travelling and he would be taking lessons with "Hauser" [*sic*] (attachment), and once invited PTF to attend a monthly meeting of

17

KJ people including Houser hosted by Stewart Wachs near Yoshida Shrine. As seen in said thread, PTF had tried to convey the historical depth and religious complexity of the culture to Schultz, providing him with documentations, etc., only to meet with an incongruous refusal to engage, eventually being rebuked for espousing an "academia of shakuhachi", with Schultz maintaining that he was a pure spirit, etc. Schultz tried manipulating PTF regarding subject matter within his academic and professional fields of competency. Schultz assumed airs of a rustic anti-intellectualism and Houser disseminated disinformation, both of which were aimed at dumbing down, diluting, and discrediting a cultural tradition which PT actively cultivates.

**70.** Houser published disinformation (KTO, 1998) about the Meiji Restoration as to the abolishment of Fuke-shu (Rinzai Zen sub-sect using shakuhachi as religious implement) by the State Shinto Meiji Oligarchy. PTF had interrogated Dougill about his piece on Sakamoto, then Dougill and his cohort Houser stopped going to Starbucks. Houser feared that his betrayal of the history of the Fuke-shu shakuhachi tradition would be discovered by PTF when he eventually happened upon the 1998 article by Houser. PTF's teacher was head of a leading national Kinko-ryu shakuhachi guild (Chikumei-sha), direct successor to the Fuke-shu Zen shakuhachi tradition that flourished under the Tokugawa. PTF's teacher had also taught Houser's teacher, and was a direct source in a living tradition with historical import, against which Houser had published traitorous disinformation about the historical context of a school of religious music under the umbrella of which he is licensed to teach. Houser, Schultz, etc.,

18

targeted PTF fearing exposure, knowing PTF would not collaborate. The religion aspect of the class-based invidious animus against PTF pertains to the historical nexus of the rise of State Shinto—presently manifest in the controversial conduct of the current PM Abe, visiting the Yasukuni Shrine, which was established to memorialize the spirits of those who fell in the struggle bringing about the Meiji Restoration (and subsequently extended to other wars, including WWII), while in office, and calling for the emperor to be made head of state, as opposed to symbol of the people; that is to say, relegating popular sovereignty in Japan to the dustbin of post-WWII history, etc. Emperor Showa withdrew attendance of the Imperial family from Yasukuni Shrine in 1978 after it interred the spirits of executed Class A war criminals. The converse of slights against Fuke-shu Zen, the Tokugawa, etc., is support for State Shinto in politics, aligning the CIA et al. with nativism and hereditary politicians, as opposed to the Imperial family, for example, which, under the stewardship of Emperor Akihito has expressed unwavering support for the Constitution. A historical opposition between Zen and theocratic Shinto (e.g., Minamoto shoguns v. Fujiwara regents) is a related aspect.

**71.** The invidious class-based animus the CIA has exhibited against PTF comprises religious, reverse-racist, political, and anti-intellectual components. On the one hand, the CIA's alignment with so-called minorities (Burakumin are ethnically Japanese) is hostile to mainstream Japanese cultural values and norms ("MJC"). Insofar as the CIA has infiltrated clandestine state actors tasked with proselytizing Evangelical Christianity or propagating

pseudo-religions in the ancient cultural capital of Kyoto, the CIA has actively targeted MJC for supplantation. On the other hand, the CIA's collaboration with State Shinto oriented hereditary politicians is hostile to the constitutional order of Japan, including the freedom of conscience. PTF is an area specialist with an affinity for MJC who has been targeted by the CIA in CO evincing a reverse-racist, anti-intellectual animus aimed at supplanting MJC.

**72.** The CIA et al. has moved from print media into digital social media (e.g., Facebook), expanding their means of collective self-representation as an 'expat community', and promoting CIA et al. fronts such as "Deep English" (Douglass) 'Deep Kyoto' (advertisements frequently show up on PTF's feed). Whether through print or social media, such promotional propaganda and disinformation have been key to CO spawned conspiracies in which PTF has been targeted, violating of his civil, etc., rights, and are 'covert' in name only to an observant, well-informed person. PTF has examined Japan Times ("JT") pieces containing disinformation or flattery fatuously promoting CIA et al. officers/assets as pseudo-cultural figures. One such piece by Kris Kosaka ("Kosaka": CIA) lavished vacuous flattery on Lotman, a non-entity in the literary world, aiming to imbue him with a literary persona and promote his vaunted ascent in the CIA contrived 'expat community' here in the 1,000 year old cultural capital of Japan.

**73.** The Kosaka article was significant as Lotman had married a woman whose family runs a noodle shop in PTF's general neighborhood, and the article was published *years* (January 2013) after PTF first complained to Schaefer et al. and during his lawsuit against the

city. The article represented a clear threat in the form of an expression of intent by the CIA to infiltrate Lotman into PTF's environs and promote him as a pseudo-culture figure. PTF had long since complained and blogged about the problems with Bray and Dalksy.

