**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DARREN R. VASATURO, | |
| **Plaintiff,** | |
| v. | Civil Action No. 15-1736 (JEB) |
| SASHA PETERKA, *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OPINION**

*Pro se* Plaintiff Darren Vasaturo's initial Amended Complaint ran 227 pages and strung together a series of farfetched allegations about Central Intelligence Agency officers who had "conspired among themselves and with others to undertake actions intended to undermine Plaintiff's ability to lead a productive life in Kyoto[, Japan]." ECF No. 75 (Am. Compl.), ¶ 104. The Court *sua sponte* issued a Memorandum Opinion and Order dismissing the suit for its patently insubstantial nature, but giving Vasaturo "one more opportunity to file a pleading of reasonable length that sets out a coherent claim." ECF No. 198 at 1. While his newly filed Second Amended Complaint is somewhat less digressive, it remains essentially fictitious and will thus be dismissed.

I.    **Background**

Vasaturo is a "private American citizen residing in Kyoto, Japan." Sec. Am. Compl., ¶ 1. He "served in the U.S. Army Signal Intelligence Corps as a Voice Intercept Operator, Korean," and he "is married to a Japanese national with whom he has two children." Id., ¶ 35. His latest 45-page Second Amended Complaint names as Defendants 17 alleged CIA officers, as well as a

dozen other U.S. officials and agencies, alleging a conspiracy to drive him out of Kyoto.  See, e.g., id., ¶ 51 ("Upon information and belief, PTF [Plaintiff] alleges that the defendants, and others, not yet known, conspired between and amongst themselves to unlawfully intrude into his life for personal and political reasons tied to the objective of displacing PTF from central Kyoto."); ¶ 59 (CIA had "ultimate aim of displacing him from Kyoto so that the CIA et al. could conduct CO [covert operations?] unimpeded by the presence of PTF, an observant, culturally engaged area specialist.").  Although Plaintiff is obviously an intelligent and articulate individual, his allegations simply do not cohere.  Some detailed quoting of the Complaint makes this manifest.

Vasaturo speaks of each personal interaction with the various Defendants as if it has been engineered by clandestine CIA agents to injure him.  See, e.g., id., ¶ 44 (Defendant "Roughan contacted PTF out of the blue after PTF's future wife became pregnant . . . , and [Plaintiff] suspected a ruse to elicit data about PTF's girlfriend's pregnancy."); ¶ 49 (Defendant "Peterka recruited [a woman named] Kudo . . . with the aim of reintroducing her to seductively undermine PTF's 3-year relationship with his then girlfriend by exploiting their formerly romantic affinity."); ¶ 58 (Kudo, who had "unilaterally decided to abort the child, against PTF's wishes and after claiming that abortion was against her religion," subsequently ambushed him, "emerg[ing] from hiding near PTF's dwelling to intrude herself, baldly asserting that she herself was still PTF's girlfriend, etc., in front of PTF's new girlfriend, shamelessly trying to drive her off under false pretenses."); ¶ 60 ("Plaintiff suffered assault and battery in December of 2007 when [Defendant] Paquette et al. set him up to be attacked at a bar where he'd agreed to meet Yoshiyuki for a drink.  The attacker was purported to be Moroccan by [Defendant] Douglass, who attempted to provoke PTF to take revenge on the culprit, belying his role in the

conspiracy."); ¶ 69 ("Schultz assumed airs of a rustic anti-intellectualism and [Defendant] Houser disseminated disinformation, both of which were aimed at dumbing down, diluting, and discrediting a cultural tradition which PT[F] actively cultivates."); ¶ 80 ("[A] goal of the conspiracy was to facilitate the infiltration of PTF's immediate environs by [Defendant] Zimbleman et al., with the nursery school being a primary social institution targeted for (re)infiltration.").