**74.** PTF's former comrade in the U.S. Army, Taylor, was involved in the conspiracy to displace PTF from Kyoto with respect to his efforts to convince PTF to consider Thailand as an acceptable destination. Taylor had spent many years in Thailand with the CIA, providing him with contacts, etc., and dispatched an individual calling himself Scott Harris ("Harris"), claiming to be from Canada and residing in Thailand, to sell PTF on Thailand. PTF made it clear that he wasn't interested in going to Thailand. Taylor was eventually stationed in Tokyo while PTF was in Kyoto, and though PTF visited Taylor and family in Tokyo, Taylor never reciprocated, despite several expressions of intent to visit during his three-year stint. Plaintiff introduced Taylor to his wife in 1984 and has known his children since they were infants. Harris showed up in Kyoto in 2007, and the first email PTF has from him is dated to June 2007; the last, April 2012. PTF conveyed to Taylor via email his complaints about being set up to be attacked at a local bar PTF had arranged to meet Paquette's friend Yoshiyuki, whom PTF referred to as 'Freemasons' so as not to put Taylor on the spot, holding out the possibility that Freemasons might represent a rogue faction in the CIA. In Taylor's reply of December 12, 2007 to one such email, he stated, "Sounds like you need to find a new crowd in Kyoto". Normally, that might sound like reasonable advice, but under the circumstances, it would have

required PTF to avoid Starbucks and all public venues targeted by the multitudinous CIA et al. Taylor was aware of that, so he was suggesting that PTF avoid Starbucks. PTF does not have sufficient information to determine whether Taylor reported to the CIA/OIG, <u>as required by EO12333,</u> PTF's allegations as to being set up for attack by CIA officers. His co-conspirators in the CIA would have counseled against doing so. Taylor is married to a Korean woman, and his family is involved with Evangelical Protestantism, placing him in two CIA et al. affinity groups that in Kyoto PTF has equated with problems, possibly providing Taylor with another motive. Like the sons of, e.g., Charles Roche and John Einarsen, it appears that Taylor's son has entered the CIA, providing Taylor with yet further motivation to conspire against PTF.

**75.** The Korean connections of Paquette and Taylor enabled collaboration; here, as Koreans account for 30% of yakuza, and they desired to conduct CO involving yakuza as well as provide for PTF's personal safety, they had motive to act in concert to displace PTF from Kyoto, which is a small city laid out 1,000 years ago, wherefore the CIA desire to conduct CO in PTF's environs, including Starbucks, which is @2km from the corporate HQ of the largest yakuza group in Kyoto. Japan's laws against yakuza were weak, but a series of Ordinances enacted in 2011-12 during the tenure of the only political party to have held office for a significant period since the 1950s other than the LDP have been effective. Prior thereto, concerted action between the CIA and yakuza groups in Japan was less risky. Connections between the LDP and yakuza are well documented; attached hereto is a recent photo of current

PM Abe (LDP) in the company of a yakuza member and Arkansas Gov. Mike Huckabee.

**76.** Dickinson, knowing PTF's wife was pregnant, introduced PTF to a female named Kuniko Sato ("Sato"), with the aim of interesting him in Sato romantically in order to sabotage PTF's marriage and family: *Moore v. City of East Cleveland* 431 U.S. 494 (1977).

**77.** Dickinson's failed conspiracy to break up PTF's new family by introducing Sato as a honey trap was a variation on the MO Peterka used with Kudo to undermine on false pretenses PTF's relationship with his previous girlfriend, representing a pattern of concerted attempts to subvert PTF's personal relationships and socially isolate him, with the aim of intentionally inflicting psychological distress and, ultimately, driving him away from Kyoto.

**78.** O'Day had an injury from a traffic accident and was suing. She plied PTF with legal questions, and PTF's ongoing lawsuit with the city became a focus for O'Day. The lawsuit centered on the nursery school attended by children of Dalsky, etc., making it a targeted social institution targeted in Kyoto. Conduct of PTF's attorney caused PTF to wonder whether the CIA had recruited her, aiming to prevent PTF from winning and the suit becoming highly publicized. When PTF told O'Day he would be suing the CIA et al., she disapproved.

**79.** The last incident of conspiratorial deliberate harassment before PTF filed this civil action was an elaborate, retaliatory concerted action involving perhaps 7 individuals, two of whom, Lotman and Zimbleman, are presently named as defendants. PTF was contacted by Zimbleman and invited to participate in a "Lit Group" ("MSG") that included a number of

23

suspected CIA et al., some of whom PTF had already blogged about, including Lotman, whom

PTF had also reported his apprehensions about to Schaefer et al. in May 2013—after reading

the aforementioned Kosaka JT piece—*as preventative measures*—before Lotman had the

chance to annoy/harass PTF. PTF had only seen Lotman in Kyoto once thereafter, on the street,

and as the "3F Project Room" ("3F")—a CIA et al. front run by MSG member Eric Luong

("Luong") that had been opened a block south of the nursery school attended by PTF's son in

July 2012 (perhaps the CIA et al. imagined that, being embroiled in a lawsuit, PTF wouldn't

notice it) and promoted Lotman, Einarsen et al. as pseudo-culture figures—had been closed

down as well, PTF was less apprehensive. Thus, when Zimbleman's wife—with 3-year old in

tow—was sent to initiate contact with PTF, he believed the approach innocuous enough to be

taken in good faith, perhaps representing an overture toward reconciliation/accommodation.