He also imagines himself the target of CIA action.  See, e.g., id., ¶ 47 ("PTF's computer was hacked multiple times, and emails with Paquette deleted."); ¶ 48 ("When Chapman asked [Defendant] Abdelsamad if he knew PTF, Abdelsamad threatened to kill him if he mentioned to PTF that they had met."); ¶ 62 ("PTF was humiliated and demoralized by the pursuit of the fraudulent [CIA] offer of translation work over a period spanning a month."), ¶ 65 ("[T]he CIA continually introduced clandestine agents into his immediate environs to annoy and harass him."); ¶ 67 ("[A] plan had already been hatched by rogue CIA officers aiming to displace PTF from Kyoto years before [Defendant] Schaeffer was assigned to the Consulate in Osaka."); ¶ 73 (CIA agent's "article represented a clear threat in the form of an expression of intent by the CIA to infiltrate [Defendant] Lotman into PTF's environs and promote him as a pseudo-culture figure."); ¶ 80 (CIA "immediately regrouped and took to planning a counteroffensive aimed at reversing the gains of PTF's campaign to liberate the Goshominami area from the CIA et al. menace."); ¶ 112 ("PTF has been targeted for exclusion from Kyoto by the CIA et al because he is an area specialist, and practices Kinko-ryu (Fuke-shu) shakuhachi."); ¶ 116 ("CIA CO have aimed to saturate social institutions so as to exercise undue influence in civil society, generating the conditions under which there would be an inevitable conflict between PTF in his normal

daily activities and clandestine agents due to overlapping spheres of activity and mutually
incompatible goals and dispositions.").

## II.    Analysis

In its prior Opinion, the Court explained that on rare occasions, it may dismiss a case *sua
sponte* for lack of subject-matter jurisdiction.  See Mem. Op. at 3.  This occurs where a
complaint is "'patently insubstantial,' presenting no federal question suitable for decision."  Best
v. Kelly, 39 F.3d 328, 330 (D.C. Cir. 1994) (quoting Neitzke v. Williams, 490 U.S. 319, 327 n.6
(1989)).  This standard requires that the "claims be flimsier than 'doubtful or questionable' –
they must be 'essentially fictitious.'"  Id.  Claims that fall into this category include "bizarre
conspiracy theories, any fantastic government manipulations of [the] will or mind, [and] any sort
of supernatural intervention."  Id.  As a general rule, this procedural vehicle is "reserved for
complaints resting on truly fanciful factual allegations," while 12(b)(6) dismissals "cull legally
deficient complaints."  Id. at 331 n.5.  The Court's prior Opinion then set forth a litany of
decisions dismissing cases under this standard.  See Mem. Op. at 4-5.

Although the events alleged here are not supernatural, neither are they remotely plausible.
Even after the Court permitted Vasaturo another chance to explain his case, "ensur[ing] that
Plaintiff has a full opportunity to set forth any legitimate causes of action he may actually
possess," Mem. Op. at 5, he has not sufficiently done so.  The Second Amended Complaint
remains a paradigm of outlandish claims about a CIA conspiracy.

Permitting such a case to proceed, moreover, is not without costs.  Not only would the
government have to expend its finite resources briefing a motion to dismiss, but the individual
Defendants who have no connection at all to the CIA must either pay lawyers or spend time
debunking the suit.  Indeed, some have already done so.  See, e.g., ECF No. 47-1 (Answer of

Defendant Dalsky) at 1 ("I have never been employed by the Central Intelligence Agency and I am not currently employed by the Central Intelligence Agency."); ECF No. 60 (Answer of Defendant Yarden) at 1 ("I have no recollection of having ever made [Plaintiff's] acquaintance."); ECF No. 61 (Answer of Defendant Taylor) at 1 ("Defendant is not now, and has never been employed by the Central Intelligence Agency in any way.").

For all of these reasons, the appropriate course requires immediate termination of the suit.

III.    **Conclusion**

The Court, accordingly, will issue a contemporaneous Order dismissing the Second Amended Complaint without prejudice as patently insubstantial.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  August 1, 2016