**80.**     That is to say, <u>PTF had believed that the above-described preventative measures he</u>

<u>had taken had achieved the desired effect</u>; however, in retrospect, it seems that the CIA made a

temporary, tactical withdrawal, in closing 3F, treating PTF's victory as a the loss of a battle

instead of the war, so to speak, and had immediately regrouped and took to planning a

counteroffensive aimed at reversing the gains of PTF's campaign to liberate the Goshominami

area from the CIA et al. menace, as it were. In other words, despite the fact that PTF had made

it unequivocally clear that the presence of CIA et al. conducting so-called CO in his immediate

environs was intolerable, the subsequent unfolding of events revealed that Zimbleman had sent

his wife and child to initiate contact as part of a conspiratorial ruse aimed at reversing the effect that PTF's reporting/blogging had of foreclosing the presence of CIA et al. conducting CO in his immediate environs by tricking him into acquiescing thereto. Accordingly, a goal of the conspiracy was to facilitate the infiltration of PTF's immediate environs by Zimbleman et al., with the nursery school being a primary social institution targeted for (re)infiltration.

81.     The invitation was revealed to be fraudulent over the course of an approximately 8-hour period the day before the scheduled meeting, when MSG members were responding to other's comments, including Zimbleman's introduction of PTF to the group, Lotman's expression of intent to attend, etc., when Zimbleman suddenly declared that he was cancelling the meeting, contradicting his earlier statements, followed by a deafening silence from MSG co-founder and host Lotman, and then a comment by Kaylie Palmer trying to compensate for Lotman's silence by claiming he was ill, too, contradicting Lotman's expression of intent to attend several hours earlier with no mention of illness, etc. Zimbleman then disbanded the group on the 28th of June—another act contradicting his prior statements as well as statements of others—in the email announcing he had been diagnosed with pneumonia, before showing up healthy at the nursery school a week later without having replied to PTF's last email and having never mentioned the nursery school at all.

82.     There can be no question that the CIA knew that PTF was extremely apprehensive about the CIA et al. conducting so-called covert action in his environs, and had specifically

reported Lotman and blogged about him and Luong, but the CIA et al. supervisors allowed

them to further conspire against PTF with Zimbleman. Having failed to displace PTF by

assault and battery, etc., the CIA adopted a purely psychological MO, aiming to intentionally

inflict sufficient psychological distress to cause PTF to have a mental break down. That was

reckless, and a potentially dangerous error in judgement by the CIA, but PTF has maintained

his composure. Two concealed objectives were revealed by said ruse: the first was to gain

access for Zimbleman, Lotman, etc., to the nursery school and primary schools PT's children

will subsequently attend in the neighborhood (e.g., the Jr. High School is in same building as

nursery school); and the second was the establishment of a counselling practice by Zimbleman

in PTF's neighborhood as a node on the network of neoliberal self-help/psychologism fronts.

**83.**     A plurality of clandestine federal agents have conspired to deprive PTF of his rights,

privileges and immunities protected by the U.S. Constitution, with none of the defendants that

were made aware of the conspiracy (e,g, Lee, Kerry) having made any apparent effort to stop

the conspiracy. 42 USC 1985(3) (Conspiracy to interfere with civil rights) and 42 USC 1986

(Action for neglect to prevent) provide respective causes of action for said violations.

**84.**     PTF was set up for attack and suffered assault and battery, he has undergone the

emotional trauma of having a girlfriend whom he thought would become his wife unilaterally

decide to abort their child, etc., and suffered humiliation, embarrassment and suffered

psychological distress to a degree that have an adverse impact on his physical health in the

form of chronic insomnia, increased alcohol consumption, etc., and is entitled to compensatory

and punitive damages in an amount according to proof, including reasonable attorneys' fees

and costs. PTF's complaints to the DOJ about the recurring conspiratorial violations by CIA

officers/assets of PTF's civil rights, etc., protected under the U.S. Constitution have been met

with deception, concealment, and deliberate retaliatory harassment including civil fraud by the

DOJ undertaken to cover up and simultaneously act in furtherance of the conspiracy. The

authority of *Bivens* enables a private action to be brought with respect to such violations.

## VI. THIRD CAUSE OF ACTION

(Civil Fraud: Deprivation of right and entitlement to honest services from public officials,

Conflict of interest, Misuse of office, Violation of duty of loyalty)

**85.**     PTF incorporates herein, as though fully set forth, paragraphs 1 through 84, above.

**86.**     Schaefer's reply to PTF's 2nd follow-up email characterized PTF's allegations as

"*concerns*", which would be "[*passed on*] *through the appropriate channels*". From the first,

Schaefer concealed the legal import of PTF's allegations of conspiratorial violations of his

civil rights, and withheld information to which PTF was entitled to be informed regarding the

proper course of action PTF should have taken. Believing that Schaefer was faithfully

executing the duty of loyalty, etc., owed by the ACSO to PTF, commensurate with said post,

PTF continued to send emails detailing further violations. In fact, Schaefer had a conflict of

interest due to his actual status as a CIA officer, as implied by the notification PTF received in

response to his complaint thereabout to the DOS/OIG. Schaefer represented himself as ACSO, but was a CIA officer posing as ACSO. PTF does not recall suspecting that Schaefer et al. were actually CIA until Kennedy replaced Snider in 2012. Concealment, etc., by Schaefer et al. caused PTF prolonged invasion of privacy and misled him, subjecting him to retaliatory harassment in Kyoto, violating his rights secured under the 1st, 4th, 5th, and 9th Amendments. PTF has ascertained that the Executive believes it is not required to respond to a petition at all, as in the case of the CIA/OIG, but if a response to such a petition is made, the official has a duty of loyalty to respond honestly, and does not have authority to mislead or deceive the petitioner. Had Schaefer continued to refuse to respond instead of sending the reply email, PTF would have suspected something was amiss and promptly sought the next mode for escalating the petition. The misleading responses from Schaefer et al. were preemptive forms of retaliation, aiming both to protect personal interests associated with achieving the political goals of the CO they were supervising, and to intentionally inflict psychological stress, making it seem futile to complain, etc. The conspiratorial co-opting of the ACSO post by the CIA facilitated the interception of such complaints against the CIA and retaliatory deception.

**87.**     PTF has cited Supreme Court precedents on conspiracy to defraud in relation to the cooption and subversion of the diplomatic post of ACSO. Here, the scenario is unusual in that an Agency and a Department of the Executive conspired to defraud the People, i.e., by agreement between the CIA and DOS to have the CIA coopt the DOS ACSO post to facilitate

the conduct of CO, etc., purposefully impairing the functionality of the ACSO.

**88.** After Schaefer et al. had ceased direct email contact with PTF, he was informed by his representative in the Senate as well as the DOS/OIG that he should report such allegations directly to the CIA/OIG. Accordingly, the statement by Schaeffer as to the "pass[ing] along" of PTF's "*concerns*" "through the appropriate channels" fraudulently concealed the actual course of action PTF should take, and represents an overt act in furtherance of the conspiracy in that it does not correspond to the action taken by the DOS/OIG in response to such a report.

**89.** After an unproductive approach to the office of Lee with his allegations, PTF embarked on what seemed to be a logical next step in telephoning the Civil Rights Division of the DOJ around July 2011, and commenced faxing documents thereto in September. In February, 2012, after PTF telephoned the DOJ again inquiring as to the status of his complaint, Callahan stated that a decision was forthcoming and (mis)led PTF to believe an investigation was underway. Callahan provided PTF with an email address, but never responded to PTF's emails, even to correct PTF when he referred to "your investigation". However, it is clear from the text of the DOJ letter that Callahan had read PTF's emails; thus, he'd purposefully refused to correctively email PTF that he had, e.g., mistakenly led PTF to believe an investigation was underway. The dismissive reply ("DOJ letter") mailed to PTF by the Kappelhoff not only misrepresented the allegations, but fraudulently attributed to PTF a fabricated allegation: "*You further state that the CIA and their agents have [] used propaganda against your blog*". Not

being an attorney, PTF assumed there was some truth in the DOJ letter related to civil rights law, but he was painfully aware that the DOJ letter had intentionally added insult to injury.

90.     After the initial shock of the surreal DOJ letter wore off, PTF studied the reference to "local and federal law enforcement officials", which seemed like a potentially tangible legal point PTF did not understand, and found the statute stating that the CIA has no police powers, suggesting there might be a technicality being exploited by the DOJ. Meanwhile, aside from generalized statements in the 2nd and 3rd paragraphs, it was clear that not only did the DOJ letter misrepresent PTF's allegations regarding civil rights violations, it purposefully ignored the entirety of the allegations (implicit and explicit) in the 100+ pages PTF submitted before being provided the email address in February of 2012, and approximately 30 pages of emails exchanged with Schaefer et al. in the interim between September 2011 and February 2012.

91.     PTF was embroiled in a lawsuit against the city of Kyoto at the time which wasn't finalized until April of 2014. It wasn't until sometime in 2014 that he discovered *Bivens*, and then the case of Richard A. Horn, whereupon it became clear that the deception by the DOJ was worse than PTF had imagined. Not only were the allegations conspiracy and substantive violations of civil rights ignored in the DOJ letter, legal statements, e.g., "law enforcement officials", had also proven to be misleading, wherefore it was clear that the DOJ fraudulently concealed the legal import of PTF's allegations, the DOJ letter being an instrument executed in the furtherance of the conspiracy, simultaneously covering up a felony conspiracy, etc., in

violation of 18 USC 4. PTF had yet to discover EO12333 and the MOU at that time.

**92.**     Furthermore, PTF's allegations, etc., were acted on secretively by the DOJ and CIA, with Paquette being removed from PTF's immediate environs as a result—representing an overt (yet concealed) act in furtherance of the ongoing conspiracy—without launching a criminal investigation. PTF's injuries were not remedied, and his cause of action was fraudulently concealed in the DOJ letter. Paquette had cancelled his old email account (several months before PTF first contacted the DOJ), attempting to despoil email evidence,.

**93.**     Kappelhoff et al. not only refused to launch an *official* investigation into PTF's allegations, on the false pretense that they set forth no violations of federal criminal civil rights laws, attempting to lead him to believe that his allegations had no merit, but flagrantly misrepresented the allegations and falsely attributed to PTF a nonsensical fabricated allegation in retaliation for complaining about the CIA, thereby smearing PT's character in an attempt to discredit him. Like Schaefer et al., Kappelhoff et al. violated the duty of loyalty owed to PTF commensurate with public office, and misused said office for personal ends.

## VII. FOURTH CAUSE OF ACTION

(*Bivens* 2: Unconstitutional statute, (related) official policies, and customs and practices;

the 1st, 4th, 5th, and 14th Amendments)

**94.**     PTF incorporates herein, as though fully set forth, paragraphs 1 through 93, above.

**95.**     Official policies based on 28 USC 535(b)(2) ("535(b)(2)"), including EO12333, the

MOU and derivative directives, as well as customs and practices of the CIA, DOJ, and DOS ("policies/practices") have facilitated or directly caused violations of PTFs civil rights, etc.

**96.** A <u>conspiracy between the DOS and CIA establishing a custom</u> whereby CIA officers are posted under diplomatic cover as ACSO deprived PTF of his rights to equal protection of laws and due process rights by facilitating violations of the duty of loyalty owed PTF by the ACSO. Said custom enabled CIA case officers to act in furtherance of conspiratorial violations of PTF's civil, etc., rights about which PTF had complained to the ACSO. CIA employees are required, per 50 USC 3571, to report such allegations to the CIA/OIG, not the AG. Because Schaefer et al. were CIA they fraudulently concealed the fact that PTF should report his allegations directly to CIA/OIG, misleading PTF to believe his grievances were properly addressed.

**97.** EO12333 supports CIA CO and makes a pretense of respecting the rights, privileges and immunities of American citizens abroad, but the history of CIA abuses makes the lack of remedial measures implemented by the DOS conspicuous. Documents responsive to PTF's FOIA request show that *<u>no discussion whatsoever</u>* has taken place at the DOS as to the handling of complaints from American citizens alleging civil rights violations by CIA officers.

**98.** 535(b)(2) is excessively vague, providing, "*unless [] the Attorney General <u>directs otherwise</u> with respect to **<u>a specified class</u>** <u>of information, allegation, or complaint</u>*", thereby granting excessive discretionary authority as to an action *otherwise* to be taken; and as to the

specification of "classes" of "information, allegation[s], and complaint[s]". The MOU

instructs that the AG set procedures per 535(b)(2) and EO1233 agreed upon with the Agency.

PTF's complaints were singled out in advance to be handled with a **<u>discriminatory motive</u>**.

**99.**    28 USC 535(a) authorizes the AG to investigate allegations of federal crimes by

suspected CIA officers reported *<u>directly</u>* to the DOJ by a citizen, but says nothing specific. The

MOU (¶ IV.B) states that the General Counsel/IG *may* conduct a "preliminary inquiry", but the

exemptions (e.g., ¶ III.F.1) are vague. The MOU required Holder to collude with Petraeus

regarding PTF's allegations, but the DOJ letter implies no 'preliminary inquiry' occurred

during 8 months, perhaps depriving PTF of his constitutional rights from yet another angle.

**100.**    It is unclear what violations of federal criminal law could arbitrarily be qualified as:

> [] relatively minor offenses to which this MOU would ordinarily apply, but
> which, in the General Counsel's opinion, do not warrant reporting pursuant
> to this MOU. (MOU, ¶ III.F.4).

A "*matter*" (i.e., "<u>special crime</u>") per the MOU (¶ VIII) that *is* required to be reported may be

treated as <u>a separate class</u> (¶ VIII. C), enabling CIA to dictate whether DOJ investigates. An

MOU has been executed between the DOJ and CIA that mandates collusion therebetween **<u>so</u>**

**<u>as to avoid accountability for such "*special crimes*" and shield the ongoing conspiracy</u>**

**<u>carried out in conjunction with an ongoing "intelligence operation"</u>**, even attempting to

circumvent recourse to the Court by exploiting the legislative fault whereby Congress has

failed to mandate CIPA for corresponding civil actions. It is unclear how a "special crime"

requiring reporting per ¶ VIII. B is handled, but it is clear that such cases falling under ¶ VIII.

C are singled out for discriminatory treatment, apparently **rendering CIPA meaningless**.

**101.** As18 USC 241/242/371 are federal criminal statutes, the relationship of the MOU, etc., to PTF's allegations is relevant to the discrepancy between the manner in which PTF's petition for a redress of grievances was handled, in particular, by: Schaefer et al., the DOJ, and the CIA/OIG, on the one hand; and by the DOS/OIG, on the other. Only the DOS/OIG is not culpable in the conspiracy, said culpability encompassing liability on the part of individuals as well as policy/practices. Once the DOJ knew Schaefer et al. were CIA officers, the violation of 18 USC 371 was readily apparent. The action of the DOS/OIG in reporting to the CIA/OIG PTF's allegations as to the conspiratorial abuse of office violating PTF's rights protected by the Constitution aimed to prevent the conspiracy. Here, the MOU (¶ VII) does address the reporting of conspiracies, but only with respect to "offenses by non-employees", presumably considering the 'intracorporate conspiracy doctrine' (e.g., Carter) applicable.

**102.** Whether said doctrine applies to civil rights violations appears not to be settled law. Moreover, the defendants are alleged clandestine agents motivated by personal goals tied to political, etc., goals of CO (i.e., "motivated by any independent personal stake in achieving the [organization's] objective" (*Spector v. Board of Trustees of Community-Technical Colleges,* 463 F. Supp. 2d 234, 251 (D.Conn.2006))). Furthermore, assuming *arguendo* that the 'field officers' had been *ordered* (i.e., "within the scope of their employment") to target PTF by Schaefer et al., that would implicate the inter-corporate conspiracies between the DOS

34

and CIA and the DOJ and CIA (*Lerner v. District of Columbia,* 362 F.Supp.2d 149, 165

(D.D.C. 2005)). In either case, *Del Marcelle v. Brown County Corp.*, 680 F.3d (7th Cir. 2012)

applies. The MOU is a policy instrument implicated in the violation of PTF's constitutional

rights. CO are conspiracies that are launched on a premise of being quasi-legal and are

planned by the NSC (EO12333 ¶ 1.2(a),(b); Kinsman). Here, however, the CO in which

Plaintiff was targeted were carried out by the CIA with the complicity of the DOS, said official

cover CIA officers (nominally) being prohibited by EO12333 from violating the U.S.

Constitution. Thus, the collusion as per the MOU shows the MOU is not aimed at preventing

conspiratorial deprivations of civil rights, etc., of Americans abroad; in fact, it purposefully

enables such conspiracies to be covered up, in violation of 18 USC 4.

**103.**     Kappelhoff ignored 18 USC 241/242/371—apparently permitted by the MOU—and

misrepresented PTF's particularized allegations, fraudulently concealing the legal import

thereof, before adding insult to injury by attributing a nonsensical fabricated allegation to PTF,

said acts serving to <u>further the conspiracy</u>. Insofar as the procedures agreed upon between

Holder and Petraeus pursuant to the MOU legal regime condoned or furthered such acts on the

part of the DOJ, said legal regime is unconstitutional. The MOU and EO12333 betray a

cynical duplicity by paying homage to a "*solemn obligation*" (EO12333: ¶ 1.1(b)), but

requiring the CIA to detail potential risks of investigation/prosecution to "<u>ongoing intelligence

operations</u>". Paquette was subjected to such "administrative, disciplinary, or other adverse

action" for his conspiratorial violations of PTF's civil, etc., rights, but PTF's injuries incurred due to Paquette's acts were not remedied. It is <u>not rational</u> to assume a disciplinary action could be "*appropriate*" without a corresponding infraction (and investigation). The civil fraud by Kappelhoff et al. was arbitrary and retaliatory. PTF was fraudulently deprived of his due process rights by Kappelhoff so that the DOJ could shield the ongoing intelligence operations.

**104.**     The DOS is not an Intelligence Community entity, and has *not* executed said MOU with the CIA; in fact, there is a <u>long standing interdepartmental dispute</u> with the CIA regarding the conduct of foreign policy and the representation of the CIA's role in CO as it relates to the history thereof. Said conflict came to the fore during the administration of John F. Kennedy, and has reappeared with respect to the official historical record of U.S. foreign policy.

**105.**     PTF has submitted two reports to the CIA/OIG in relation to allegations raised in this civil action, but has not received a single notice acknowledging receipt thereof, even though the reports included allegations as to federal crimes committed against PTF by CIA employees. PTF has ascertained that the Supreme Court has not ruled on whether or not the government is required to respond to a petition for a request for grievances, but PTF believes that under the circumstances, the practice of the CIA/OIG not responding to such a petition represents a violation of PTF's rights secured by the 1st and 5th Amendments.

**106.**     A vague disclaimer is found in EO12333 (¶ 2.8), and (¶ 2.2) explicitly states:

> Set forth below are certain general principles that, in addition to and
> consistent with applicable laws, are intended to achieve **the proper balance**

> **between** *the acquisition of* **essential information** *and protection of*
> **individual interests**. [emphasis added]

PTF's rights protected under the Bill of Rights and 14th Amendment are inviolable; thus, it is

not clear as to what said "proper balance" refers. PTF's allegations regard CO that are not for

"*the acquisition of essential information*", but aimed at subverting religious/ cultural traditions

in a paradigmatic historical city, and directly at the expense of PTF's "individual interests".

**107.**     In pursuing litigation against the CIA, PTF has found 32 CFR 1904, which serves to

preemptively enable CIA employees to evade being served process, while continuing to

engage in the offending harassment, unabated, as per Roughan, Laverne, and Douglass. Said

regulation includes a disclaimer in 1904.1 stating, "*This part is intended to secure the orderly*

*execution of the Agency's affairs and not to impede any legal proceeding*", but not only is it

being used to impede this civil action, it is being used in furtherance of the conspiracy.

**108.**     535(b)(2), said MOU, EO12333, and 32 CFR 1904 correspond to: "…***law*[s]** *which*

***shall abridge the privileges or immunities of citizens of the United States***". Related concerns

have also been expressed by the NYU Brennan Center for Justice. By instituting collusion, the

MOU facilitated the deprivation of PTF's right to honest services by the DOJ. By refusing to

initiate an investigation that would have seen Schaefer et al. charged with criminal Honest

Services Fraud, the DOJ committed a second infraction thereof. Said laws/policies violate the

Privileges or Immunities Clause of the 14th Amendment, as applicable through reverse

incorporation. *Bivens* provides the authority to bring a civil action for said violations.

# VIII. FIFTH CAUSE OF ACTION

(*Bivens* 4: Class-of-one equal protection of the laws, Substantive due process;

the 1st, 4th, 5th, 9th, and 14th Amendments)

**109.** PTF incorporates herein, as though fully set forth, paragraphs 1 through 108, above.

**110.** The above-described forms of deliberate harassment PTF has been subjected to over many years in various forms by CIA officers/assets has been carried out within a socio-political historic context that has seen other violations of PTF's rights, including injury to his economic interests, such as denigration of his competitive position in the translation market, and various violations of his inalienable natural rights, including the right to pursue happiness, etc. When PTF first came to Kyoto to work in 1999, he secured employment with a translation company that he later learned that the foreigner staff appears to have comprised exclusively of CIA officers (Tech Communications: attached). PTF left the unusual work environment there and travelled, eventually returning to Kyoto after spending a couple of years in Tokyo. After returning to Kyoto one company PTF worked for was Osaka-based GoldCoast Productions (mentioned in email to Schaefer, 2010: attached), which is run by an Australian—co-founded with an American—and managed by another American (head translator: Peter). The agreement had included an implicit understanding that PT would commute to the office for about a year to learn the technical material, and then work freelance from home in Kyoto. In short, Peter persistently imposed a hostile work environment on PTF,

38

and continually urged PTF to move closer to the office, that is, to leave Kyoto. The resulting

interpersonal conflict intensified to the point that the owner opted to offer PTF a severance

package to abrogate the contract, which PTF accepted. The company was a CIA et al. front,

and Peter and the other American were CIA officers. Peter recently left the company

(attachment). Here, before the problems with Paquette and Blackman with respect to the

fraudulent offer of translation work, PTF had already experienced problems with CIA in the

translation industry. The CIA has attempted to flood the market with translators (Luong, etc.)

in order to deplete the availability of work and to drive down the rates, or to otherwise exert an

undue influence, violating the spirit (if not letter) of anti-trust laws to PTF's detriment. Peter

pressured PTF to leave Kyoto, and Blackman and Paquette wasted PTF's time and effort to

frustrate and prevent him from being productive in pursuing his lawful profession, etc., in

Kyoto. Both had the objective to displace PTF from Kyoto by deliberate harassment.

**111.**     Plaintiff has been subjected to serial deliberate harassment, which the Court has

addressed with respect to a class-of-one equal protection claim in *Geinosky v. City Of Chicago*,

675 F.3d 743 (2012). In that case, the culprits were police officers, in this case, employees of

the CIA and DOJ. PTF submitted a FOIA request to the CIA for information on the number of

complaints received annually about civil rights harassment, his request was denied on national

security exemptions. Plaintiff does not know whether other individuals have received a

fraudulent response from the DOJ in reply to a petition for redress of grievances.

**112.**     PTF has been targeted for exclusion from Kyoto by the CIA et al because he is an area specialist, and practices Kinko-ryu (Fuke-shu) shakuhachi. PTF introduced Jansen, one of few American historians of Japan to have been recognition with a Japanese Order, to Roughan, who followed up by telling PTF of a book by CIA officer 'Romulus Hillsborough', writer of disinformation promoting anti-foreign zealots as samurai revolutionaries, etc. Houser falsely attacked the "Tokugawa *clan*" for abolishing Fuke-shu in 1871, but the Tokugawa (a ruling House, not a clan) had relinquished power in 1867 before the Meiji Restoration of 1868. Furthermore, the Tokugawa had fostered the formal recognition of Fuke-shu, granting Kurosawa Kinko permission to gathering pieces from temples across the country into a coherent repertoire, thereby constituting the Kinko-ryu. As Hardacre states, Tokugawa era Japan was diverse religiously, with a plurality of sects of both Buddhism and Shinto, whereas the Meiji Restoration occasioned the institution of an oppressive, monolithic state controlled religion. PTF was targeted because he opposed the supplantation of traditional culture in Kyoto and the promotion militarism as well as CIA efforts to adversely influence (i.e., dis-inform) public opinion in support of the LDP's efforts to revise the war-renouncing Article 9 of the Constitution, a CIA objective since the 1950s (e.g., FRUS excerpts attached).

**113.**     Authentic American academics (i.e., Jansen and Keene) have been awarded Orders by the government of Japan, but LDP bureaucrats to recognize CIA officer imposters as part of an intelligence arrangement promoting CO in Kyoto. When Einarsen was thus recognized, the JT

characterized him as "a central figure" of the "Kyoto expatriate community", which is a CIA CO contrivance. Aside from Einarsen, the Japanese government supported Japan Foundation has recognized two other CIA et al. locally through an essay contest, helping establish them in civil society: Ted Taylor, "the 'internationalizer'; and J.J. O'Donoghue, now a JT columnist.

**114.** PTF has the right to lead a normal life in Kyoto, Japan, enjoying traditional cultural and religious practices in their normal state, and to be let alone by CIA CO in civil society (Ingraham v. Wright, (1977) No. 75-6527). The fact that PTF is in Japan, where he values the traditional culture and religious practices deserving of preservation, does not diminish his rights to enjoy same free from government intrusion (e.g., *Sierra Club v. Morton*, No. 70-34 (1972)). Practices such as disseminating disinformation on religious traditions, proselytization and propagation of alien/pseudo-religions by state actors directly implicate the 1st and 9th Amendments, as freedom of conscience is a prerequisite to the pursuit of happiness.

**115.** CIA CO have promoted discontented factions in Kansai (Koreans and Burakumin) connected to yakuza, whereas Plaintiff represents a form of mainstream interests in Japan and wherefore his targeting embodies a form of reverse-racism aimed at supporting said CO. The CIA has been collaborating with the yakuza (60% Burakumin, 30% Korean) since the end of WWII, and PTF has refused to do so. The CIA CO exploit an East-West schism in Japan related to religion and politics. The adoption of *Ishin* by LDP supported Toru Hashimoto (Burakumin, yakuza connections, CIA front Japan Today) in naming his new political party

resonates with militaristic exclusionism (e.g., *sonno-joi*: "Revere the Emperor, Expel the Barbarians" (Hesselink, etc.)), the 'Ryoma craze', and the hereditary politicians connected the Meiji era (e.g., Aso, Abe, Kan). The CIA has cultivated ties with and falsely promoted individuals associated with ethnic/religious/etc. factions in an attempt to catapult them to the fore in civil society and undermine MJC in Kyoto for personal and political aims.

116.     CIA CO have aimed to saturate social institutions so as to exercise undue influence in civil society, generating the conditions under which there would be an inevitable conflict between PTF in his normal daily activities and clandestine agents due to overlapping spheres of activity and mutually incompatible goals and dispositions. The CIA does not employ area specialists in Kyoto because CIA CO actively target traditional culture—with which PTF has an affinity—for supplantation, wherefore the CIA et al. have targeted PTF for exclusion.

117.     CO embody (covert) foreign policy implicated herein as embracing reverse-racism against civil society in a U.S. ally and PTF, while the publically espoused foreign policy is implicated as to the "pivot to Asia" aimed at increasing the presence of America in Asia by means of CO including: collaboration with yakuza; bigoted attacks by Evangelical Christians on Japanese religion; introduction of CIA-contrived forms of pseudo-Buddhism (Doug Duncan and Catherine Pawasarat); and the introduction of outright pseudo-religions.

118.     U.S. heritage militates against the government's undertaking of CO to subvert the civil society institutions of an allied country with the intent to transform said society culturally

for personal and political aims. PTF has been singled out for discriminatory treatment in

conjunction with attempts to conduct flagrantly intrusive CO that are covert in name only and

being conducted based on a multi-lateral intelligence arrangement by an international coterie

of bigots, and encompass the growth of a hereditary LDP political class and a parallel practice

whereby the children of CIA officers succeed their parents as CIA officers, instantiating a

system wherein federal office is inherited, thereby supplanting the constitutional order with

feudalism. There are many Kyoto businesses operated as CIA et al. fronts publicized by a

network of media outlets used in CO aiming to represent same as constituents of an 'expat

community' in civil society, instantiating same as a newcomer quasi social institution.

**119.**     The CIA was signed into being during the Cold War in 1947 by former President

Truman, who publically repudiated the course taken by the agency in the 1960s. The Cold War

has passed into an era of globalization seeing Americans seeking their livelihood abroad in

societies that have developed modern socio-economic and political systems.

**120.**     PTF is a private American citizen not subject to the arbitrary whims of government

officials. The Executive has purposefully sought to displace PTF from his place of legal

permanent residency to carry out CO, and fraudulently misled PTF when he complained**,**

exceeding their authority and violating PTF's rights, privileges and immunities enumerated by

the U.S. Constitution as well as his implied rights "retained by the people" secured under the

9th Amendment, including those derived from the common law tradition, inalienable natural

rights, etc. Said conduct should shock the conscience of the Court, and violated PTF's

substantial due process rights, depriving him of equal protection and procedural due process.

*Biven's* provides the authority to bring a private action with respect to said violations.

## IX. RELIEF REQUESTED

**121.**     PTF hereby requests a TRIAL BY JURY, and seeks judgment and Relief as follows:

1.  For statutory, compensatory and punitive damages according to proof;

2.  Damages for intentional infliction of emotional distress and mental anguish by unlawful

    intrusion and disruption of PTF's life by CIA employees, including personal discomfort,

    annoyance and emotional distress caused by harassment, the hatching of depraved plots

    against PTF including assault and battery, hacking of PTF's electronics devices, etc.;

3.  Declaratory relief pertaining to the policies, customs and practices of the CIA, DOS, and

    DOJ that have resulted in violations of PTF's Constitutional rights, including the

    declaration of EO12333 and the MOU as exceedingly vague and therefore failing to meet

    the requirements of the Constitution corresponding to the legal status thereof;

4.  A permanent injunction enjoining the CIA and DOS from conspiring to post CIA officers

    and the like under the assumed title of ACSO in the DOS;

5.  A permanent injunction requiring the relevant Agencies and/or Departments of the

    Executive Branch to implement steps necessary to improve transparency in the reporting

    requirements related to the possible commission of federal crimes by a CIA officer or a

proxy thereof against an American citizen overseas;

6. A permanent injunction requiring the Executive and Legislative Branches to ensure that complaints alleging a conspiracy to interfere with civil rights by covert CIA officers/assets, etc., overseas against an American citizen overseas are not ignored;

7. A permanent injunction requiring the CIA/OIG to provide notification to any American citizen overseas submitting a report to the CIA/OIG alleging unlawful misconduct against a CIA officer, proxy thereof, etc., in acknowledgement of the receipt thereof;

8. A permanent injunction placing a restraining order on each of the CIA et al. defendants as well as others implicated in allegations set forth in filings and evidentiary communications submitted by PTF from coming into proximity with PTF, defining a reasonable sphere of activity based on a radial distance from PTF's residence, etc., preferably removing said defendants/proxies from central Kyoto, and proscribing future intrusion by the CIA; and

9. For reasonable attorneys' fees, investigation and litigation costs reasonably incurred and for such other relief as may be appropriate.

Respectfully Submitted,

Darren R. Vasaturo
502 Sun Lotus Ikeji
217 Owaricho, Nakagyoku
Kyoto, Japan 604-0934

Dated: July 25, 2016